PROSKAUER ROSE LLP
Andrew E. Rice
David L. Bayer
Eleven Times Square
New York, New York 10036-8299
Telephone: 212.969.3000
Facsimile: 212.969.2900
arice@proskauer.com
dbayer@proskauer.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                 :

JONATHAN IRONS and KAREN CHANDLER,  :    13 Civ. 4467 (MKB) (JO)
                                 :

            Plaintiffs,  :    **ECF Case**

                                 :

            v.  :

BEDFORD-STUYVESANT COMMUNITY  :
LEGAL SERVICES; LEGAL SERVICES NYC;  :
and BETTY STATON in her individual and  :
official capacities,  :

                                 :

            Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF UNDISPUTED FACTS ................................................2

ARGUMENT ...........................................................................................13

I.   IRONS'S ALLEGATIONS ARE INSUFFICIENT TO STATE A CLAIM FOR
     SEXUAL HARASSMENT.......................................................................13

II.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
     PLAINTIFFS' RETALIATION CLAIMS ........................................................17

     A.   Defendants Decided to Terminate Plaintiffs' Employment Months Before
          Irons's Harassment Complaint, Negating Any Possible Causal Connection ........18

     B.   BSCLS Terminated Plaintiffs' Employment for Legitimate, Non-
          Retaliatory Reasons as Part of System-Wide Layoffs at LSNYC .........................19

          1.   There Is No Genuine Dispute that BSCLS Faced a Significant
               Budget Deficit in 2011 Requiring Layoffs .................................................20

          2.   BSCLS Selected Plaintiffs for Layoff for Numerous Legitimate
               Reasons Bearing No Relationship Whatsoever to Irons's
               Harassment Complaint...............................................................................21

     C.   Plaintiffs' Retaliation Claims Fail Because They Cannot Establish That
          They Engaged in Protected Activity .....................................................................22

          1.   Irons's Harassment Complaint Was Not Protected Activity
               Because He Did Not Have a Good Faith Belief that Defendants
               Violated the Law......................................................................................22

          2.   Chandler Did Not Oppose Harassment or Participate in a Formal
               Proceeding Concerning Irons's Claims Before Her Termination.............23

III. IRONS'S DISCRIMINATORY DISCHARGE CLAIM FAILS BECAUSE IT IS
     CONTRARY TO THE UNDISPUTED RECORD EVIDENCE .....................................24

CONCLUSION................................................................................................26

**CASES**

*Aiossa v. Bank of Am., N.A.*,
    10-CV-1275, 2012 U.S. Dist. LEXIS 135699 (E.D.N.Y. Sept. 21, 2012) .............................17

*Alfano v. Costello*,
    294 F.3d 365 (2d Cir. 2002).........................................................................................................14

*Ardigo v. J. Christopher Capital, LLC*,
    No. 12 Civ. 3627, 2013 WL 1195117 (S.D.N.Y. Mar. 25, 2013) ....................................15, 16

*Beachum v. AWISCO N.Y.*,
    785 F. Supp. 2d 84 (S.D.N.Y. 2011).........................................................................................25

*Bynog v. SL Green Realty Corp.*,
    05 Civ. 0305, 2007 U.S. Dist. LEXIS 19110 (S.D.N.Y. Mar. 20, 2007) ................................15

*Correa v. Mana Prods.*,
    550 F. Supp. 2d 319 (E.D.N.Y. 2008) ......................................................................................24

*Dall v. St. Catherine of Siena Med. Ctr.*,
    966 F. Supp. 2d 167 (E.D.N.Y. 2013) ......................................................................................17

*DeWitt v. Lieberman*,
    48 F. Supp. 2d 280 (S.D.N.Y. 1999).........................................................................................25

*Dzanis v. JPMorgan Chase & Co.*,
    10 Civ. 3384, 2011 U.S. Dist. LEXIS 137356 (S.D.N.Y. Nov. 30, 2011) ..............................25

*Feingold v. New York*,
    366 F.3d 138 (2d Cir. 2004).......................................................................................................17

*Fenner v. News Corp.*,
    09 Civ. 09832, 2013 U.S. Dist. LEXIS 170187 (S.D.N.Y. Dec. 2, 2013)..........................18, 19

*Hernandez v. Kaisman*,
    103 A.D.3d 106, 957 N.Y.S.2d 53 (1st Dep't 2012) ...............................................................15

*In re Metlife Demutualization Litig.*,
    624 F. Supp. 2d 232 (E.D.N.Y. 2009) ......................................................................................13

*ITC Ltd. v. Punchgini, Inc.*,
    482 F.3d 135 (2d Cir. 2007).......................................................................................................13

*Joseph v. Owens & Minor Distrib., Inc.*,
    11-CV-5269, 2014 U.S. Dist. LEXIS 39711 (E.D.N.Y. Mar. 24, 2014).................................17

*Magnoni v. Smith & Laquercia, LLP*,
    701 F. Supp. 2d 497 (S.D.N.Y. 2010)................................................................15

*Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*,
    842 F.2d 590 (2d Cir. 1988)........................................................................22

*Middleton v. Metro. Coll.*,
    545 F. Supp. 2d 369 (S.DN.Y. 2008)..........................................................22, 23

*Montana v. First Fed. Sav. & Loan Ass'n*,
    869 F.2d 100 (2d Cir. 1989)........................................................................25

*O'Dell v. Trans World Entm't Corp.*,
    153 F. Supp. 2d 378 (S.D.N.Y. 2001)..........................................................14

*Russo v. N.Y. Presbyterian Hosp.*,
    972 F. Supp. 2d 429 (E.D.N.Y. 2013) ................................................... passim

*Sank v. City Univ. of N.Y.*,
    10 Civ. 4975, 2011 U.S. Dist. LEXIS 125016 (S.D.N.Y. Oct. 27, 2011) ..............24

*Setelius v. Nat'l Grid Elec. Servs. LLC*,
    11-CV-5528, 2014 U.S. Dist. LEXIS 134789 (E.D.N.Y. Sept. 24, 2014) ..............19

*Sgarlata v. Viacom, Inc.*,
    02 Civ. 7234, 03 Civ. 5228, 2005 U.S. Dist. LEXIS 4435 (S.D.N.Y. Mar. 21,
    2005) ................................................................................................25

*Strauss v New York State Dept. of Educ.*,
    805 N.Y.S.2d 704 (3d Dep't 2005)..............................................................25

*Townsend v. Benjamin Enters.*,
    679 F.3d 41 (2d Cir. 2012)........................................................................23, 24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013)..............................................................................17

*Wilson v. N.Y.P. Holdings*,
    No. 05 Civ 10355, 2009 WL 873206 (S.D.N.Y. Mar. 31, 2009) ........................15

**STATUTES**

42 U.S.C. § 2000e-3(a) ...................................................................................................23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ......................................................................................................13

## <u>PRELIMINARY STATEMENT</u>

In 2011, Bedford-Stuyvesant Community Legal Services ("BSCLS"), a program of Legal Services NYC ("LSNYC"), was facing a severe budget deficit necessitating layoffs. The undisputed record evidence establishes that layoffs were inevitable throughout 2011, and that by August 2011,[1] Betty Staton ("Staton"), then Acting Project Director of BSCLS, had selected Plaintiffs Jonathan Irons ("Irons") and Karen Chandler ("Chandler") (together, "Plaintiffs") for layoffs to be implemented at the end of the year. Thus, as both Plaintiffs admitted, they had essentially no working relationship with Staton since July.

Against this backdrop, Irons made a specious complaint of sexual harassment against Staton to Human Resources on November 23, shortly after the circulation of a general layoff notice to all BSCLS staff, and months after Plaintiffs had been selected for layoff. Thereafter, Plaintiffs alleged that their layoffs were in retaliation for Irons's complaint and Chandler's supposed involvement in that complaint. Plaintiffs now assert claims under Title VII of the Civil Rights Act ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL") for retaliation and aiding and abetting, while Irons also asserts claims of sexual harassment and discrimination under those statutes.

