-----------------------------------------------------------X

JONATHAN IRONS and KAREN CHANDLER,      :
                                        :
                    Plaintiffs,         :      No. 13-cv-4467(MKB)(JO)
                                        :
        v.                              :
                                        :
BEDFORD-STUYVESANT COMMUNITY            :
LEGAL SERVICES; LEGAL SERVICES NYC;     :
and BETTY STATON in her individual and  :
official capacities;                    :
                                        :
                    Defendants.         :
-----------------------------------------------------------X


## PLAINTIFF JONATHAN IRONS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


**Wigdor LLP**

85 Fifth Avenue
New York, NY 10003
Tel: (212) 257-6800
Fax: (212) 257-6845

*Counsel for Plaintiff Jonathan Irons*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...............................................................................................2

I.    IRONS' EMPLOYMENT AND PERFORMANCE AT BSCLS ................................2

II.    IRONS WAS SUBJECTED TO SEXUAL HARASSMENT BY STATON................3

III.    IRONS' PROTECTED COMPLAINT.......................................................................4

IV.    BSCLS' "INVESTIGATION" OF IRONS' COMPLAINT........................................5

V.    DEFENDANTS' FABRICATED EXPLANATION
FOR IRONS' TERMINATION ................................................................................6

        A.    Defendants' Purported Concerns or Complaints Regarding Irons'
Performance Are Undocumented, Post-Hoc and Fabricated............................6

        B.    The Final Decision to Terminate Irons Was Not Made Until After He
Engaged In Protected Activity.........................................................................8

ARGUMENT.....................................................................................................................9

I.    LEGAL STANDARD .............................................................................................9

II.    IRONS CAN ESTABLISH A PRIMA FACIE CASE OF RETALIATION ..............10

        A.    Irons Engaged in Protected Activity................................................................11

        B.    There is a Causal Connection Between Irons' Complaint
and Termination................................................................................................14

            i.    Temporal Proximity Raises an Inference of Retaliation............................14

            ii.    The Decision to Terminate Irons Was Not Made Prior to His
Engagement in Protected Activity .............................................................14

III.    NUMEROUS ISSUES OF FACT EXIST AS TO WHETHER DEFENDANTS'
STATED REASONS FOR TERMINATION ARE FALSE OR PRETEXTUAL......17

        A.    *First Issue of Fact*: Defendants' Reasons for Termination Are False ..........18

B.    *Second Issue of Fact*: Defendants' Reasons for Termination Are Post-Hoc ...................................................................................19

C.    *Third Issue of Fact*: Defendants' Version of Events is Implausible ..............20

D.    *Fourth Issue of Fact*: Inconsistencies as to When the Decision Was Made ...................................................................................20

E.    *Fifth Issue of Fact*: Violations of LSNYC Policy Demonstrate Pretext ........21

F.    *Sixth Issue of Fact*: Sham "Investigation" of Irons' Complaint.....................21

IV.    IRONS' SEXUAL HARASSMENT CLAIMS MUST PROCEED TO TRIAL ...................................................................................22

V.    IRONS' DISCRIMINATORY TERMINATION CLAIMS MUST PROCEED TO TRIAL ...................................................................................24

VI.    IRONS' AIDING AND ABETTING CLAIMS MUST PROCEED TO TRIAL ...................................................................................25

CONCLUSION...................................................................................26

# TABLE OF AUTHORITIES

**Cases**

Baron v. NYC Dep't of Educ.,
  06 Civ. 2816(FB)(MDG), 2009 WL 1938975 (E.D.N.Y. July 7, 2009) ..........................24

Benussi v. UBS,
  12 Civ. 1261(PAC), 2014 WL 558984 (S.D.N.Y. Feb. 14, 2014) ....................................13

Bermudez v. NYC,
  783 F. Supp. 2d 560 (S.D.N.Y. 2011) ........................................................................22, 24

Black v. Zaring Homes, Inc.,
  104 F.3d 822 (6th Cir. 1997) ...........................................................................................23

Byrnie v. Town of Cromwell,
  243 F.3d 93 (2d Cir. 2001) ..............................................................................................19

Caravantes v. 53rd St. Partners,
  09 Civ. 7821(RPP), 2012 WL 3631276 (S.D.N.Y. Aug. 23, 2012) .................................22

Carter v. Rosenberg & Estis,
  95 Civ. 10439(DLC), 1998 WL 150491 (S.D.N.Y. Mar. 31, 1998) .................................13

Cioffi v. Averill Park,
  444 F.3d 158 (2d Cir. 2006) .............................................................................................16

Cityspec, Inc. v. Smith,
  617 F. Supp. 2d 161 (E.D.N.Y. 2009) ..............................................................................10

Collins v. Cohen Pontari Lieberman & Pavane,
  04 Civ. 8983(KMW)(MHD), 2008 WL 2971668 (S.D.N.Y. July 31, 2008) ...................20

Colon v. Fashion Inst.,
  12 Civ. 7405(HB), 2013 WL 5677047 (S.D.N.Y. Oct, 18, 2013)....................................17

Crawford v. Metro Gov't of Nashville,
  555 U.S. 271 (2009).........................................................................................................11

Ebanks v. Neiman Marcus Group, Inc.,
  414 F. Supp. 2d 320 (S.D.N.Y. 2006) ..............................................................................24

Ellis v. Century 21,
  975 F. Supp. 2d 244 (E.D.N.Y. 2013) ..............................................................................11

Feingold v. NY,
    366 F.3d 138 (2d Cir. 2004) ............................................................................14

Galimore v. City Univ. of New York Bronx Cmty. Coll.,
    641 F. Supp. 2d 269 (S.D.N.Y. 2009) ............................................................ 24

Gorzynski v. Jet Blue,
    596 F.3d 93 (2d Cir. 2010) ...........................................................................14

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000) ............................................................................25

Grant v. Bethlehem Steel Corp.,
    622 F.2d 43 (2d Cir. 1980) ............................................................................14

Guzman v. News Corp.,
    09 Civ. 09323(LGS), 2013 WL 5807058 (S.D.N.Y. Oct. 28, 2013)................................14

Henry-Offor v. City Univ. of New York,
    11 Civ. 4695(NRB), 2012 WL 2317540 (S.D.N.Y. June 15, 2012)..................................35

Ingenito v. Riri USA, Inc.,
    11 Civ. 2569(MKB), 2013 WL 752201 (E.D.N.Y. Feb. 27, 2013)....................................10

Joseph v. Owens & Minor Distribution, Inc.,
    11 Civ. 5269(MKB), 2014 WL 1199578 (E.D.N.Y. Mar. 24, 2014) ................................14

Kanhoye v. Altana,
    686 F. Supp. 2d 199 (E.D.N.Y. 2009) ...........................................................11

Kessler v. Westchester,
    461 F.3d 199 (2d Cir. 2006) .......................................................................9, 10

Klings v. New York State OCA,
    04 Civ. 3400(KAM)(LB), 2010 WL 1292256 (E.D.N.Y. Apr. 5, 2010)....................19, 20

La Grande v. DeCrescente,
    370 F. App'x 206 (2d Cir. 2010) ...................................................................11