Plaintiffs' claims are fatally deficient because even accepting their version of events, Staton's alleged conduct falls well short of actionable sexual harassment, and the undisputed evidence establishes that Plaintiffs' termination – for legitimate, non-retaliatory, non-discriminatory reasons – had nothing whatsoever to do with Irons's spurious complaint or his gender. Accordingly, Defendants[2] are entitled to summary judgment on all of Plaintiffs' claims.

---

[1] All dates hereinafter refer to 2011 unless otherwise stated.

[2] BSCLS, LSNYC and Staton are, collectively, the "Defendants."

## STATEMENT OF UNDISPUTED FACTS

LSNYC is the largest organization exclusively devoted to providing free civil legal services in the United States. (Declaration of Raun Rasmussen ("Rasmussen Decl.")[3] ¶ 2.) LSNYC maintains offices across New York City, including BSCLS, that provide community-based legal services. (Rasmussen Decl. ¶¶ 4-5; Irons Tr. 63:3-8; Rasmussen Tr. 19:6-20:11.)

Irons was hired as Director of General Litigation at BSCLS in March 2008 by then-Project Director[4] Victor Olds ("Olds"). (Irons Tr. 34:17-22, 35:8-36:22.) Irons handled (and supervised attorneys handling) cases in unemployment insurance, Social Security disability, supplemental security income, immigration, and family court. (Irons Tr. 39:22-40:9, 41:16-42:7.) Chandler also was hired by Olds, as his confidential personal assistant, in December 2007. (Chandler Tr. 30:22-31:17.) Both Plaintiffs had known Olds from previous jobs. (Irons Tr. 37:16-22; Chandler Tr. 31:21-32:3.) Chandler became the Director of Finance and Administration in or around April or May 2008, and dealt with grants, budgets, supervision and purchasing. (Chandler Tr. 39:8-12, 40:24-41:8.)

## Morale Issues at BSCLS in 2011

Starting in late 2010, BSCLS staff and others in the community raised concerns about the working conditions and leadership at BSCLS. (Rice Decl. Ex. SS; Staton Tr. 119:21-121:2, 166:4-19; Rasmussen Tr. 70:7-16.) BSCLS staff members complained to the BSCLS Board of Directors (the "Board") (of which Staton was then Chair) about Plaintiffs' poor and disrespectful treatment of staff. (Staton Tr. 101:10-25, 104:12-105:9, 145:3-11, 153:18-25.) These

---

[3] References to Declarations of Andrew E. Rice, Esq.; Laura Vogel; Betty Staton; and Michael Young are cited as "Last Name Decl." Excerpts from the following deposition transcripts, attached as exhibits to the Rice Declaration, will be cited as "Last Name Tr. __": Raun Rasmussen (Ex. B); Jonathan Irons (Ex. C); Karen Chandler (Ex. D); Betty Staton (Ex. E); Victor Olds (Ex. F); Jeanne Perry (Ex. G); Lana Gilbert (Ex. UU); and Vilia Hayes (Ex. VV).

[4] Project Director is the most senior paid position at LSNYC programs. (Perry Tr. 55:11-13.)

complaints culminated in a series of written and in-person communications between staff and the

Board in March 2011, in which staff complained about Olds and his "allies" and urged a change

in management, including Plaintiffs. (Staton Decl. ¶ 4, Exs. A, C; Staton Tr. 110:11-18, 111:14-

112:15, 113:3-7, 116:2-9, 116:18-117:5.) Amid this "widespread dissatisfaction," Olds resigned

from BSCLS in May, with Staton succeeding him as Acting Project Director. (Olds Tr. 37:11-

17; Irons Tr. 60:22-61:6, 64:9-13; Rasmussen Tr. 52:15-19, 53:4-15; Staton Tr. 123:4-5.)

### Budget Deficit and Layoffs at LSNYC and BSCLS in 2011

BSCLS was also facing an unprecedented funding crisis requiring staff reductions in

2011. (Vogel Decl. ¶ 7; Rasmussen Tr. 64:22-65:5, 84:15-85:7; Rice Decl. Ex. K.) Among

other cuts, LSNYC learned in the spring that funding from the Legal Services Corporation

("LSC"), from which LSNYC programs receive a substantial portion of their funding, would be

reduced in 2011 and future years, and in November learned that the decrease would be far

greater (14.8%) than initially projected (5%). (Vogel Decl. ¶¶ 7, 22; Perry Tr. 26:17-27:15; Rice

Decl. Exs. K, Y.) LSNYC's Board's budget directives require that LSNYC and its programs

submit a balanced budget for their approval each December. (Rasmussen Tr. 91:7-18; Vogel

Decl. ¶¶ 3, 5.) Laura Vogel ("Vogel"), LSNYC Director of Budget, updates budget workbooks

for LSNYC programs throughout the year and sends them to the Project Directors. (Vogel Decl.

¶¶ 1, 3, 5.) For programs facing deficits, the budget workbooks reflect projected layoffs,

calculated as a number of "full-time equivalents" ("FTEs"). (Vogel Decl. ¶ 3-4.)

In July, LSNYC offered a voluntary buyout program to employees with at least ten years

of service at LSNYC programs in an effort to reduce the need for layoffs. (Rice Decl. Ex. L;

Rasmussen Tr. 66:3-13; Vogel Decl. ¶ 8.) While Staton hoped that buyouts would reduce the

need for layoffs at BSCLS, she knew buyouts would not solve the deficit entirely because there

were only three people, including Robert Purdie (who eventually took the buyout), who were eligible. (Staton Tr. 138:23-139:4, 252:8-20; Rice Decl. Ex. U.)

Thus, in the summer of 2011, following a series of earlier conversations about the need for layoffs at BSCLS, Staton decided in consultation with Raun Rasmussen ("Rasmussen") (LSNYC Executive Director) and Jeanne Perry ("Perry") (LSNYC Chief of Operations) to implement layoffs at the end of the year. (Rasmussen Tr. 16:12-18, 59:22-60:13, 61:9-13; Staton Tr. 225:23-226:10.) Throughout 2011, the projected FTE reductions required for BSCLS to balance its budget for 2012 hovered around 5. (Rasmussen Tr. 81:4-17; Vogel Decl. Exs. C-D, H, J-L, N.) In September, Staton explained to BSCLS staff that without layoffs, BSCLS was projected to have a deficit of over $600,000 in 2012 and over $1.2 million in 2013, and "that some level of layoffs is inevitable." (Vogel Decl. ¶ 12, Ex. E; Rice Decl. Ex. P.) Staton discussed staff reductions at a BSCLS staff meeting on September 23, and Irons recalled attending such a meeting. (Staton Decl. ¶ 6, Ex. D; Irons Tr. 135:12-22.)

Staton emailed all BSCLS staff on November 14, providing general notice that BSCLS intended to implement layoffs effective January 4, 2012. (Rice Decl. Exs. W, X.) Irons admitted he received the notice and Chandler admitted she likely had. (Irons Tr. 144:23-146:17; Chandler Tr. 166:4-18.) The next day, Rasmussen emailed staff at all LSNYC programs to inform them of the newly announced, and significant, additional LSC funding cuts. (Rice Decl. Ex. Y.)

Plaintiffs admitted that they were aware of the funding deficit. (Irons Tr. 109:23-111:7; Chandler Tr. 115:9-12.) Irons also admitted that he became aware of "some talk about layoffs" at LSNYC, including at BSCLS, "maybe in mid July." (Irons Tr. 123:13-124:7.) Chandler knew by November 22 at the latest that BSCLS would implement layoffs at the end of the year.

(Chandler Tr. 153:15-155:8.)  Chandler also received and reviewed budget workbooks as Director of Finance and Administration.  (Chandler Tr. 138:15-139:16, 170:9-171:21.)