Lamberson v. Six W.,
    122 F. Supp. 2d 502 (S.D.N.Y. 2000) .......................................................11, 13

Mandell v. Cnty. Of Suffolk,
    316 F.3d 368 (2d Cir. 2003) .......................................................................24, 25

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)............................................................................................10

Middleton v. Metro Coll.,
    545 F. Supp. 2d 369 (S.D.N.Y. 2008) ..........................................................13

Nagle v. Marron,
    663 F.3d 100 (2d Cir. 2011) ..........................................................................16

Olivieri v. Waldbaum,
    12 Civ. 1195(SLT)(MDG), 2013 WL 5507141 (E.D.N.Y. Sept. 30, 2013).....................22

Ramos v. Marriott,
    134 F. Supp. 2d 328 (S.D.N.Y. 2001) ..........................................................10

Reed v. A.W. Lawrence,
    95 F.3d 1170 (2d Cir. 1996) ..........................................................................13

Reeves v. Sanderson Plumbing,
    530 U.S. 133 (2000)................................................................................17, 19

Russell v. Cnty. Of Nassau,
    696 F. Supp. 2d 213 (E.D.N.Y. 2010) ..........................................................11

Russo v. NY Presbyterian Hosp.,
    972 F. Supp. 2d 429 (E.D.N.Y. 2013) ....................................................16, 17

Santos v. Costco Wholesale, Inc.,
    271 F. Supp. 2d 565 (S.D.N.Y. 2003) ..........................................................10

Sassaman v. Gamache,
    566 F.3d 307 (2d Cir. 2009) ..........................................................................21

Shin v. ITOCHU Int'l,15
    97 Civ. 6235(SAS), 1998 WL 474198 (S.D.N.Y. Aug, 13, 1998)..............15, 20

Stern v. Trustees of Columbia University,
    131 F.3d 305 (2d Cir. 1997) ..........................................................................21

Summa v. Hofstra,
    708 F.3d 115 (2d Cir. 2013) ....................................................................10, 17

Terry v. Ashcroft,
    336 F.3d 128 (2d Cir. 2003) ..........................................................................23

Tomassi v. Insignia Financial,
    478 F.3d 111 (2d Cir. 2007) ...................................................................9, 13

Torres v. Pisano,
    116 F.3d 625 (2d Cir. 1997) .......................................................................23

Ugactz v. United Parcel Serv.,
    10 Civ. 1247(MKB), 2013 WL 1232355 (E.D.N.Y. Mar. 26, 2013) ...............................14

Weiss v. JP Morgan,
    332 F. App'x 659 (2d Cir. 2009) ..................................................................19

Wimes v. Health,
    157 Fed. App'x 327 (2d Cir. 2005) ...............................................................11

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir. 2013) ...................................................................17, 20

Zimmitti v. Aetna Life Ins. Co.,
    64 F. Supp. 2d 69 (D. Conn. 1999)................................................................21

**Other Authorities**

FRCP 56(c) ...........................................................................................9

Plaintiff Jonathan Irons ("Irons"), by and through counsel, Wigdor LLP ("Wigdor"), submits this Memorandum of Law in Opposition to the Motion for Summary Judgment made by Defendants Bedford-Stuyvesant Community Legal Services ("BSCLS"), Legal Services NYC ("LSNYC") and Betty Staton ("Staton") (collectively, "Defendants").

## PRELIMINARY STATEMENT

If a female subordinate was subjected to the following by her older male supervisor, there would be no question that she could maintain a claim for a sexual harassment:

- In the female's presence, the male supervisor regularly discusses going to bars and meeting women who think he is hot and sexually attractive, and want to "please" him.

- In the female's presence, the older male supervisor constantly talks about younger women finding him hot.

- In the female's presence, and while looking directly into her eyes the older male supervisor frequently talks about younger women wanting to "please" him.

- This conduct occurred regularly and consistently – approximately three times per week – for three months.

Under those facts, an employer's motion for summary judgment would be futile.

Now imagine that after three months of being subjected to the conduct described above, the female subordinate makes a complaint of sexual harassment against her male supervisor. No employer would even argue, much less prevail in arguing on summary judgment, that the female subordinate's complaint was made in bad faith as a matter of undisputed fact.

Assume that the subordinate had a completely spotless performance record, an excellent performance review, no documented performance deficiencies and no one had ever even verbally counseled her about her performance. Imagine that every budget projection produced in the month prior to her complaint – including one produced only two days prior to her complaint – had the subordinate budgeted *in* for 2012 and beyond. Then, two days after her complaint, a

budget is produced that projects her termination. 14 days later, the female subordinate is fired in a layoff, supposedly selected for poor performance. Surely a jury would be permitted to determine whether the subordinate was terminated in retaliation for making her complaint.

The case described thus far is this one, only in this case, the supervisor is a female and the subordinate a male. Despite the gender reversal, the outcome in this case must be the same as in the hypothetical described above. A jury must decide the claims brought herein.

## STATEMENT OF FACTS

## I.    IRONS' EMPLOYMENT AND PERFORMANCE AT BSCLS

In March 2008, Irons was hired by then-Project Director Victor Olds ("Olds") as the Director of General Litigation at BSCLS. ¶¶19-20.[1] In this role, Irons supervised attorneys handling, and directly handled, public benefits, immigration and family court cases. ¶¶23, 26. Irons' performance was "outstanding" and viewed as such. ¶59(ix)(a)-(h). Indeed, his most recent performance – which is indicative of his record overall – consisted of:

- A December 2010 performance evaluation in which Irons was rated "Exceeds Expectations" or "Meets Expectations" in every applicable category, and referred to Irons' performance as "exemplary." ¶59(ix)(a).

- A January 2011 email from Olds stating: "great work [ ] is occurring . . . in connection with our UI/SSI practice. This [ ] is supervised by [ ] Irons, who clearly is doing a phenomenal job! . . . Way to go, Jonathan . . . !" ¶59(ix)(c).

- A January 2011 email from Michael Young ("Young"), then Interim Executive Director of LSNYC, congratulating Irons "on exceeding the [contract] goals – in such a spectacular way! And, thanks for all your other good work." ¶59(ix)(d).

Consistent with this record, Defendant Betty Staton ("Staton") testified that she was not aware of any document reflecting any performance deficiency of Irons. ¶59(ix)(f). Staton also never communicated any performance issues to Irons, and does not believe that anyone else did either. ¶59(ix)(g). Irons' confirmed that he never received any criticism of his performance. ¶59(ix)(h).

---

[1] "¶__" citations refer to Defendants' Local Rule 56.1 Statement and Plaintiffs' responses thereto.

## II.    IRONS WAS SUBJECTED TO SEXUAL HARASSMENT BY STATON

In July 2011, Staton – who was the Chair of the BSCLS Board – was appointed Acting Project Manager and became Irons' supervisor. ¶¶16-17.  Shortly thereafter, Staton began subjecting Irons to persistent sexual harassment and sexually offensive conduct. ¶¶142-146. Staton routinely made "offensive gender based comments, unwanted sexual advances, [and] sexualized statements" (¶142), including:

- "regularly in September sp[eaking] about the fact that she would go to bars, meet men at bars who thought she was hot, sexually attractive, and wanted to please her." ¶143.