**Plaintiffs' Layoffs**

In light of the morale concerns and the deficit situation at BSCLS in the spring of 2011, the BSCLS Board and LSNYC leadership began contemplating Plaintiffs' termination as part of a management overhaul at BSCLS.  (Staton Tr. 101:10-21, 124:14-125:24, 145:3-11, 151:9-16; Young Decl. ¶¶ 4-7, Ex. A; Rice Decl. Ex. JJ.)  Staton determined that spring in consultation with the BSCLS Board – before she became Acting Project Director – that Plaintiffs would not be part of BSCLS's future plans.  (Staton Tr. 101:3-18, 136:3-12, 137:3-5, 150:18-151:8, 196:7-197:23, 214:20-215:14, 236:3-13, 316:3-11.)  After becoming Acting Project Director in July, Staton continued to pursue Plaintiffs' terminations, as urged by the BSCLS Board and LSNYC leadership.  (Staton Tr. 146:8-19, 148:3-10; Rice Decl. Exs. R, LL; Perry Tr. 129:13-130:6, 130:18-132:25; Vogel Decl. ¶¶ 13-14, Exs. F-G; Gilbert Tr. 31:21-33:7, 36:9-23; Rasmussen Tr. 67:14-68:2.)  Staton decided, however, that it would be better to terminate Plaintiffs as part of year-end layoffs so that Plaintiffs would not have a negative reflection on their employment.  (Staton Tr. 125:25-126:12, 127:25-128:18; Rasmussen Tr. 103:9-104:4, 115:6-22.)  In light of the fact that Staton knew Plaintiffs would not remain at BSCLS, and as both Staton and Plaintiffs testified, Plaintiffs were isolated from BSCLS staff from the outset of Staton's tenure as Acting Project Director.  (Chandler Tr. 45:23-46:9, 91:2-4, 106:21-24, 142:21-144:19; Staton Tr. 100:4-9, 101:3-8, 131:14-132:15; Irons Tr. 94:18-95:4.)

Thus, by early summer 2011, Rasmussen, Staton and Perry knew that Plaintiffs' layoffs would be part of the plan to meet the budget deficit at BSCLS, and Staton confirmed this decision in August.  (Rasmussen Tr. 63:16-64:4, 104:5-16; Staton Tr. 137:24-138:14, 139:9-140:3; Rice Decl. Ex. M; Gilbert Tr. 36:9-23.)  Indeed, the LSNYC Board made Plaintiffs'

layoffs a condition of BSCLS receiving relief from budget directives in the form of a carry-forward deficit. (Young Decl. ¶ 7.) From September, all versions of the BSCLS budget workbook reflected either Plaintiffs' layoffs specifically, or the need to implement significant FTE reductions.[5] (Vogel Decl. ¶¶ 10-19, 21, 24, 26-27, Exs. D-L, N, P, R-S.)

Staton sent 30-day layoff notices to Plaintiffs (as well as female staff attorney Gina Son ("Son")) on December 2, informing them of their layoffs effective January 4, 2012. (Irons Tr. 148:24-149:10, 221:23-222:2, 222:8-12; Chandler Tr. 164:7-16; Rice Decl. Exs. AA, BB; Rasmussen Tr. 98:8-11.) There were 19 layoffs across several LSNYC programs at the end of 2011, including 12 female employees at offices other than BSCLS. (Irons Tr. 222:13-223:9, 224:10-225:8, 225:25-226:3; Rice Decl. Ex. CC; Rasmussen Tr. 65:15-23.)

Neither Plaintiff has personal knowledge about the decision-making process that led to their selection for layoff, including the timing of the decision. (Irons Tr. 139:22-25, 140:12-16; Chandler Tr. 156:3-12.) In addition to the morale issues described above, there were several other reasons why Plaintiffs were chosen for layoffs. (Rasmussen Tr. 67:6-13, 115:6-22, 121:6-23; Staton Tr. 160:22-161:24; Perry Tr. 79:18-80:25; Young Decl. ¶ 5.)

While LSNYC was required to bargain with the Legal Services Staff Association ("LSSA") (the union representing staff employees) concerning layoffs of bargaining-unit personnel, and to comply with its collective-bargaining agreement, Plaintiffs were managers and not represented by the LSSA. (Irons Tr. 149:25-150:6, 150:19-151:3; Rasmussen Tr. 97:7-22; Perry Tr. 136:24-137:13; Chandler Tr. 11:22-25.) BSCLS thus had greater flexibility to lay off

---

[5] In addition to the "active," official budget workbooks, Vogel would also send Project Directors alternate budget workbooks with varying staffing plans to allow them to weigh options. (Vogel Decl. ¶ 5; Staton Tr. 249:14-22.) Vogel would not include individual layoff selections in the active budget workbooks until instructed to do so by the relevant Project Director, in order to avoid early publication of the identities of the individuals to be laid off. (Vogel Decl. ¶ 5; Rasmussen Tr. 114:9-115:5; Staton Tr. 246:19-247:8, 247:17-23; Perry Tr. 113:17-114:21, 128:7-25.) The active budget workbook reflected Plaintiffs' layoffs as of November 18. (Vogel Decl. ¶ 24, Ex. P.)

managers (such as Plaintiffs) vis-à-vis bargaining-unit employees, who must generally be chosen in reverse seniority order, and LSNYC programs would therefore often review managers first for potential layoff, particularly in light of pressure from the LSSA to save union jobs.  (Rasmussen Tr. 96:22-97:22; Perry Tr. 80:5-17, 136:24-137:20; Young Decl. ¶ 5.)

In addition, BSCLS was one of the smallest LSNYC programs, for which it was difficult to justify the number and cost of managers in the context of a significant budget deficit and the need to retain attorneys with expertise in certain practice areas.  (Young Decl. ¶ 5; Staton Decl. ¶ 7; Perry Tr. 136:14-137:24; Irons Tr. 63:9-15; Rasmussen Tr. 28:2-10.)  Irons was the highest-paid employee at BSCLS other than the Project Director, but he "was not delivering the level of service . . ." expected of someone with his experience and at his cost.  (Irons Tr. 64:14-65:10; Rasmussen Tr. 35:7-14.)  Irons did not have the sophisticated legal experience and skills required of a Director of Litigation (the position for which he had applied); instead, he was given the unique title "Director of *General* Litigation" and did not work on appeals or "impact litigation" as expected of someone at his level.  (Rasmussen Tr. 31:22-33:21, 35:7-25; Staton Tr. 162:7-22.)  As Irons did not work on housing cases, which was the most significant practice area at BSCLS, it was important to retain the Director of Housing Litigation (the only other attorney manager at BSCLS) and other housing attorneys.  (Staton Tr. 74:24-75:8, 82:12-18; Irons Tr. 41:10-15; Chandler Tr. 60:22-61:9, 61:13-20; Young Decl. ¶ 5.)  Other attorneys were retained for expertise that Irons did not have, in areas like foreclosure and tax.  (Irons Tr. 56:25-57:3, 58:5-9; Chandler Tr. 60:4-13, 62:2-4; Staton Tr. 80:11-14, 82:6-8; Rice Decl. Ex. SS.)  Moreover, Irons was not needed to handle benefits cases – which were handled even by paralegals and do not generally require a high level of sophisticated legal skills – and BSCLS had lost its family law

grant.  (Irons Tr. 50:17-51:2, 70:11-19; Rasmussen Tr. 34:18-25; Staton Tr. 44:21-22, 75:23-76:9, 80:20-24; Chandler Tr. 84:20-85:12.)

Chandler is not an attorney and admittedly could not have taken on the duties of an attorney.  (Chandler Tr. 12:2-3, 249:24-250:13; Perry Tr. 137:21-24.)  After terminating Chandler – the highest-paid non-lawyer – BSCLS was able to cover her duties through minimal part-time arrangements and remaining employees, at negligible cost.  (Rasmussen Tr. 108:19-109:9, 109:23-112:10; Staton Tr. 327:11-16; Rice Decl. Exs. QQ, RR; Chandler Tr. 40:3-19.)