- Staton also "constantly" talked about "younger men finding her hot and wanting to please her," which Irons "found very offensive in the workplace." ¶143.

- This conduct occurred regularly and consistently – approximately three times per week – from September through November 2011. ¶¶143, 146.

- Staton would often look directly at Irons when making these comments. ¶¶143, 146.

- (i) "[T]his pattern of behavior was consistent, and it culminated in a statement she made to [Irons] [on] November 15, 2011, and it was through that that [Irons] believe[d] that those statements were sexual advances;" and (ii) "what [the statements] did is they indicated Ms. Betty Staton's sexual prowess." ¶143.

In addition to providing specific examples of this pattern of sexualized conduct, Irons identified two specific days on which he was harassed.  On November 15, 2011, Staton looked "directly" at Irons and said, "I have a man who is 14 years younger than me, and he knows how to please me, will take care of me and please me." ¶144.  Irons believed that Staton was making a "sexual advance" through this comment, and it caused Irons to:

> [feel] very embarrassed, when [Staton] was speaking directly at [him], humiliated, and [he] felt abused, and [he] went back to [his] office . . . thinking what [he] should do, because [he] felt that Ms. Betty Staton could no longer treat [him] as – fairly as a subordinate unless [he] pleased her in a way that she spoke about so oftentimes, and [he] felt that [he] was viewed as a sexual object. ¶144.

¶144.  Irons also identified November 22, 2011 as a date that Staton made sexually inappropriate comments at the office. ¶145.

## III.    IRONS' PROTECTED COMPLAINT

On November 16, 2011, Irons contacted Karen Chandler ("Chandler") to ask how to make a formal complaint of sexual harassment against Staton. ¶¶155, 156. Chandler contacted Verna Alexander ("Alexander"), who was a member of LSNYC's Sexual Harassment Panel ("SHP"). ¶157. Chandler advised Alexander that "Irons had been sexually harassed by the project director . . . Staton." ¶158. As a member of the SHP, Alexander was required to report the complaint to the Chair of the SHP, but, in violation of LSNYC policy, failed to do so. ¶116(vi).[2] Alexander told Chandler that Irons should speak to Lana Gilbert ("Gilbert"), a member of LSNYC's Human Resources ("HR") team. ¶158.

So, on November 23, 2011, Irons told Elisette Reynoso ("Reynoso"), another HR employee, that he wanted to file a complaint against Staton for sexual harassment. ¶159. Reynoso called Gilbert and relayed what Irons had told her. ¶159. On November 28, 2011, Irons spoke with Gilbert and told her he wanted to file a complaint of sexual harassment. ¶162.

Gilbert informed Jeanne Perry ("Perry"), then-LSNYC Chief of Operations, that Irons had made a complaint of sexual harassment against Staton. ¶163. Rather than taking the allegation seriously, Perry testified that she was "amused" by Irons' allegations of sexual harassment and "had a certain kind of skepticism [ ] in [her] own mind about it." ¶164. Perry then discussed the allegations with Raun Rasmussen ("Rasmussen"), LSNYC's Executive Director. ¶164. Both Perry and Rasmussen "thought it was inconceivable that the complaint had any merit whatsoever." ¶164. Perry and Rasmussen then discussed the allegations with Staton. ¶¶164, 166. Perry and Staton laughed about the allegations. ¶164.

Less than one week later – and only 16 days after his initial complaint to Chandler was relayed to Alexander – Irons and Chandler were terminated. ¶116.

---

[2] Defendants' brief inexplicably makes no mention of the fact that Irons' complaint was relayed to Alexander.

## IV.   BSCLS' "INVESTIGATION" OF IRONS' COMPLAINT

After having a good laugh about Irons' sexual harassment complaint, and summarily determining (without speaking to Irons or Staton) that "it was inconceivable that the complaint had any merit," Perry and Rasmussen initiated a sham "investigation." ¶164.  Indeed, rather than make any attempt to follow LSNYC's policies regarding sexual harassment complaints, Perry and Rasmussen chose to have Vilia Hayes ("Hayes") investigate the complaint. ¶164.

Hayes is a member of the LSNYC Board. ¶164.  Rasmussen considered the possibility that Hayes' membership on the Board might create a conflict of interest, but ultimately viewed that fact as part of the reason that she was the "perfect choice." ¶164.  Outside of LSNYC, Hayes is an attorney with Hughes Hubbard & Reed ("Hughes Hubbard"), where the employment aspect of her practice is focused exclusively on representing management-side clients. ¶164.

Hayes purports to have "determined" that Irons' complaint lacked merit. ¶171.

However, a review of her "investigation" demonstrates that it was a complete sham:

- The document drafted by Hayes purporting to summarize her investigation includes a summary of a purported interview of Jessica Rijo ("Rijo").  However, Rijo testified that she could not recall speaking to any investigator regarding Irons' complaint. ¶171(iii).

- Hayes interviewed at least one witness in March 2012, four months after Irons' complaint, but falsely testified that she interviewed everyone in December 2011. ¶171(iv).

- Hayes may have prepared the entire investigation summary in March 2012, more than three months after she interviewed most of the witnesses, including Irons and Staton. ¶171(v).

- The summary contains numerous errors, including referring to Irons by the wrong name.  It also is incomplete in many ways, including three places where the words "[FILL IN]" appear instead of actual names and dates. ¶171(vii-viii).

- As late as December 20, 2011, Hayes had not even decided that she would interview Chandler, a key witness. ¶171(ix).

Moreover, the investigation was conducted in violation of numerous LSNYC policies

concerning the investigation of complaints of sexual harassment (¶116(vi)):

| DEFENDANTS' POLICY | DEFENDANTS' VIOLATIONS |
|---|---|
| LSNYC has a policy for investigating complaints of sexual harassment. | Rasmussen testified: "I don't believe that we ever actually considered using the sexual harassment policy." |
| Alexander was required to notify the SHP of Irons' complaint by November 23, 2011. | Alexander took no affirmative action in response to Irons' complaint. |
| The SHP was then required to appoint members to address the complaint. | The SHP was completely bypassed in favor of the inherenetly biased Hayes. |
| All witnesses are required to be interviewed. | Hayes fabricated the contents of an interview that she never even conducted. |
| An investigation was required to be concluded by January 18, 2012. | Certain witnesses were not even interviewed until March 2012. |
| A formal report was required to be complete by February 1, 2012. | A formal report was not written until March 8, 2012. |

Irons was interviewed by Hayes on December 1, 2011. ¶167. Staton was interviewed the

following day. ¶168. Later that day, Staton fired Irons. ¶116.

## V.  DEFENDANTS' FABRICATED EXPLANATION FOR IRONS' TERMINATION

Defendants contend that the decision to terminate Irons was first made in the spring of

2011 as a result of various complaints purportedly made by BSCLS staff about Irons and

Chandler, but carried out in December 2011 to coincide with layoffs that were projected to occur

at the time. Def. Br. at pp. 2-3, 5. However, this is disputed by significant record evidence.