Plaintiffs' performance also contributed to their layoff.  Irons was, at times, "an impediment to getting some important work done in the office," including his interference with the LSNYC central office concerning immigration matters after BSCLS's immigration work had been mismanaged under Olds.  (Rasmussen Tr. 36:3-37:13; Staton Tr. 168:21-169:3.)  BSCLS staff had told Rasmussen that Irons did not have a valuable role in the office, that he mostly spent time working on his own cases and not engaging with staff as a supervisor, and that he was Olds's henchman.  (Rasmussen Tr. 73:16-23.)  Staton testified that Irons was not exercising his supervisory authority or was not qualified to do it, and BSCLS staff had complained that Irons sat in his office and never did anything.  (Staton Tr. 97:14-25, 98:15-21, 153:18-154:25.)

According to Rasmussen, Chandler "was not a good fit for the organization" because "she was barely even marginally productive . . . and so it was a bad use of our money to continue to employ her."  (Rasmussen Tr. 56:25-57:6.)  As early as January, LSNYC Interim Executive Director Michael Young ("Young") expressed concerns from LSNYC Central staff that Chandler was "not functioning as effectively . . . as she should and as other Directors of Administration in the system do."  (Rice Decl. Ex. SS; Olds Tr. 47:24-48:11.)  Chandler was regarded as a "no-show, meaning that she was frequently missing in action, didn't come into the office, people

couldn't find her."  (Rasmussen Tr. 42:25-43:17; Perry Tr. 69:23-25.)  Incredibly, Chandler

missed work in all but *one* biweekly period in 2011.  (Rice Decl. Ex. H.)  Rasmussen, Perry,

Staton and Lana Gilbert ("Gilbert") (LSNYC Human Resources ("HR") Administrator) all heard

complaints about Chandler about her lack of responsiveness, her conduct in the office, and her

failure or inability to do her work.  (Rasmussen Tr. 43:17-21; Perry Tr. 68:2-14, 69:7-25; Gilbert

Tr. 22:9-23:4; Staton Tr. 153:18-154:5.)  Chandler admitted that she heard criticism about her by

some of the support staff at BSCLS.  (Chandler Tr. 63:11-14.)

    Chandler also contributed to BSCLS's loss of approximately $90,000 of funding from a

foreclosure grant.  (Rasmussen Tr. 43:22-44:5.)  On at least two occasions in 2011, Pascale

Nijhof (LSNYC Director of Grants and Contracts) criticized Chandler's failure to keep track of

required paperwork:  first, stating (in reference to Chandler and Olds), "What a mess just

because two people (not on this email) paid no attention to their money!"; and second, stating

that "the case should NEVER have been reported . . . without someone making sure that all the

necessary . . . paperwork was completed."  (Rice Decl. Exs. I, J (emphases in originals);

Rasmussen Tr. 45:9-12.)  Chandler testified that in the second instance it was Irons's

responsibility to keep track of the forms – which he admitted were very simple – and ensure they

were collected and forwarded properly.  (Chandler Tr. 78:18-23; Irons Tr. 76:3-5.)

**Irons's Harassment Allegations**

    While Irons testified that Staton engaged in a "pattern of behavior" in September through

November that included "offensive gender based comments, unwanted sexual advances, [and]

sexualized statements, inappropriately stated in the workplace . . . ," he identified only two

specific incidents of alleged sexual harassment by Staton.  (Irons Tr. 157:15-158:3, 166:9-167:2.)

First, Irons alleged that on November 15, he went to the bathroom and when he came out, Staton

was in the front area of the office and looked directly at him and said, "I have a man who is 14

years younger than me, and he knows how to please me, will take care of me and please me."
(Irons Tr. 162:18-163:5.)  Second, Irons alleged that on November 22, Staton and a visitor had a
conversation in Staton's office, with the door open, during which they talked in a "very party-
like, loud, boisterous manner."  (Irons Tr. 163:24-164:10, 164:19-22.)  Irons testified that Staton
"talked about her experience in a bar and how . . . a man thought she was hot, and that he wanted
to pick her up . . . but she had a boyfriend . . . ."  (Irons Tr. 164:23-165:2.)  Irons admitted that:
he was in his office and never walked over to Staton's office during this conversation; neither
Staton nor her visitor was talking directly to him; and he does not know whether he heard
everything that was said.  (Irons Tr. 165:5-11, 200:9-20.)

Irons also testified that Staton made "unwanted sexual advances" toward him, by
"regularly . . . [speaking] about the fact that she would go to bars, meet men at bars who thought
she was hot, sexually attractive, and wanted to please her . . . ," culminating in the November 15
incident.  (Irons Tr. 158:19-159:9.)  But Irons admitted that Staton never directly asked him
whether he was interested in sexual activity with her.  (Irons Tr. 162:13-17.)  Irons also admitted
that he was not a participant in any of the conversations in which Staton allegedly made hostile
and sexually harassing comments, and did not hear everything that Staton said during the
allegedly offensive conversations.  (Irons Tr. 182:19-183:6, 184:18-21.)

Chandler testified that she learned of Staton's allegedly sexually harassing conduct from
Irons, but that she doesn't "know anything . . . ."  (Chandler Tr. 176:25-177:8.)  Chandler denied
witnessing Staton make inappropriately sexual remarks to Irons, and never heard Staton discuss
sex or her body.  (Chandler Tr. 178:10-14, 202:3-8.)  Chandler later testified that she both
"heard" Staton make inappropriately sexual remarks to Irons *and* that Irons told her about them.
(Chandler Tr. 178:21-180:6.)  But Chandler did not see Staton engage in any sexual misconduct

toward Irons.  (Chandler Tr. 180:11-19.)  Chandler testified that she first heard Staton say

something of a sexual nature to Irons between November 13 and 15.  (Chandler Tr. 182:17-22.)

Chandler admitted that she was not offended by the conversation, did not report it to anyone, and

did not know if there was anything sexual about Staton's words.  (Chandler Tr. 186:24-187:3,

187:12-14, 187:24-188:13.)  Chandler did not witness or hear any other incidents between Staton

and Irons.  (Chandler Tr. 199:12-18.)  Chandler also testified that Irons told her that he had been

sexually harassed by Staton on several occasions, but that she was "not sure what they are . . . ."

(Chandler Tr. 188:16-19.)

**Irons's Complaint of Sexual Harassment**

Irons testified that he complained to Chandler about Staton's behavior starting in

September, but did not complain to anyone else at LSNYC or BSCLS until November.  (Irons

Tr. 169:22-170:12.)  In contrast, Chandler testified that Irons first complained to her about sexual

harassment around November 15.  (Chandler Tr. 197:25-198:7.)  Irons contacted Chandler on

November 16 to ask her how to make a formal complaint.  (Irons Tr. 232:25-233:4.)  Plaintiffs

both testified that this was part of Chandler's duties as Director of Finance and Administration.

(Irons Tr. 232:25-233:9, Chandler Tr. 208:9-20.)  Thereafter, Chandler informed Irons that he

should speak to Gilbert.  (Irons Tr. 236:6-17; Chandler Tr. 209:4-10.)

Irons first contacted LSNYC's HR Department to complain that he had been sexually

harassed by Staton on November 23, the day before Thanksgiving.  (Irons Tr. 237:14-238:2,

239:6-11.)  Irons did not speak directly to Gilbert (who was on vacation), but rather spoke to

Elisette Reynoso ("Reynoso"), who called Gilbert and relayed that Irons wanted to file a

complaint.  (Irons Tr. 239:21-240:14, 241:24-242:5, 242:10-18; Gilbert Tr. 48:3-10, 50:2-4.)