### A.  Defendants' Purported Concerns or Complaints Regarding Irons' Performance Are Undocumented, Post-Hoc and Fabricated

There were complaints made by BSCLS staff in the spring of 2011, but they did not

concern Irons. ¶¶51-60. The complaints were memorialized in two separate documents written

6

by BSCLS staff; an email dated March 14, 2011 (the "March 14 Email") and a letter dated March 18, 2011 (the "March 18 Memorialization Letter"). ¶¶55-60. Neither document made any mention, by name or title, to Irons. Id. In contrast, both letters repeatedly refer to Olds by title. Id. Staton admitted that neither document articulated any complaint as to Irons. Id. In an effort to get around this fact, Staton testified that various staff complained about Irons and Chandler during a "special" Board meeting on March 16, 2011. ¶59. This is disputed, as:

- The Board meeting was prompted by the March 14 Email and memorialized in the March 18 Memorialization Letter, neither of which reference Irons. ¶¶55-59.

- Rijo, a staff member who signed the March 18 Memorialization Letter, testified that she never submitted any complaints against Irons and did not remember anyone making a complaint against Irons. ¶59(iv).

- No minutes were taken during the March 16, 2011 Board meeting, despite the fact that they were required to be taken. ¶59(v).[3]

- Staton could not recall a single conversation or specific complaint concerning Irons or Chandler made by BSCLS staff members *before, during or after the March 16, 2011 meeting*, that she actually relied upon when deciding to terminate their employment, including from staff members that were at the March 16, 2011 meeting. ¶59(iii).

Nevertheless, in an attempt to build on the fiction that Irons was targeted for termination because of his performance, Staton and Rasmussen claim in conclusory fashion that Irons (i) was an impediment to getting "some important work done in the office;" (ii) "did not have a valuable role in the office;" (iii) "mostly spent time working on his own cases and not engaging with staff as a supervisor" and (iv) Irons sat in his office and "never did anything." Def. Br. at p. 8. No explanation is provided as to how Irons could spend most of his time "working on his own cases" and, simultaneously, "never d[o] anything." None of these supposed issues are documented, and no one at any time, including Staton, raised them with Irons. Supra p. 2.

---

[3] Staton attempted to explain this by claiming that no minutes were taken at the March 16, 2011 Board meeting because it was a "special meeting." ¶59(v). This was a complete lie, as March 16, 2011 was the third Wednesday of the month, which is when regular Board meetings are held. Id.

Defendants also argue that Irons' termination was influenced by the fact that he was a manager (and therefore compensated more than the staff attorneys) and primarily handled and supervised benefits cases. Def. Br. at pp. 6-7. However, Irons was chosen for termination rather than Debra Giles ("Giles"), an attorney who primarily handled benefits cases, whose compensation was "very close" to Irons', and whose performance record was objectively worse. ¶116(vii). Giles received such a poor performance review for 2010 that she filed a grievance. Id. In Staton's words, the review "wasn't good." Id. Giles also "had some real challenges in terms of her writing abilities and her research abilities and her understanding of the application of certain provisions of the law as it related to the cases that she was assigned." Id. Irons complained that he did not feel that Giles "prepared for her cases or that she presented herself well in hearings." Id. Staton admitted that she never attended any of Giles' hearings. Id.[4]

**B.      The Final Decision to Terminate Irons Was Not Made Until After He Engaged In Protected Activity**

Defendants claim that it was in "August [that] Staton definitively decided and told Rasmussen and Perry that Irons, Chandler, and Son would be terminated as part of the layoffs at BSCLS at the end of 2011." Def. Br. at pp. 18-19. This is disputed by myriad evidence, including the testimony of Staton and Perry. At deposition, Staton claimed that the termination decision was made in the Spring of 2011 "before" she took over as Acting Project Director in July. ¶117. In contrast, Perry testified that that the decision had not been finalized as of October 11, 2011. ¶70(vi). These statements cannot be reconciled. Moreover, evidence establishes that: (i) Irons was not slated for termination before engaging in protected activity; and (ii) the final decision to terminate Irons' employment was not made until after his protected complaints:

---

[4] It is true that Giles was a member of the union. ¶175. But, Defendants' argument that it is easier to terminate management than union members, even if true, is hardly relevant. Other union members, including Gina Son ("Son), were terminated as part of the 2011 layoffs. ¶¶10, 109.

- Gilbert testified that, as of August 30, 2011, no one had told her that a decision to fire Irons and Chandler had been made, and their terminations were only being "considered."

- On October 12, 2011, a potential budget option was produced that had Irons and Chandler budgeted *in* for 2012 and beyond.

- On October 15, 2011, Vogel sent Staton an email attaching the October 12, 2011 budget "Options" in which she wrote: "the attached workbook reflects the *option* of laying off certain staff." (emphasis added).

- On October 19, 2011 Staton reported to the Board that "[she was] still hoping that the number of lay-offs will be less than originally estimated."

- **On October 25, 2011, November 4, 2011, November 8, 2011 and November 14, 2011 (two days before Irons' complaint), budget options were produced that had Irons and Chandler budgeted *in* for 2012 and beyond. No budget options that were produced during this time reflected Irons or Chandler being terminated.**

- On November 16, 2011, Staton reported to the Board that she was still "working on reducing the amount" of layoffs.

¶70. These documents unquestionably establish that, even if Irons' termination was contemplated at some point prior to his November 16, 2011 complaint, there was no plan to terminate him as of November 16, 2011, and certainly no decision had been finalized.

On November 18, 2011, two days after Irons' complaint of harassment was forwarded to a member of the LSNYC SHP by Chandler, another budget was produced. ¶116(i). Irons and Chandler were both slated for termination, and were fired 14 days later. Id.

## ARGUMENT

### I. <u>LEGAL STANDARD</u>

Summary judgment is only appropriate where "there is no genuine issue as to any material fact." FRCP 56(c). The Court must view all facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences in its favor. See <u>Tomassi v. Insignia Financial</u>, 478 F.3d 111, 116 (2d Cir. 2007). "The judge's function is not . . . to weigh the evidence and determine the truth of the matter." <u>Kessler v. Westchester</u>, 461 F.3d

199, 206 (2d Cir. 2006). To the contrary, "[t]he Court should not grant summary judgment if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Cityspec, Inc. v. Smith, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009). Importantly,

> while summary judgment is available in discrimination cases where there are no genuine issues of material fact, **"an extra measure of caution is merited" when considering summary judgment in discrimination cases** because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."

Ingenito v. Riri USA, Inc., 11 Civ. 2569(MKB), 2013 WL 752201, at *4 (E.D.N.Y. Feb. 27, 2013) (emphasis added) (citations omitted); see also Santos v. Costco Wholesale, Inc., 271 F. Supp. 2d 565, 571 (S.D.N.Y. 2003) ("Summary judgment is 'ordinarily inappropriate' in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision . . . And "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law.") (citations omitted).

## II.   IRONS CAN ESTABLISH A PRIMA FACIE CASE OF RETALIATION

Retaliation claims under Title VII, New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") are subject to the framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). A plaintiff must first establish a *prima facie* case of retaliation by showing that (1) he engaged in a protected activity; (2) his employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. Summa v. Hofstra, 708 F.3d 115, 125 (2d Cir. 2013). **This burden "is so minimal that some courts simply assume the existence of a prima facie case."** Ramos v. Marriott, 134 F. Supp. 2d 328, 338 (S.D.N.Y. 2001) (emphasis added). Defendants challenge the protected activity and causal connection prongs of the *prima facie* case. Both challenges are without merit.