Gilbert called Irons the Monday after Thanksgiving, November 28, upon her return to the office,

and Irons told Gilbert that he wanted to file a sexual harassment complaint against Staton.  (Irons

Tr. 243:15-244:5.)  Gilbert informed Perry, who then met with Rasmussen to discuss the complaint.  (Perry Tr. 99:21-100:6, 104:12-105:17; Gilbert Tr. 55:2-6; Rasmussen Tr. 125:6-126:12.)  Perry and Rasmussen discussed the possibility that Irons was setting up a retaliation claim because Plaintiffs might have seen a budget document showing the elimination of Plaintiffs' positions that had been circulated inadvertently to the Project Directors and Directors of Administration.  (Rasmussen Tr. 126:19-127:13; Perry Tr. 107:9-109:22.)

LSNYC engaged Vilia Hayes ("Hayes") of Hughes Hubbard & Reed to investigate Irons's complaint, and Hayes interviewed Irons on December 1, Staton on December 2 and 5, and Chandler on December 29.  (Rasmussen Tr. 132:21-133:20; Complaint (Rice Decl. Ex. A) ¶¶ 38-39; Staton Tr. 22:6-23; Chandler Tr. 202:11-14; Hayes Tr. 36:20-37:6, 63:8-19.)  Hayes determined that Irons's complaint, even if true, lacked merit because he merely reported overhearing episodic conversations involving very mild language.  (Hayes Tr. 88:23-89:22.)

Rasmussen first became aware of Irons's allegations against Staton on November 23, when Reynoso told him, without any additional detail, that Irons had come to the office to make a complaint.  (Rasmussen Tr. 123:2-14, 124:11-19.)  Staton became aware of Irons's harassment complaint against her in late November, through a phone call from Perry and Rasmussen. (Staton Tr. 265:24-266:18, 269:2-4; Perry Tr. 106:14-107:2.)  Chandler was not mentioned in that call, and Staton did not learn prior to Chandler's termination that anyone had alleged that Chandler was a witness to the events alleged by Irons.  (Staton Tr. 290:3-5, 318:4-11.)

Irons filed a charge with the EEOC alleging sex discrimination and retaliation – the only such charge he filed – on or about April 5, 2012.  (Irons Tr. 24:21-25:5, 33:2-6; Rice Decl. Ex. FF.)  Chandler filed a charge with the EEOC alleging retaliation – the only such charge she filed – on or about August 15, 2012.  (Chandler Tr. 23:5-24:13, 29:21-30:8; Rice Decl. Ex. EE.)

Chandler testified that she believes she was terminated from employment at BSCLS because she made sure that Irons "saw the correct people in order to file his harassment case." (Chandler Tr. 207:2-12.) Chandler also testified that she offered to serve as a witness on Irons's behalf, but that she did not tell anyone this other than Irons. (Chandler Tr. 220:24-221:4.)

**Irons's Discrimination Allegation**

Irons claims that his termination was discriminatory because women with similar salaries or who he alleges were less qualified (such as Debra Giles ("Giles")) were retained. (Irons Tr. 214:14-24, 215:18-21.) Irons admitted that Giles was a long-serving, bargaining-unit employee whom he supervised. (Irons Tr. 22:10-13, 216:8-11, 255:9-14.) Chandler testified that she did not feel Staton treated men less well than women at BSCLS. (Chandler Tr. 203:25-204:5.)

## ARGUMENT

Summary judgment is appropriate under Rule 56(a) of the Federal Rules of Civil Procedure where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment, nor may a plaintiff create a genuine issue of fact by simply reiterating allegations in his complaint. *See, e.g., ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007); *In re Metlife Demutualization Litig.*, 624 F. Supp. 2d 232, 249, 258-59 (E.D.N.Y. 2009). Under these standards, Defendants are entitled to summary judgment on all of Plaintiffs' claims.

## I. IRONS'S ALLEGATIONS ARE INSUFFICIENT TO STATE A CLAIM FOR SEXUAL HARASSMENT.

Defendants are entitled to summary judgment on Irons's sexual harassment claims because the alleged conduct (even if true) does not rise to the level of actionable hostile work environment sexual harassment under Title VII, the NYSHRL, or the NYCHRL. Under Title

VII and the NYSHRL, Irons must show that Staton's alleged conduct was "sufficiently severe or pervasive to alter the conditions of the [his] employment and create an abusive working environment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citation omitted). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374. While the standard is more liberal under the NYCHRL, Irons still must show that he was treated "less well . . . because of [his] gender," and Defendants are entitled to summary judgment if the conduct constituted no more than "petty slights or trivial inconveniences." *See Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450-54 (E.D.N.Y. 2013). Moreover, Irons must establish that he suffered a hostile work environment "*because of [his] gender*." *Id.* at 451 (emphasis in original).

Irons's claim fails under any standard because his allegations describe isolated, trivial occurrences that were not sexual in nature. *See O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 382-83, 386-87 (S.D.N.Y. 2001) (granting summary judgment to employer where, with one exception, alleged harasser did not engage in any vulgar conduct or make any sexually inappropriate comments). Irons identified only two specific incidents, admitting that he was not a participant in either conversation. (Irons Tr. 165:5-11, 166:9-167:2, 182:19-183:6, 193:23-24, 200:9-20.) Indeed, aside from Irons's allegation that Staton looked at him during one incident, there is no evidence that Irons was involved in any way in the alleged conversations, and he admitted that he did not hear everything that Staton said. (Irons Tr. 184:18-21.)

Moreover, the alleged comments were not objectively offensive such that they constituted actionable harassment. Rather, Irons alleges that Staton talked about having a younger man who knows how to please her, and about having men approach her at bars. (Irons Tr. 162:18-163:5,

164:23-165:2.)  Courts have routinely rejected sexual harassment claims – even under the NYCHRL – despite much more egregious and pervasive incidents.[6]  Thus, Irons's allegations necessarily fail to establish a claim for hostile work environment under the more stringent Title VII and NYSHRL standard, and indeed pale in comparison to those in several cases in which courts nevertheless granted summary judgment in favor of employers.[7]

In a very similar case recently decided in this Circuit, the court dismissed a plaintiff's sexual orientation hostile work environment claim under the NYCHRL *at the pleading stage* because, "[c]onclusory allegations of 'repeated, offensive, harassing comments' aside . . . the . . . Complaint identifie[d] only three occasions when allegedly offensive statements were made." *Ardigo v. J. Christopher Capital, LLC*, No. 12 Civ. 3627(JMF), 2013 WL 1195117, at *4-5 (S.D.N.Y. Mar. 25, 2013).  In *Ardigo*, the plaintiff allegedly twice overheard the owner state that he "only hire[d] gay men because they [we]re productive and [he] trust[ed] them," and on another occasion overheard one employee say to another, "Oh, are you going to introduce me to another gay guy?!"  *Id.* at *4.  As in *Ardigo*, Irons's allegations describe – at most – only "mildly offensive statements," *id.* at *5, that he overheard, and on even fewer occasions than in *Ardigo*.

---

[6] *See Russo*, 972 F. Supp. 2d at 451-53 (granting summary judgment where plaintiff alleged that surgeon, *inter alia*, brushed against plaintiff's body as he walked past her; "trapped" plaintiff "directly in front of [his] crotch"; used sexually suggestive names for chest tubes; held his hands "as if he were grabbing a woman's breasts"; and yelled profanities at plaintiff); *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 505-06 (S.D.N.Y. 2010) (dismissing sexual harassment claim where supervisor "[told] a crude anecdote from his sex life with another woman, and occasionally refer[red] to [the plaintiff] as voluptuous and knock[ed] her knee"); *Wilson v. N.Y.P. Holdings*, No. 05 Civ. 10355 (LTS)(DFE), 2009 WL 873206, *28-29 (S.D.N.Y. Mar. 31, 2009) (granting summary judgment for employer on gender and racial harassment claims despite comments/incidents including:  "training females is like 'training dogs'"; "women need to be horsewhipped"; a reference to black female celebrities as "whores" and "sluts"; and addressing female employees as "girls").