## A.    __Irons Engaged in Protected Activity__

The term "protected activity" refers to any action taken to "oppose statutorily prohibited discrimination." Wimes v. Health, 157 Fed. App'x 327, 328 (2d Cir. 2005). "Protected oppositional activities include informal as well as formal complaints and complaints to management." Lamberson v. Six W. Retail, 122 F. Supp. 2d 502, 511 (S.D.N.Y. 2000). A complaint is protected even if the conduct complained of was not "actually prohibited" under the law, so long as "the plaintiff had a 'good faith belief' that such conduct was prohibited." Ellis v. Century 21, 975 F. Supp. 2d 244, 280 (E.D.N.Y. 2013) (citing La Grande v. DeCrescente, 370 F. App'x 206, 212 (2d Cir. 2010); see also Kanhoye v. Altana, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived."). Thus, "'[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication **'virtually always'** constitutes the employee's opposition to the activity.'" Russell v. Cnty. of Nassau, 696 F. Supp. 2d 213, 237 (E.D.N.Y. 2010) (quoting Crawford v. Metro. Gov't of Nashville, 555 U.S. 271, 276 (2009)) (emphasis added). Opposition to "potentially" discriminatory practices also is protected. Kanhoye, 686 F. Supp. at 206. There is no question that Irons engaged in "protected activity."

*First*, on November 16, 2011, Irons complained to Chandler that he was being sexually harassed by Staton and wanted to file a formal complaint. Supra p. 4. *Second*, on the same day, Chandler relayed Irons' complaint to Alexander, a member of LSNYC's SHP. Id. *Third*, on November 23, 2011, Irons told Reynoso, an HR employee, that he wanted to file a sexual harassment complaint against Staton. Id. Reynoso, in turn, called Gilbert, another HR employee, and relayed what Irons had told her. Id. *Fourth*, on December 1, 2011, Irons was interviewed by Hayes in connection with her "investigation." Supra p. 6.

11

Defendants argue that Irons' complaints are not protected because he did not hold a "good faith belief" that Staton actually sexually harassed him. Def. Br. at p. 22. Specifically, Defendants argue that "Irons' allegations concern incidents so mild and sporadic that he could not have objectively believed that they constituted unlawful sexual harassment." Def. Br. at p. 23. Defendants' argument is easily rejected, as it is based both on (i) their misrepresentation of the record evidence; and (ii) their misstatement of the law.

Defendants' characterization of Irons' allegations as "sporadic" is disputed. Staton's conduct, which included "offensive gender based comments, unwanted sexual advances, [and] sexualized statements," was "**consistent**," "**regular**[ ]" and "**constant**[ ]." Supra p. 3 (emphasis added). Staton "**regularly**" "spoke about the fact that she would go to bars, meet men at bars who thought she was hot, sexually attractive, and wanted to please her." Id. (emphasis added). Similarly Staton "**constantly**" talked about her "sexual prowess" and "younger men finding her hot and wanting to please her." Id. (emphasis added). Staton – who often would stare at Irons when making these comments – engaged in sexually offensive conduct approximately **three times per week** from September through November 2011. Id. The conduct was not "sporadic."[5]

Nor was the conduct "mild." Defendants would not even be making this argument if Irons' and Staton's genders were reversed. There is no question that it would be reasonable for a young female subordinate to complain if her older male supervisor: (i) "spoke about the fact that [ ]he would go to bars, meet [women] at bars who thought [ ]he was hot, sexually attractive, and wanted to please [him];" (ii) said "I have a [woman] who is 14 years younger than me, and [s]he

---

[5] Defendants' assertion that Irons could recall only two instances of harassment is misleading at best. At deposition, Irons was asked whether he could provide any specific "dates, meaning not a month or a time period, but a specific date" on which he was harassed other than November 15, 2011 and November 22, 2011. ¶146. While he could not recall any other specific *dates*, Irons, as stated above, did describe various specific conduct that Staton engaged in approximately three times per week from September 2011 to November 2011. Supra p. 3.

knows how to please me, will take care of me and please me;" and (iii) made these "constant" and "regular" comments while looking directly at the female subordinate. The only difference between that circumstance and this case is that Irons is a man and Staton a women.

Courts have held that conduct far less severe was sufficient to support a good faith belief of harassment. Reed v. A.W. Lawrence, 95 F.3d 1170 (2d Cir. 1996) (two sex-based comments sufficient to support reasonable belief); Benussi v. UBS, 12 Civ. 1261(PAC), 2014 WL 558984, at *8 (S.D.N.Y. Feb. 14, 2014) ("a jury is the appropriate arbiter of whether [the plaintiff's] belief was reasonable" where only one sex-based remark was alleged); Carter v. Rosenberg & Estis, 95 Civ. 10439(DLC), 1998 WL 150491, at *11 (S.D.N.Y. Mar. 31, 1998). In contrast, Irons' allegations concerned approximately 40 remarks (three times per week for three months).[6]

Finally, Defendants ask the Court to draw an inference in their favor – based on purported "circumstantial evidence" – that Irons complained because he knew that he might be fired. Putting aside that there is no evidence to suggest that Irons believed he would be fired, this argument violates the requirement that the Court view all facts in the light most favorable to Irons and resolve ambiguities and draw inferences in his favor. See Tomassi, 478 F.3d at 116.

Simply put, the record clearly raises at least an issue of fact as to whether Irons held a good faith belief that he was subjected to sexual harassment. Nothing more is required. See Lamberson, 122 F. Supp. at 512 (summary judgment denied where the plaintiff "raised a triable issue as to whether he had a good faith, reasonable belief" that his complaint concerned unlawful discrimination).

---

[6] The only case relied on by Defendants, Middleton v. Metro. Coll., 545 F. Supp. 2d 369 (S.D.N.Y. 2008), is completely inapposite. Middleton involved a complaint concerning "an offhand comment arising out of an isolated incident." Id. at 375. The plaintiff in the case "acknowledge[d] that [the] conduct was not repeated." Id. In contrast, Staton engaged in sexualized conduct approximately three times per week over a three month period. Supra p. 3.

**B.** **There is a Causal Connection Between Irons' Complaint and Termination**

     i.     Temporal Proximity Raises an Inference of Retaliation

It is well established that "[a] plaintiff can indirectly establish a causal connection to support a [ ] retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Ugactz v. United Parcel Serv., 10 Civ. 1247(MKB), 2013 WL 1232355, at *20 (E.D.N.Y. Mar. 26, 2013) (quoting Gorzynski v. JetBlue, 596 F.3d 93, 110 (2d Cir. 2010)); see also Feingold v. NY, 366 F.3d 138, 156 (2d Cir. 2004).

Irons was terminated: (i) **16 days** after complaining to Chandler that he was being sexually harassed by Staton, which was relayed to a member of LSNYC's SHP; (ii) **nine days** after Irons informed HR that he wanted to file a complaint of sexual harassment against Staton; (iii) **four days** after Irons relayed the details of his complaint to HR; and (iv) **one day** after Irons was interviewed during the purported "investigation" of his complaint.