[7] *See Bynog v. SL Green Realty Corp.*, 05 Civ. 0305 (WHP), 2007 U.S. Dist. LEXIS 19110, at *23-25 (S.D.N.Y. Mar. 20, 2007) (where plaintiff was allegedly subjected to approximately six comments/incidents concerning her race and gender and "was also exposed to pornography and touched in an inappropriate manner") (collecting cases); *Hernandez v. Kaisman*, 103 A.D.3d 106, 108-09, 114, 957 N.Y.S.2d 53 (1st Dep't 2012) (where, *inter alia*, defendant allegedly spoke publicly about his affinity for women with large breasts; suggested that a plaintiff get breast implants and told her that her underwear was exposed and that he was "enjoying" himself; touched another plaintiff's buttocks and told her she needed to "tighten it up"; walked around in his underwear; sent five sexually explicit emails over two months; and referred to himself as "pimp Kaisman").

Thus, Irons's allegations – which would have been insufficient to state a claim even at the pleading stage – necessarily cannot survive the stricter threshold at summary judgment.

Aside from the alleged incidents of November 15 and 22, Irons's other harassment allegations are too vague and conclusory to establish a claim.  Rather, Irons alleged generally that between September and November, Staton spoke to others about going to bars, men buying her drinks and thinking she was hot, and that she had a boyfriend.[8]  (Irons Tr. 157:15-158:3, 158:19-159:9.)  Such conclusory allegations are insufficient to withstand summary judgment.  *See Russo*, 972 F. Supp. 2d at 452 n.18 (holding that "Plaintiff's general conclusory allegations that [alleged harasser] treated her, and all women, in an 'inappropriate and demeaning manner' on a regular basis, made 'comments of an underlying sexual nature,' and acted 'in a physically intimidating manner towards women,' . . . provide[d] no support for Plaintiff's hostile work environment claim") (collecting cases) (internal citations omitted); *Ardigo*, 2013 WL 1195117, at *5 (holding that "conclusory assertions of hostility and offensive comments [were] not enough to salvage the claim").  In any event, as with the specific incidents that Irons identified, these generalized allegations do not rise to the level of actionable harassment.  Moreover, Irons admitted that he was not a participant in any of the conversations in which Staton allegedly made hostile and sexually harassing comments.  (Irons Tr. 182:19-183:6.)  Nor did Irons complain to anyone about any alleged harassment until November.[9]  (Chandler Tr. 197:25-198:7.)

---

[8] Irons's testimony that Staton made "unwanted sexual advances" toward him by the above conduct (Irons Tr. 158:19-159:9) is patently unreasonable.  Irons admitted that Staton never directly asked him whether he was interested in sexual activity with her.  (Irons Tr. 162:13-17.)  More significantly, as described above, Irons admitted that Staton never even talked directly *to* him during any of the allegedly offensive incidents.

[9] Although Irons testified that he first complained to Chandler about Staton's behavior in September, he did not complain to anyone else at BSCLS or LSNYC until November, and Chandler testified that Irons first complained to her about sexual harassment around November 15.  (Irons Tr. 169:22-170:12; Chandler Tr. 197:25-198:7.)

Finally, even assuming Irons can establish that Staton's alleged conduct rose to the level of actionable harassment, his claim fails because the alleged conduct was not directed at him *as a man*, but rather, was liable to be overheard by anyone at BSCLS, regardless of their gender. *See Russo*, 972 F. Supp. 2d at 451-52 (granting summary judgment for employer where allegedly offensive conduct was directed to all staff, not just plaintiff or women).

## II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' RETALIATION CLAIMS.

Plaintiffs allege that their terminations were retaliatory, and thus must show: "(1) participation in a protected activity known to the defendant[s]; (2) an employment action disadvantaging the plaintiff[s]; and (3) a causal connection between the protected activity and the adverse employment action." *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004). If Plaintiffs can establish such a *prima facie* case, the burden shifts to Defendants to identify a legitimate, non-retaliatory reason for their actions. *See Aiossa v. Bank of Am., N.A.*, 10-CV-1275 (JS) (ETB), 2012 U.S. Dist. LEXIS 135699, at *8 (E.D.N.Y. Sept. 21, 2012). Once they do so, the burden then shifts back to the Plaintiffs, who must prove that Defendants' stated reason is a pretext for retaliation. *Id.* Under Title VII and the NYSHRL, Plaintiffs must thereby prove that "but for" the protected activity, they would not have been terminated. *See Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 191-92 & n.12 (E.D.N.Y. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). Even under the NYCHRL, "[a] plaintiff must still establish . . . that 'there was a causal connection between his protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for his termination was pretextual or motivated at least in part by an impermissible motive." *Joseph v. Owens & Minor Distrib., Inc.*, 11-CV-5269 (MKB), 2014 U.S. Dist. LEXIS 39711, at *63 (E.D.N.Y. Mar. 24, 2014) (internal quotations and citations omitted).

Plaintiffs cannot even establish a *prima facie* case of retaliation because they neither engaged in protected activity, nor is there any causal link between any purported protected activity and their layoffs. Even assuming Plaintiffs can move beyond the *prima facie* phase, however, their retaliation claims fail because Defendants selected Plaintiffs for layoff for legitimate, non-retaliatory reasons, and Plaintiffs cannot demonstrate pretext.

**A.      Defendants Decided to Terminate Plaintiffs' Employment Months Before Irons's Harassment Complaint, Negating Any Possible Causal Connection.**

Simple logic dictates that an adverse employment action cannot possibly constitute retaliation for a complaint not yet made. *See Fenner v. News Corp.*, 09 Civ. 09832 (LGS), 2013 U.S. Dist. LEXIS 170187, at *76-77 (S.D.N.Y. Dec. 2, 2013) (holding that under Title VII, NYSHRL and NYCHRL, "[t]here can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity") (citations omitted); *Russo*, 972 F. Supp. 2d at 456 (granting summary judgment on retaliation claim where defendant presented evidence that the decision to terminate plaintiff was made prior to plaintiff's complaint).

Here, Plaintiffs' layoffs could not have constituted retaliation for Irons's sexual harassment complaint, which he lodged on November 23 (Irons Tr. 237:14-238:2, 239:6-11), because the record evidence indisputably establishes that Defendants had already decided to terminate Plaintiffs' employment months earlier. As early as the spring of 2011, at the urging of several BSCLS Board members and LSNYC leadership, Staton determined that Plaintiffs would not be part of BSCLS's future plans, partly based on their performance deficiencies and contribution to low employee morale. (Staton Tr. 101:3-18, 136:3-12, 137:3-5, 150:18-151:8, 196:7-197:23, 214:20-215:14, 236:3-13, 316:3-11; Young Decl. ¶ 4.) In August, Staton definitively decided and told Rasmussen and Perry that Irons, Chandler, and Son would be

terminated as part of the layoffs at BSCLS at the end of 2011. (Rasmussen Tr. 63:16-64:4; Staton Tr. 137:24-138:14, 139:9-140:3.)[10]

Plaintiffs have no evidence to dispute the timing of Defendants' decision to lay them off. (Irons Tr. 139:22-25; Chandler Tr. 156:3-12.) Indeed, Plaintiffs' own deposition testimony demonstrates their awareness that Staton began marginalizing them at the outset of her tenure as Acting Project Director, further undermining the required causal link. *See Fenner*, 2013 U.S. Dist. LEXIS 170187, at *77 ("[M]ere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation."). *Both* Plaintiffs and Staton testified that they had essentially no working relationship with one another since July – before any complaint of sexual harassment. (Irons Tr. 94:18-95:4; Chandler Tr. 45:23-46:9, 91:2-4, 106:21-24; Staton Tr. 100:4-9, 101:3-8.) Thus, Plaintiffs cannot establish a causal link between Irons's harassment complaint and their layoff, a deficiency that is fatal to their retaliation claims.[11]

### B.	BSCLS Terminated Plaintiffs' Employment for Legitimate, Non-Retaliatory Reasons as Part of System-Wide Layoffs at LSNYC.