Much longer periods of time have been held to be sufficiently proximate to establish causation. See, e.g., Joseph v. Owens & Minor Distribution, Inc., 11 Civ. 5269(MKB), 2014 WL 1199578 (E.D.N.Y. Mar. 24, 2014) (one month sufficient) (citing Gorzynski, 596 F.3d at 110 ("[W]e have previously held that five months is not too long to find the causal relationship.")); Guzman v. News Corp., 09 Civ. 09323(LGS), 2013 WL 5807058 at *21 (S.D.N.Y. Oct. 28, 2013) (seven month gap is sufficient); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45–46 (2d Cir. 1980) (eight month gap is sufficient). As such, Irons can establish causation.

     ii.     The Decision to Terminate Irons Was Not Made Prior to His Engagement in Protected Activity

Defendants argue that that decision to terminate Irons' employment was made prior to November 16, 2011 and, therefore, that the termination decision could not have been in retaliation for his complaint. Def. Br. at p. 18. However, this is vehemently disputed.

Defendants claim that it was in "August [that] Staton definitively decided and told Rasmussen and Perry that Irons, Chandler, and Son would be terminated as part of the layoffs at BSCLS at the end of 2011." Def. Br. at p. 19. Defendants cite the testimony of Staton and Rasmussen to support this self-serving claim, and contend that "Plaintiffs have no evidence to dispute the timing of Defendants' decision to lay them off." Id. This is simply false. *First*, this claim is disputed by Staton herself, who testified that the decision to terminate was made in the spring of 2011 "before" she took over as Acting Project Director in July. Supra p. 8. *Second*, Defendants' claim is disputed by Perry, who testified that that the decision had not been finalized as of October 11, 2011. Supra p. 8. Thus, there are at least three different timeframes presented by Defendants as to when the "final" decision to terminate Irons was made. See Shin v. ITOCHU Int'l, 97 Civ. 6235(SAS), 1998 WL 474198, at *5-6 (S.D.N.Y. Aug. 13, 1998) (a reasonable juror could infer that defendant's explanation was pretextual because testimony regarding the timing of the "final" decision was inconsistent).

Defendants claim that the decision was made prior to Irons' complaint is also disputed by the weight of the documentary evidence. As explained supra p. 9:

- *Third*, On October 12, 2011, a potential budget option was produced that had Irons and Chandler budgeted *in* for 2012 and beyond.

- *Fourth*, On October 15, 2011, Vogel sent Staton an email attaching the October 12, 2011 budget "Options" in which she wrote: "the attached workbook reflects the *option* of laying off certain staff." (emphasis added).

- *Fifth*, On October 19, 2011 Staton reported to the Board that "[she was] still hoping that the number of lay-offs will be less than originally estimated."

- **Sixth, on October 25, 2011, November 4, 2011, November 8, 2011 and November 14, 2011 (two days before Irons' complaint), budget options were produced that had Irons and Chandler budgeted *in* for 2012 and beyond. No budget options that were produced during this time reflected Irons' termination.**[7]

---

[7] Defendants claim that various budgets did not identify Irons' termination to avoid early publication of the decision. ¶66. This self-serving statement is disputed by the fact that, at the exact same time budget workbooks were being

- *Seventh*, On November 16, 2011 – the day of Irons' complaint – Staton reported to the Board that she was still "working on reducing the amount" of layoffs.

- *Eighth*, On November 18, 2011 – two days after Irons' complaint – a budget was produced that reflected Plaintiffs' terminations.

Viewing this evidence in the light most favorable to Irons, a jury could determine that he was not even being considered for termination between October 25, 2011 and November 16, 2011, the date of Irons' complaint. It certainly cannot be determined as a matter of undisputed fact that the decision was final by November 16, 2011. See Cioffi v. Averill Park, 444 F.3d 158, 163 (2d Cir. 2006) ("informal consensus" that employee should be fired is not a final decision for purposes of summary judgment); Nagle v. Marron, 663 F.3d 100, 110 (2d Cir. 2011) ("[I]t is established that an adverse employment action occurs on the date that a decision was formally reached.").

Defendants rely on Russo v. NY Presbyterian Hosp., 972 F. Supp. 2d 429 (E.D.N.Y. 2013). In Russo, Your Honor held that the plaintiff was unable to establish that she was terminated on "May 28, 2008[ ] for filing a formal complaint against [her supervisor] on May 22, 2008." Id. at 456-57. The decision was based, in part, on the fact that the defendant in that case had "presented evidence that the decision to terminate Plaintiff was made prior to Plaintiff's oral and written complaint." Id. The facts in Russo, however, are easily distinguishable. In Russo, prior to her May 22, 2008 complaint, the plaintiff had been "relieved of her duties pending an investigation" of an incident that occurred on May 15, 2008. Id. In contrast, Irons never received a single warning or criticism, documented or verbal, prior to his complaints. Supra pp. 2, 7. Instead, he was the subject of positive performance reviews and much praise. Supra p. 2.

---

created that did not include layoff selections, budget workbooks were also being created that *did* include layoff selections. Id. Moreover, the November 18, 2011 budget, which reflected Plaintiffs' terminations only two days after Irons' complaint, *did not* reflect Son's termination even though Defendants claim that Son's termination was "definitively decided" upon by August 2011. ¶116(i). Final decisions simply had not been made when Irons complained.

Most important, in direct contrast to <u>Russo</u>, there is substantial documentary evidence that the decision to terminate Irons was *not* made until after his complaint. <u>Supra</u> pp. 8-9.

## III. NUMEROUS ISSUES OF FACT EXIST AS TO WHETHER DEFENDANTS' STATED REASONS FOR TERMINATION ARE FALSE OR PRETEXTUAL

Once a *prima facie* case is established, the employer must advance a "legitimate, nondiscriminatory reason [ ] for its action." <u>Summa</u>, 708 F.3d at 125. Then the burden shifts back to the employee to demonstrate that: (i) the reasons for termination were false; <u>**or**</u> (ii) the reasons are pretext and protected activity was the cause of the termination. <u>See Reeves v. Sanderson Plumbing</u>, 530 U.S. 133, 148 (2000) ("A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); <u>Colon v. Fashion Inst.</u>, 12 Civ. 7405(HB), 2013 WL 5677047, at *9 (S.D.N.Y. Oct. 18, 2013) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."). "But-for" causation applies under Title VII and the NYSHRL, and the "motivating factor" standard applies under the NYCHRL. Def. Br. at p. 17.

However, despite the different standards,

> The determination of whether retaliation was a "but-for" cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment . . . A jury should eventually determine whether the plaintiff has proved by a preponderance of the evidence that she did in fact complain about discrimination and that she would not have been terminated if she had not complained about discrimination.

<u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 846 (2d Cir. 2013). Thus, if the Court finds evidence sufficient to satisfy the motivating factor standard under the NYCHRL, this would require a jury to determine Irons' claims under Title VII and the NYSHRL as well.

In any event, the record evidence of falsity and pretext is more than sufficient to satisfy both standards of causation.