Even if Plaintiffs could establish a causal connection between their purported protected activity and their layoffs – and they cannot as shown above – the record abounds with evidence

---

[10] Documentary evidence further shows that the decision to lay off Plaintiffs was made before November 23. (*See, e.g.,* Rice Decl. Ex. JJ (May 31 Perry email to Young and Staton calculating cost of Chandler layoff); Young Decl. ¶ 6, Ex. A (June 3 notes of phone call between Young and Staton concerning Plaintiffs' layoff); Rice Decl. Ex. M (Aug. 30 Gilbert email attaching cost of Plaintiffs' layoffs); Vogel Decl. Exs. F-G (Sept. 15 budget workbooks assuming Plaintiffs' layoffs to meet budget directives).)

[11] Even assuming that the decision to lay off Plaintiffs was not made until after Irons's complaint on November 23, Chandler's claim would still fail because there is no evidence that anyone involved in the decision knew that Chandler had engaged in any protected activity before she received her layoff notice on December 2. *See Setelius v. Nat'l Grid Elec. Servs. LLC*, 11-CV-5528 (MKB), 2014 U.S. Dist. LEXIS 134989, at *71 (E.D.N.Y. Sept. 24, 2014) ("In order to establish a causal connection, Plaintiff must show that the person responsible for her termination knew of her [protected activity] . . . ."). Thus, there is no evidence that anyone involved in the layoff decision knew that Chandler opposed Staton's alleged harassment and/or supported Irons's complaint until December 29, when she was interviewed during the internal investigation. (Rasmussen Tr. 124:11-19; Staton Tr. 290:3-5, 318:4-11; Chandler Tr. 202:11-14; Hayes Tr. 63:8-19.) While Chandler testified that she offered to serve as a witness on Irons's behalf, she admitted that she did not tell anyone this other than Irons. (Chandler Tr. 220:24-221:4.)

demonstrating that Defendants terminated Plaintiffs' employment for legitimate, non-retaliatory reasons, and Plaintiffs cannot establish pretext. The undisputed record evidence conclusively shows that: (i) BSCLS (along with several other LSNYC programs) faced a severe budget deficit in 2011 requiring layoffs in order to comply with LSNYC budget directives; and (ii) Plaintiffs were selected for those layoffs for several reasons, including morale concerns, management status, cost, skill set, position need, and performance.

1.     There Is No Genuine Dispute that BSCLS Faced a Significant Budget Deficit in 2011 Requiring Layoffs.

Plaintiffs have no evidence to dispute the existence of significant funding deficits at several LSNYC offices – including BSCLS – in 2011. (Rasmussen Tr. 64:22-65:5.) As described above, LSNYC lost significant funding, including a 14.8% reduction in LSC funding for 2012, which far outstripped earlier projections of 5% in 2012 and 10% in 2013. (Vogel Decl. ¶¶ 7, 22; Rice Decl. Exs. K, Y; Rasmussen Tr. 84:15-85:7.) Thus, throughout 2011, budget workbooks projected that BSCLS needed to reduce approximately 5 FTEs at the end of the year. (Rasmussen Tr. 81:4-17; Vogel Decl. Exs. C-D, H, J-L, N.)

Plaintiffs admitted that they were aware of the funding deficit and impending layoffs before November 22. (Irons Tr. 109:23-111:7, 123:13-124:7; Chandler Tr. 115:9-12, 127:8-11, 153:15-155:8.) Moreover, Chandler, as Director of Administration, had access to and reviewed BSCLS budget workbooks. (Chandler Tr. 138:15-139:16, 170:9-171:21.) Even beyond Plaintiffs' careful admissions, however, the documentary evidence clearly shows that it would have been impossible for anyone at BSCLS – and especially Chandler, as Director of Finance and Administration – to ignore the significant budget deficit and impending layoffs.[12]

---

[12] *See* Rice Decl. Ex. K (Aug. 31 email from Rasmussen to staff at all LSNYC programs explaining "dire financial situation"); Vogel Decl. ¶ 9, Ex. B (Sept. 8 email from Vogel to Project Directors and Directors of Administration re: budget workbooks); Rice Decl. Ex. P (Sept. 19 email from Staton to all BSCLS employees re: budget, including

In light of the undeniable deficit at BSCLS and the corresponding need for layoffs, Plaintiffs are left with only one possible argument: that others should have been selected for the layoff instead of them. But the undisputed record evidence reveals several legitimate, non-retaliatory reasons why Plaintiffs were chosen for the layoff.

> 2. BSCLS Selected Plaintiffs for Layoff for Numerous Legitimate Reasons Bearing No Relationship Whatsoever to Irons's Harassment Complaint.

Facing a significant projected deficit, Staton, in consultation with the BSCLS Board, determined in spring 2011 – before she became Acting Project Director – that Plaintiffs would not be part of BSCLS's future plans because of their role in the low morale at BSCLS. (*See supra*, Point II.A.) The morale issues at BSCLS had persisted for some time, but culminated in March when BSCLS staff strenuously advocated a change in leadership. (Staton Tr. 101:10-25, 104:12-105:9, 119:21-121:2, 153:18-25, 166:4-19; Rice Decl. Ex. SS; Staton Decl. ¶ 4, Exs. A, C.) In written communications, it was clear that staff were complaining not only about Olds, but also about Plaintiffs, Olds's "allies" whom he had previously known and hired. (Staton Decl. Ex. A; Irons Tr. 35:8-36:22, 37:16-22; Chandler Tr. 30:22-31:17, 31:21-32:3.) Indeed, staff complained specifically about Plaintiffs at the March BSCLS Board meeting. (Staton Decl. ¶ 4, Ex. C; Staton Tr. 111:14-112:15, 113:3-7.) Following Olds's departure, the BSCLS Board and LSNYC leadership sought to overhaul the BSCLS management team, and LSNYC leadership had made Plaintiffs' termination a condition of BSCLS's receipt of partial relief from LSNYC's budget requirements. (Young Decl. ¶¶ 5, 7.). Thus, Staton determined in the spring that Plaintiffs would be laid off at the end of 2011 and (as Plaintiffs admitted) marginalized Plaintiffs from the outset of her tenure as Acting Project Director because she knew that they would not be

inevitable layoffs); Staton Decl. Ex. D (Sept. 23 BSCLS staff meeting agenda reflecting discussion re: proposed cuts in staff); Vogel Decl. ¶ 20, Ex. M (Nov. 8 email from Vogel to Project Directors and Directors of Administration re: budget workbooks); Rice Decl. Ex. Y (Nov. 15 email from Rasmussen to all LSNYC staff re: LSC funding cuts).

retained. (Staton Tr. 124:14-126:12, 127:25-128:18; Rasmussen Tr. 103:9-104:4, 115:6-22; *see supra*, Point II.A.)

In addition, as described above, Plaintiffs were chosen for layoff because: (i) they were managers and not represented by the staff union, and thus, it was administratively and politically easier to terminate them vis-à-vis bargaining-unit staff (*see supra*, at pp. 6-7); (ii) their high cost was not justified by their contributions to the program, which due to its small size, required attorneys with expertise in certain areas more than managers (*see supra*, at pp. 7-8); and (iii) their performance – particularly Chandler's – was poor (*see supra*, at pp. 8-9). Thus, Defendants had countless, significant reasons to select Plaintiffs for termination when the BSCLS deficit required layoffs at the end of 2011. There is no contrary evidence in the record to raise a genuine fact dispute as to any of these reasons. Moreover, both Plaintiffs admitted that they have no personal knowledge about the decision-making process that led to their selection for layoff. (Irons Tr. 140:12-16; Chandler Tr. 156:3-12.) Accordingly, Plaintiffs cannot show that Defendants' reasons for their termination are a pretext for retaliation or that Defendants were motivated even in part by an impermissible motive, much less that retaliatory motive was the "but-for" cause for their termination, as required under Title VII and the NYSHRL.