### A. *First Issue of Fact*: **Defendants' Reasons for Termination Are False**

Defendants' explanation for Irons' inclusion in the December 2011 layoffs is that: (i) in spring 2011, staff complained that Irons played a role in low morale; and (ii) Irons' performance was poor. Def. Br. at pp. 21-22. Both points are disputed by documents and testimony. The complaints made in the spring of 2011 did not concern Irons. Supra pp. 6-7. The complaints were memorialized in two documents. Id. Both refer to Olds by title numerous times, but neither makes any mention, by name or title, of Irons. Id. at 7. Staton even admitted that neither letter articulated any complaint as to Irons. Id. Staton did testify that various staff complained about Irons and Chandler during a "special" Board meeting on March 16, 2011, but this is also disputed:

- *First*, the March 16, 2011 meeting was prompted by the March 14 Email and memorialized in the March 18 Memorialization Letter, and neither reference Irons.

- *Second*, Rijo, a staff member who signed the March 18, 2011 Memorialization Letter, testified that she never submitted any complaints against Irons and did not remember anyone making a complaint against Irons.

- *Third*, no minutes were taken during the March 16, 2011 Board meeting, despite the fact that they were required to be taken.

- *Fourth*, Staton could not recall a single conversation or specific complaint concerning Irons or Chandler made by BSCLS staff members *before, during or after the March 16, 2011 meeting*, that she actually relied upon when deciding to terminate their employment, including from staff members that were at the March 16, 2011 meeting.

Supra p. 7. Moreover, there is literally no documentation whatsoever that identifies any deficiency in Irons' performance, and Staton admitted that no performance deficiencies were ever raised with Irons. Supra p. 2. To the contrary, Irons' documented performance record was exceptional, and included an extremely positive performance review and written praise from

Olds (describing Irons as "phenomenal") and Young (congratulating Irons for exceeding contract goals in such a "spectacular way," as well as "for all [his] other good work"). Id.

Thus, issues of fact exist as to whether Defendants' justifications for Irons' inclusion in the layoff are false, which is sufficient to establish an inference of retaliation. Reeves, 530 U.S. at 148 ("prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); Byrnie v. Town of Cromwell, 243 F.3d 93, 102 (2d Cir. 2001) ("A motion for summary judgment may be defeated where a plaintiff's prima facie case [is] combined with sufficient evidence to find that the employer's asserted justification is false.").[8]

**B.** ***Second Issue of Fact*: Defendants' Reasons for Termination Are Post-Hoc**

As explained supra p. 2, there is literally no documentation whatsoever that identifies any deficiency in Irons' performance, and Staton admitted that no performance deficiencies were ever raised with Irons. Thus, the claim that Irons was a poor performer, made for the first time after his complaint, is entirely post-hoc, which supports a finding of pretext. See Weiss v. JP Morgan, 332 F. App'x 659, 663 (2d Cir. 2009) ("post-hoc explanations for a termination decision may suggest discriminatory motive"). In Klings v. New York State OCA, 04 Civ. 3400(KAM)(LB), 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010), the court explained:

> [D]espite the numerous affidavits submitted and depositions taken from OCA supervisors, many expressing criticism of Klings's personality and work performance, not a single one of these sentiments has been memorialized in Klings's written evaluations. Only after the filing of this case, in sworn affidavits and depositions, are such negative critiques documented on the record. Taken at its minimum, the stark disparity between Klings's complimentary written performance evaluations, and the criticisms now being asserted, coupled with

---

[8] Defendants add that Irons was selected for layoff because he was not a union member and was well compensated. Def. Br. at p. 22. However, it is undisputed that union members were terminated in connection with the layoffs. ¶10, 109. Moreover, there was another employee, Giles, with a compensation level "very close" to Irons', who worked on the same type of cases and whose performance was objectively far worse than Irons'. Supra p. 8.

Klings's sworn denial that she was orally counseled about these criticisms, creates a genuine issue of fact for the jury's determination.

see also Collins v. Cohen Pontani Lieberman & Pavane, 04 Civ. 8983(KMW)(MHD), 2008 WL 2971668, at *11 (S.D.N.Y. July 31, 2008) (issue of fact as to pretext sufficient to deny summary judgment where the employer could not cite a written record of plaintiff's poor performance).

### C. *Third Issue of Fact*: Defendants' Version of Events is Implausible

In addition to the evidence disputing the truth of Defendants' supposed reasons for Irons' termination, it is completely implausible that Staton would have decided to terminate Irons in March 2011 because of his purportedly awful performance, and instead wait nine months, until December 2011 – less than three weeks after his complaint of sexual harassment – to terminate him. Kwan, 737 F.3d at 846 ("A plaintiff may prove that retaliation was a [ ] cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."). At the very least, the nine month gap raises an inference that the supposed concerns Staton had with Irons in March were not the real reason for his termination. Defendants' argument that this immense gap in time was due to the fact that Staton is a "softy" can be made to a jury. ¶116(iv)(a)(i).

### D. *Fourth Issue of Fact*: Inconsistencies as to When the Decision Was Made

As explained supra pp. 8-9, Defendants claim that the decision to terminate Plaintiffs was made before Irons' complaint (which is disputed). However, also as explained id., Defendants present at least three inconsistent versions of when the decision was made (spring 2011, August 2011 or sometime after October 11, 2011). These inconsistencies are, alone, sufficient to establish pretext. Shin, 1998 WL 474198, at *5-6 (All witnesses testified that the termination decision was made prior to the complaint, but the testimony as to when the decision was made

was inconsistent. This inconsistency was the "only evidence demonstrating pretext," but it is sufficient for a juror to infer that defendant's explanation was pretext for retaliation).

### E.    *Fifth Issue of Fact*: Violations of LSNYC Policy Demonstrate Pretext

As illustrated in the chart contained supra p. 6, Defendants violated numerous policies in the way in which they handled Irons' complaint of discrimination. These policy violations are probative of pretext. Zimmitti v. Aetna Life Ins. Co., 64 F. Supp. 2d 69, 79 (D. Conn. 1999) ("Failure to follow an organization's stated policies or routine procedures can be evidence of pretext."); Stern v. Trustees of Columbia University, 131 F.3d 305, 313 (2d Cir. 1997).

### F.    *Sixth Issue of Fact*: Sham "Investigation" of Irons' Complaint

"The failure of an employer to conduct an adequate investigation or to undertake an appropriate response can constitute evidence in support of a Title VII plaintiff's allegations." Sassaman v. Gamache, 566 F.3d 307, 314-15 (2d Cir. 2009). Thus, "Title VII suits often require a court or jury to consider whether an employer's response to an allegation of discrimination *itself* constitutes evidence of discrimination or liability for discrimination." Id., at 314.

Defendants' response to Irons' complaint of sexual harassment was completely unreasonable and evinces bias against Irons for making the complaint. As described supra p. 4, Perry testified that she was "amused" when she first learned of Irons' allegations of sexual harassment. Indeed, Perry and Staton actually laughed about the allegations. Id. Moreover, without doing any investigation whatsoever, or even speaking with Irons or Staton, both Perry and Rasmussen summarily determined that "it was inconceivable that the complaint had any merit whatsoever." Id. Obviously, Irons' complaint was not taken seriously.