### C. Plaintiffs' Retaliation Claims Fail Because They Cannot Establish That They Engaged in Protected Activity.

#### 1. Irons's Harassment Complaint Was Not Protected Activity Because He Did Not Have a Good Faith Belief that Defendants Violated the Law.

Irons's retaliation claim fails because his harassment complaint was not based on a good faith belief that Staton harassed him, and thus, did not constitute protected activity. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *Middleton v. Metro. Coll.*, 545 F. Supp. 2d 369, 373-75 (S.D.N.Y. 2008).

As described above (*see supra*, Point I), Irons's allegations concern incidents so mild and sporadic that he could not have objectively believed that they constituted unlawful sexual harassment. *See Middleton*, 545 F. Supp. 2d at 374-75 (granting summary judgment for employer where plaintiff did not have an objectively reasonable belief that a single, offhand comment, uttered during an isolated, heated encounter, constituted unlawful sexual harassment). In addition, despite alleging that Staton began harassing him in September, Irons did not make a formal complaint until November 23, when he knew layoffs were approaching at BSCLS, and circumstantial evidence strongly suggests he knew that he would be selected for such layoffs. (Irons Tr. 123:13-124:7, 135:12-22; Rasmussen Tr. 126:19-127:13; Perry Tr. 107:9-109:22.) *See Middleton*, 545 F. Supp. 2d at 374 (noting that plaintiff asserted allegations of sexual harassment only after learning that she was being investigated in connection with the same incident about which she complained). Consequently, Irons cannot even establish a *prima facie* case of retaliation, because he never engaged in any protected activity.

        2.        Chandler Did Not Oppose Harassment or Participate in a Formal
                  <u>Proceeding Concerning Irons's Claims Before Her Termination.</u>

Chandler also did not engage in any protected activity to establish a *prima facie* case of retaliation. Protected activity can take one of two forms: opposition to discrimination; or participation in a formal proceeding involving claims of harassment. *See Townsend v. Benjamin Enters.*, 679 F.3d 41, 48 (2d Cir. 2012) (citing Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a)). Chandler cannot show that she engaged in either type of protected activity.

First, Chandler contends that she opposed the alleged harassment by helping Irons find the right way to file a complaint, but both Plaintiffs testified that Chandler did so pursuant to her duties as Director of Finance and Administration. (Irons Tr. 232:25-233:9; Chandler Tr. 208:9-20.) Performance of one's regular job duties is not protected activity for purposes of retaliation

claims. *See Sank v. City Univ. of N.Y.*, 10 Civ. 4975, 2011 U.S. Dist. LEXIS 125016, at *27 (S.D.N.Y. Oct. 27, 2011) ("[A]n employee investigating or reporting complaints of alleged misconduct pursuant to her official duties is not engaged in inherently oppositional activity."); *cf. Correa v. Mana Prods.*, 550 F. Supp. 2d 319, 330 (E.D.N.Y. 2008) ("In order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment.").

Moreover, Chandler's "participation" as a witness in LSNYC's internal investigation of Irons's complaint would not constitute protected activity because it predated any formal proceeding. *Townsend*, 679 F.3d at 49. In any event, Chandler's conclusory allegation that she offered to serve as a witness cannot possibly suffice to establish protected activity where Chandler admitted that she has no personal knowledge of any alleged harassment by Staton. Although she wavered, Chandler testified that while Irons told her that he had been sexually harassed by Staton on several occasions, she was "not sure what they are . . . ," and did not "know anything . . . ." (Chandler Tr. 176:25-177:8, 188:16-19.)[13]

## III.  IRONS'S DISCRIMINATORY DISCHARGE CLAIM FAILS BECAUSE IT IS CONTRARY TO THE UNDISPUTED RECORD EVIDENCE.

Irons contends that BSCLS discriminated against him because when he was terminated, women who were in similar salary ranges or who he alleges were less qualified than him were retained. (Irons Tr. 214:14-24.) Defendants are entitled to summary judgment on this claim because Irons has proffered no evidence that he was discharged because of his gender.

---

[13] Even assuming Chandler actually witnessed any alleged harassment, Chandler admitted that she was not offended by Staton's words, did not know if there was anything sexual about the conversations, and never heard Staton discuss sex or her body. (Chandler Tr. 186:24-187:3, 187:24-188:13, 202:3-8.) Thus, like Irons, Chandler could not have had a good faith belief that Staton's conduct constituted sexual harassment. *See Townsend*, 679 F.3d at 48 (stating that because plaintiff did not know whether complainant's harassment allegations were true, she lacked a good-faith belief that the discriminatory action had occurred, as required for protection under the opposition clause).

Irons was terminated for several legitimate, non-discriminatory reasons as part of city-wide layoffs at LSNYC. (*See supra*, Point II.B.2.) For this reason alone, Irons's discriminatory discharge claim cannot survive summary judgment. *See Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 107 (2d Cir. 1989) (finding no inference of discrimination when plaintiff's termination occurred during a reorganization eliminating many positions); *Sgarlata v. Viacom, Inc.*, 02 Civ. 7234 (RCC), 03 Civ. 5228 (RCC), 2005 U.S. Dist. LEXIS 4435, at *18 (S.D.N.Y. Mar. 21, 2005) (granting employer summary judgment where plaintiff was terminated in reduction-in-force and only offered his own belief that he was discriminated against).

Moreover, Irons was laid off at the same time as two other BSCLS employees – both women, refuting any inference of gender discrimination. (Irons Tr. 221:23-222:2, 222:8-12; Rasmussen Tr. 98:8-11; Rice Decl. Ex. BB; Chandler Tr. 164:7-16.) In addition, 12 of the 16 employees laid off at other LSNYC offices were women. (Irons Tr. 222:13-223:9, 224:10-225:8, 225:25-226:3; Rice Decl. Ex. CC; Rasmussen Tr. 65:15-23.) Chandler also testified that she did not feel Staton treated men less well than women at BSCLS. (Chandler Tr. 203:25-204:5.)

While Irons contends that Debra Giles should have been laid off instead of him, Giles and Irons cannot be considered "similarly situated" comparators for purposes of a discrimination claim in light of Irons's admissions that Giles was a long-serving, bargaining-unit employee whom he supervised.[14] (Irons Tr. 22:10-13, 215:18-21, 216:8-11, 255:9-14.)[15]

---

[14] *See Dzanis v. JPMorgan Chase & Co.*, 10 Civ. 3384 (BSJ) (JLC), 2011 U.S. Dist. LEXIS 137356, at *15-16 (S.D.N.Y. Nov. 30, 2011) (finding that plaintiff's subordinates were not similarly situated to plaintiff); *Beachum v. AWISCO N.Y.*, 785 F. Supp. 2d 84, 95 (S.D.N.Y. 2011) (stating that placement of position inside vs. outside bargaining unit "is a critical, material difference . . . and would preclude any reasonable jury from finding the similarly situated requirement met").

[15] Because Plaintiffs' underlying claims of harassment, discrimination and retaliation fail, they cannot prevail on their aiding and abetting claims against Staton. *See Strauss v New York State Dept. of Educ.*, 805 N.Y.S.2d 704, 709 (3d Dep't 2005); *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999) ("There is ... a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor."). In any event, Staton "cannot be held liable . . . for aiding and abetting [her] own violations of the [law]." *See Strauss*, 805 N.Y.S.2d at 709.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary

judgment and dismiss the Complaint in its entirety.

Dated:          New York, New York
              December 2, 2014          Respectfully submitted,

PROSKAUER ROSE LLP

By: /s/ Andrew E. Rice_____
     Andrew E. Rice
     David L. Bayer
     PROSKAUER ROSE LLP
     11 Times Square
     New York, NY 10036-8299
     Phone: (212) 969-3000
     Fax: (212) 969-2900
     Email: arice @proskauer.com
           dbayer@proskauer.com

     *Attorneys for Defendants*