Then, Rasmussen and Perry chose an inherently biased Board member to conduct an "investigation." Supra p. 5. The investigative summary demonstrates the inadequacy of the

investigation, including outright fabrications and missing information. Supra p. 5. Simply put, the manner in which Defendants responded to Irons' complaint of sexual harassment demonstrates that Defendants held contempt for Irons for making his complaint. Certainly this, along with the myriad other evidence described herein, supports an inference of retaliation.

## IV.    IRONS' SEXUAL HARASSMENT CLAIMS MUST PROCEED TO TRIAL

To prove a case of sexual harassment under Title VII and the NYSHRL, a plaintiff must show discriminatory sexual conduct in the workplace that is sufficiently severe or pervasive to alter the conditions of the work environment. Caravantes v. 53rd St. Partners, 09 Civ. 7821 (RPP), 2012 WL 3631276, at *13 (S.D.N.Y. Aug. 23, 2012). Under the NYCHRL, however, the activity complained of need not be severe or pervasive. Olivieri v. Waldbaum, 12 Civ. 1195(SLT)(MDG), 2013 WL 5507141, at *7 (E.D.N.Y. Sept. 30, 2013). **"All that is required under the NYCHRL is that [the plaintiff] proffer evidence of unwanted gender-based conduct."** Bermudez v. NYC, 783 F. Supp. 2d 560, 588 (S.D.N.Y. 2011) (emphasis added).

Defendants, in conclusory fashion, describe Irons' complaints as concerning "isolated, trivial occurrences that were not sexual in nature." Def. Br. at p. 14. This is flat out false. Staton's conduct included "consistent" and "regular" "offensive gender based comments, unwanted sexual advances, [and] sexualized statements." Supra p. 3. Staton "regularly" spoke about "meet[ing] men at bars who thought she was hot, sexually attractive, and wanted to please her." Id. Similarly Staton "constantly" talked about her "sexual prowess" and "younger men finding her hot and wanting to please her." Id. Staton – who often would stare directly at Irons when making these comments[9] – engaged in sexually offensive conduct approximately three times per week for three months. Id.

---

[9] Defendants' argument that Irons' harassment claim fails because the conduct was not directed at him is without merit. Staton often would stare directly at Irons when making these comments, thus "includ[ing] [Irons] in the

22

Defendants' claim that Irons could recall only two instances of harassment is misleading. At deposition, Irons was asked whether he could provide any specific "dates, meaning not a month or a time period, but a specific date" on which he was harassed other than November 15, 2011 and November 22, 2011. Supra p. 12, n.5. While he could not recall any other specific *dates*, Irons, as stated above, did describe various specific conduct that Staton engaged in approximately three times per week from September 2011 to November 2011. Supra p. 3.

Again, if a male supervisor walked around the office speaking about younger females believing that he is sexually attractive and wanting to please him, Defendants would not even argue that the conduct was "trivial." The simple fact is that the conduct that Staton engaged in is extremely sexualized, offensive and harassing. As a result, Staton's comments caused Irons to feel "very embarrassed," "humiliated," "abused," and "felt that Ms. Betty Staton could no longer treat [him] as – fairly as a subordinate unless [he] pleased her in a way that she spoke about so oftentimes, and [he] felt that [he] was viewed as a sexual object by [Staton]." Supra p. 3.

When determining whether a hostile work environment exists under Title VII and the NYSHRL, courts look to "whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." See Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003). Based on the record, a jury would certainly be permitted to determine that Staton's harassment of Irons altered the conditions of his employment for the worse. At a minimum, a jury would be permitted to determine that Staton's

---

conversation." ¶148. Moreover, even comments not directed at an employee can contribute to a hostile work environment. See e.g., Torres v. Pisano, 116 F.3d 625, 633 (2d Cir. 1997) ("[A]n employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile."); Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) ("sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII").

harassment of Irons constitutes "unwanted gender-based conduct," which is "[a]ll that is required under the NYCHRL." Bermudez, 783 F. Supp. 2d at 588.

Finally, Defendants disingenuously argue that Staton's comments were not directed to Irons "as a man," because they would be overheard by anyone at the office "regardless of their gender." Def. Br. at p. 17. Of course, Defendants simply ignore the contents of Staton's comments, which specifically single out men as sexual objects "who [find] her hot and wanted to please her." Supra p. 3. In any event, "whether [the defendant's] unpleasant demeanor indicated hostility towards [a protected class], or a more general incivility towards all of her employees, is a question not fit for resolution on a motion for summary judgment." Ebanks v. Neiman Marcus Group, Inc., 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006).

## V. IRONS' DISCRIMINATORY TERMINATION CLAIMS MUST PROCEED TO TRIAL

"[D]iscrimination claims [also] are analyzed under the burden-shifting framework of *McDonnell Douglas*." Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003). The only aspect of the *prima facie* case at issue herein is whether there is evidence that Irons' termination "occurred under circumstances giving rise to an inference of discrimination." Galimore v. City Univ. of New York Bronx Cmty. Coll., 641 F. Supp. 2d 269, 281 (S.D.N.Y. 2009).

"[A] showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' - is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." Baron v. NYC Dep't of Educ., 06 Civ. 2816(FB)(MDG), 2009 WL 1938975, at *7 (E.D.N.Y. July 7, 2009) (quoting Mandell, 316 F.3d 368). Here, Irons was terminated, but Giles was retained, even though:

- Giles was also an attorney and performed work on the same types of cases as Irons.

- Giles performance record was objectively worse. She received such a poor review for 2010 that she filed a grievance. In Staton's words, the review "wasn't good."

- Giles also "had some real challenges in terms of her writing abilities and her research abilities and her understanding of the application of certain provisions of the law as it related to the cases that she was assigned."

- Irons complained that he did not feel that Giles "prepared for her cases or that she presented herself well in hearings."

- Giles' compensation was "very close" to Irons', and, therefore, the cost benefit of her termination would have been similar to Irons'.

Supra p. 8.

Defendants' argument that Giles was not "similarly situated" to Irons is based solely on the fact that she was a member of the union. Def. Br. at p. 25. However, that fact is irrelevant because it is undisputed that union employees were terminated in connection with the December 2011 layoffs. ¶¶10, 109. In any event, "[o]rdinarily, the question whether two employees are similarly situated is a question of fact for the jury." Mandell, 316 F.3d at 379; see also Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury.").

In addition to his *prima facie* case, Irons can demonstrate pretext for the reasons set forth supra pp. 17-22. Therefore, Irons' discriminatory termination claim must proceed to trial.

## VI. IRONS' AIDING AND ABETTING CLAIMS MUST PROCEED TO TRIAL

Irons' aiding and abetting claims must survive. As Staton "actually participated in" the unlawful conduct, she can be liable as an aider and abettor. Henry-Offor v. City Univ. of New York, 11 Civ. 4695(NRB), 2012 WL 2317540 (S.D.N.Y. June 15, 2012).

**CONCLUSION**

For the forgoing reasons, Plaintiff Irons respectfully requests that Defendants' motion for summary judgment be denied in all respects.

Dated: January 16, 2015
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: Douglas H. Wigdor
Michael J. Willemin

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com

*Counsel for Plaintiff*