UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

JONATHAN IRONS and KAREN CHANDLER,

                    Plaintiffs,             **MEMORANDUM & ORDER**
                                                   13-CV-4467 (MKB)

        v.

BEDFORD-STUYVESANT COMMUNITY
LEGAL SERVICES, LEGAL SERVICES NYC,
and BETTY STATON,

                    Defendants.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Jonathan Irons and Karen Chandler brought this action against Defendants

Bedford-Stuyvesant Community Legal Services ("BSCLS"), Legal Services NYC ("LSNYC")

and Betty Staton on August 7, 2013, alleging that Irons was subject to sexual harassment,

discrimination and retaliation on the basis of his sex in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law,

N.Y. Exec. Law § 296 ("NYSHRL") and the New York City Human Rights Law, N.Y.C.

Admin. Code § 8-107 ("NYCHRL"), that Chandler was subject to retaliation in violation of Title

VII, NYSHRL and NYCHRL, and that Defendant Staton aided and abetted violations of

NYSHRL and NYCHRL.  Defendants moved for summary judgment on all claims.[1]  For the

reasons set forth below, the Court grants Defendants' motion for summary judgment as to

Plaintiffs' Title VII and NYSHRL claims, and dismisses Plaintiffs' NYCHRL claims without

prejudice.

---

[1]  On April 17, 2015, the Court referred Defendants' motion to Magistrate Judge James
Orenstein for a report and recommendation.  The Court vacates its April 17, 2015 Order.

## I. Background

### a. The parties

LSNYC is a community-based organization that provides legal services to low-income clients throughout New York City.  (Defs. 56.1 ¶¶ 1, 5; Pls. 56.1 ¶¶ 1, 5.)  BSCLS is a component of LSNYC and provides free legal services to residents of the Bedford-Stuyvesant and Crown Heights communities in the areas of housing, foreclosure, tax, immigration, social security and unemployment insurance, and at some time it had a family law practice.  (Defs. 56.1 ¶¶ 6, 41, 50; Pls. 56.1 ¶¶ 6, 41, 50.)  In 2011, BSCLS had approximately twelve employees, and only four management positions, which were titled Project Director, Director of Housing Litigation, Director of General Litigation and Director of Finance Administration.  (Defs. 56.1 ¶ 7; Pls. 56.1 ¶ 7.)  The first three management positions were supervising attorneys, and the fourth was an administrative management position.  (Defs. 56.1 ¶¶ 8, 33–34; Pls. 56.1 ¶¶ 8, 33–34.)  The non-management employees, including six staff attorneys, were represented by the Legal Services Staff Association ("LSSA"), a union.  (Defs. 56.1 ¶¶ 10, 40; Pls. 56.1 ¶¶ 10, 40.)

BSCLS's Former Project Director, Victor Olds, hired both Chandler and Irons.  He hired Chandler, a former colleague at the United States Attorney's Office, as his confidential personal assistant in December of 2007 and Irons, a former colleague from the New York State Attorney General's Office, as Director of General Litigation at BSCLS in March of 2008.  (Defs. 56.1 ¶¶ 19–21, 29–30; Pls. 56.1 ¶¶ 19–21, 29–30.)  Both Chandler and Irons reported to Olds until Olds resigned from BSCLS in May of 2011, although Olds continued as a LSNYC employee until approximately October of 2011.  (Defs. 56.1 ¶¶ 37, 62; Pls. 56.1 ¶¶ 37, 62.)

As Director of General Litigation, Irons handled unemployment insurance, social security benefits, family court and "some, but not many," immigration matters, and supervised attorneys

— Debra Giles, Jooyeon Lee, Gina Son and Catherina Isobe — in the same types of matters.[2] (Defs. 56.1 ¶¶ 23–26; Pls. 56.1 ¶¶ 23–26.) Plaintiffs assert that Irons had additional responsibilities, including attending community meetings and orchestrating outreach in community settings. (Pls. 56.1 ¶ 23; Tr. of Aug. 5, 2014 Dep. of Jonathan Irons ("Irons Dep."), annexed to Decl. of Michael J. Willemin in Opp'n to Mot. for Summ. J. ("Willemin Decl.") as Ex. 1, 61:21–62:6.) Irons served in this position until he was terminated in January of 2012. (Defs. 56.1 ¶ 28; Pls. 56.1 ¶ 28.) In 2011, his annual salary was approximately $106,000. (Defs. 56.1 ¶ 127; Pls. 56.1 ¶ 127.)

Chandler, who was not an attorney, was promoted from Olds' personal assistant to Director of Finance and Administration in April or May of 2008. (Defs. 56.1 ¶¶ 32, 125; Pls. 56.1 ¶¶ 32, 125.) In that position, Chandler dealt with grants, budgeting and purchasing, and worked directly with Pascale Nijhof, LSNYC Director of Grants and Contracts, and Laura Vogel, LSNYC Director of Budget. (Defs. 56.1 ¶¶ 33–36; Pls. 56.1 ¶¶ 33–36.) Chandler served in this position until she was terminated in January of 2012. (Defs. 56.1 ¶ 39; Pls. 56.1 ¶ 39.) In 2011, Chandler's salary was approximately $72,400. (Defs. 56.1 ¶ 128; Pls. 56.1 ¶ 128.)

Staton is the current President of BSCLS, and served as Chair of the Board of Directors of BSCLS (the "BSCLS Board") in 2011 until she became Acting Project Director in July of that year. (Defs. 56.1 ¶¶ 11, 16–17; Pls. 56.1 ¶¶ 11, 16–17.) Staton permanently assumed the Project Director role in 2012, and has held the title of President since the summer of 2012. (Defs. 56.1

---

[2] Each attorney under Irons' supervision handled cases in one or more of BSCLS's practice areas. Giles handled supplemental security income cases and some housing cases, Lee handled housing cases and a few immigration and Social Security cases, Son handled immigration cases, and Isobe handled foreclosure actions. (Defs. 56.1 ¶¶ 43–46, 48; Pls. 56.1 ¶¶ 43–46, 48.) Paralegals were also available to represent clients at Social Security hearings. (Defs. 56.1 ¶ 49; Pls. 56.1 ¶ 49.) The Director of Housing Litigation, not Irons, was responsible for supervising BSCLS's "numerous" housing cases. (Defs. 56.1 ¶¶ 24, 42; Pls. 56.1 ¶¶ 24, 42.)

¶¶ 17–18; Pls. 56.1 ¶¶ 17–18.)  As Acting Project Director and Project Director, Staton's duties include supervising all the attorneys, handling BSCLS goals and grants, and conducting budget planning and oversight.  (Defs. 56.1 ¶ 17; Pls. 56.1¶ 17.)  Staton has the authority to make decisions concerning the termination of employees.  (Defs. 56.1 ¶ 17; Pls. 56.1¶ 17.)

   **b.  Staff concerns about management**

   Beginning in late 2010, members of the BSCLS staff and the Board of LSNYC voiced concerns about the working conditions and staff morale at BSCLS.  Many of the complaints were about Olds, and, in particular, his "management" and "leadership."  (Defs. 56.1 ¶¶ 51–54; Pls. 56.1 ¶¶ 51–54; *see* E-mail from Michael D. Young to Betty Staton, annexed to Decl. of Andrew Rice in Supp. of Defs. Mot. for Summ. J. ("Rice Decl.") as Ex. SS, D006785–86.)  In an e-mail dated March 14, 2011, the "concerned" staff e-mailed Staton expressing reservations about Olds, and noted that there "are two standards for employee conduct: one for the Project Director and his allies, and another for everyone else."  (Defs. 56.1 ¶ 55–57; Pls. 56.1 ¶¶ 55–57; Mar. 14, 2011 e-mail annexed to Decl. of Betty Staton ("Staton Decl.") as Ex. A.)  That same day, Staton responded to the e-mail and stated that the BSCLS was "formulating a plan of action" regarding more effective leadership and positive growth for the staff and the organization, and invited the staff members to a board meeting on March 16, 2011.  (Defs. 56.1 ¶ 58; Pls. 56.1 ¶ 58; E-mail from Betty Staton dated Mar. 14, 2011, annexed to Staton Decl. as Ex. B, D006776.)  On March 16, 2011, some BSCLS staff — not including Irons or Chandler — attended the board meeting to further explain their concerns, but no minutes were taken.  (Defs. 56.1 ¶¶ 59, 61; Pls. 56.1 ¶¶ 59, 61.)  On March 18, 2011, the staff sent a letter to Staton and the BSCLS Board "to memorialize [the] discussion," (the "March 18, 2011 Letter"), which did not mention Irons or Chandler. (Mar. 18, 2011 Letter, annexed to Willemin Decl. as Ex. 12.)  In May of 2011, Olds resigned and

Staton became Acting Project Director at BSCLS. (Defs. 56.1 ¶¶ 62–63; Pls. 56.1 ¶¶ 62–63.)

Plaintiffs dispute any inference that the discontent amongst the staff and in the BSCLS or LSNYC Boards was related to their employment. (Pls. 56.1 ¶¶ 54–57.) Plaintiffs also highlight that they received positive reviews at work,[3] and assert that no one at BSCLS or LSNYC communicated to them or to Olds that Plaintiffs' performance was deficient, that they were not well-liked among the staff, or that they had any attendance problems. (*See* Pls. 56.1 ¶ 59; Mar. 14, 2011 e-mail; Staton Dep. 116:2–117:22.) Plaintiffs' coworker Jessica Rijo-Lopez, who signed the March 18, 2011 Letter to the BSCLS Board, also could not recall any complaints about Irons or Chandler. (Mar. 18, 2011 Letter at D006784; Tr. of Aug. 25, 2014 Dep. of Jessica Rijo-Lopez ("Rijo Dep."), annexed to Willemin Decl. as Ex. 10, 32:2–33:22.)

Defendants suggest that the staff concerns about management at BSCLS included Olds, as well as Irons and Chandler, who were viewed as Olds' allies and were perceived to be governed by a different set of rules under Olds' management. (*See* Def. 56.1 ¶ 53.) Staton testified that these concerns led the Board to pressure her to terminate Irons' employment beginning in April or May of 2011. (Staton Dep. 101:3–21.) The parties agree that Staton had

---

[3] *E.g.*, Tr. of Aug. 21, 2014 Dep. of Victor Olds ("Olds Dep."), annexed to Willemin Decl. as Ex. 7, 88:25–89:25; Evaluation form for Jonathan Irons by Victor Olds dated Dec. 16, 2010 ("Irons Dec. 2010 Eval."), annexed to Willemin Decl. as Ex. 14; E-mail from Michael Young dated Jan. 24, 2011, annexed to Willemin Decl. as Ex. 15 (congratulating Plaintiffs for exceeding goals); *see also* Tr. of Aug. 8, 2014 Dep. of Betty Staton ("Staton Dep."), annexed to Willemin Decl. as Ex. 3, 237:5–24 (stating that there are no documents to reflect Plaintiffs' poor performance); Tr. of Aug 22, 2014 Dep. of Raun Rasmussen ("Rasmussen Dep."), annexed to Willemin Decl. as Ex. 8, 56:2–24 (stating that Plaintiffs were not hurting clients).

The Court notes that different but overlapping excerpts of the transcripts of the August 8, 2014 deposition of Betty Staton and August 22, 2014 deposition of Raun Rasmussen, LSNYC Executive Director, are annexed as Exhibits E and B, respectively, to the Rice Declaration. The parties have similarly attached different and overlapping excerpts of other depositions, as well. The Court will refer generally to each deposition to include both sets of excerpts, regardless of whether they are annexed to the Willemin Declaration or to the Rice Declaration.

practically no interaction with Irons or Chandler after Staton became Acting Project Director in July of 2011, and Defendants contend that it is because Staton did not expect that they would remain employed by BSCLS for much longer.  (Defs. 56.1 ¶¶ 27, 38; Pls. 56.1 ¶¶ 27, 38; Staton Dep. 101:3–18.)

### c.   BSCLS 2011 budget cuts and layoffs

In 2011, various LSNYC constituent programs faced funding problems and were required to make budget cuts.  (Defs. 56.1 ¶ 68; Pls. 56.1 ¶ 68.)  LSNYC, and consequently BSCLS, lost a portion of their funding from the federal Legal Services Corporation, and BSCLS lost funding for family law work from "Keeping Families Together," a prior funding source.  (Defs. 56.1 ¶¶ 50, 68; Pls. 56.1 ¶¶ 50, 68.)  The budget concerns made it likely that some layoffs and other cost-reducing measures would be necessary, although the parties dispute when the decision to lay off employees became final.  (Defs. 56.1 ¶¶ 67–70, 113; Pls. 56.1 ¶¶ 67–70, 113.)  BSCLS's budget was submitted to the LSNYC Board for approval at the last LSNYC Board meeting of the year, in December of 2011.  (Defs. 56.1 ¶ 64; Pls. 56.1 ¶ 64.)  Vogel prepared "budget workbooks" in advance of this meeting to track revenues and expenses for the LSNYC programs, including BSCLS, and those workbooks were ultimately prepared to comply with the LSNYC Board's budget directives.  (Defs. 56.1 ¶ 65; Pls. 56.1 ¶ 65.)

Throughout 2011, BSCLS predicted that it would be required to reduce its expenses by around five "full-time equivalents" or "FTEs," which approximate the average annual total compensation cost for an LSNYC employee — although Plaintiffs assert that the budget was in flux, and it was not clear what, if any, reductions or layoffs were necessary until the final budget was approved in December of 2011.  (Defs. 56.1 ¶¶ 75–76; Pls. 56.1 ¶¶ 75–76.)  LSNYC offered a voluntary buyout program to employees in July of 2011 in an effort to reduce the need for

layoffs and other cutbacks, and one BSCLS employee, Robert Purdie, took advantage of the program. (Defs. 56.1 ¶¶ 71, 73; Pls. 56.1 ¶¶ 71, 73.) As early as July of 2011, after Staton became Acting Project Director, Staton and LSNYC's then-Chief of Operations Jeanne Perry considered laying off Chandler, and Staton and Perry discussed laying off Chandler in conjunction with other potential cost-cutting scenarios.[4] (Defs. 56.1 ¶ 80; Pls. 56.1 ¶ 80.) LSNYC's Brooklyn programs began to consider consolidating administrative functions in the summer of 2011. (Defs. 56.1 ¶ 125; Pls. 56.1 ¶ 125.) Throughout the summer and fall of 2011, Staton repeatedly told the BSCLS staff and BSCLS and LSNYC Boards that there was a layoff mandate, but expressed optimism about raising funds, and about reducing the number of potential layoffs through alternative workforce reductions.

On August 30, 2011, Lana Gilbert, then-LSNYC Human Resources Administrator, e-mailed a document detailing cost calculations for Irons and Chandler's layoffs and a buyout for Robert Purdie (pursuant to the program announced in July). (E-mail dated Aug. 30 from Gilbert to B. Caines and Perry, annexed to Willemin Decl. as Ex. 21.) On August 31, 2011, Rasmussen sent an e-mail to all staff at LSNYC programs explaining the difficult financial situation. (Defs. 56.1 ¶ 84; Pls. 56.1 ¶ 85.) On September 15, 2011, five draft budget workbooks were prepared, including two that did not include Plaintiffs as employees after 2011, and three that showed their continued employment. (*Compare* Budget Workbooks dated Sept. 15, 2011, annexed to Willemin Decl. as Exs. 16–17, 20, at 9 *with* Budget Workbooks dated Sept. 15, 2011, annexed to

---

[4] Perry testified that, based on documents reviewed at her deposition, she did not believe the decision was finalized before October 11, 2011, but that Plaintiffs' layoffs were included in a working set of assumptions" about where to cut costs, based on the needs of the program, the relative ease of laying off management employees versus union employees, and the spending on each employee. (Tr. of Aug. 14, 2014 Dep. of Jeanne Perry ("Perry Dep."), annexed to Willemin Decl. as Ex. 4, 134:13–1367:20; *see also* Pls. 56.1 ¶ 70(vi).)

Willemin Decl. as Exs. 18–19, at 9.)  The only other staff reductions reflected in any of the budget workbooks were Robert Purdie, who had accepted a voluntary buyout, and Victor Olds. (*Id.*)  The parties agree that these were prepared "in order to illustrate the impact on the budget of various staffing assumptions."[5]  (Defs. 56.1 ¶ 90; Pls. 56.1 ¶ 90.)

On September 19, 2011, Staton e-mailed all BSCLS employees a memorandum about the budget, explaining that the budget was not "final" but "there is no doubt that some level of layoffs is inevitable."  (Defs. 56.1 ¶ 90; Pls. 56.1 ¶ 90.)  Reports to the LSNYC Board in September and October of 2011 expressed hope that the buyouts program would reduce the need for layoffs, but noted that voluntary buyouts were more expensive than layoffs.  (Minutes of LSNYC Bd. Meeting dated Sept. 13, 2011, annexed to Willemin Decl. as Ex. 40, D002881 (expressing hope to reduce layoffs through buyout); Minutes of LSNYC Bd. Meeting dated Oct. 11, 2011, annexed to Willemin Decl. as Ex. 43, D002263 (same, noting buyouts cost more than layoffs).)  On September 23, 2011, Staton held a meeting with the BSCLS staff to discuss the proposed cuts in staff.  (Defs. 56.1 ¶ 91; Pls. 56.1 ¶ 91; Agenda dated Sept. 23, 2011, annexed to Rice Decl. as Ex. Q.)  On September 27, 2011, the buyout was extended.  (E-mail dated Sept. 27, 2011 from Perry to "Eligible Employees," annexed to Willemin Decl. as Ex. 24.)

On October 11, 2011, Perry e-mailed Gilbert asking for a budget including the layoffs of Irons and Chandler and the buyout for Purdie.  (Defs. 56.1 ¶ 93; Pls. 56.1 ¶ 93.)  Gilbert testified that she could not recall if this was a "final document," but she stated that she thought it was. (Pls. 56.1 ¶ 93(1); Tr. of Aug. 15, 2014 Dep. of Lana Gilbert ("Gilbert Dep."), annexed to

---

[5]  Defendants also contend that alternate versions of the "active" or operative budget workbooks were occasionally prepared so that the Project Directors at LSNYC programs could see the effect of different staffing alternatives and see what *additional* layoffs might be needed. (Decl. of Laura Vogel in Supp. of Defs. Mot. for Summ. J. ("Vogel Decl.") ¶ 5, Docket Entry No. 40-7; Rasmussen Dep. 62:9–64:5.)

Willemin Decl. as Ex. 6, 28:15–29:15.)  Alternate models were exchanged the following day,

and the active budget workbook continued to reflect no staff reductions beyond Olds.  (Defs.

56.1 ¶ 94; Pls. 56.1 ¶ 94.)  On October 19, 2011, Staton prepared a report to the BSCLS Board

indicating that she hoped the number of layoffs would be lower than originally estimated.

(Project Director Report to BSCLS Bd. dated Oct. 19, 2011, annexed to Willemin Decl. as Ex.

27, D002309).  Throughout October and early November, more budget workbooks were

prepared, some of which showed Plaintiffs' continued employment, and some of which did not.

(Defs. 56.1 ¶¶ 96–100; Pls. 56.1 ¶¶ 96–100; Budgets dated Oct 12, Oct. 15, Oct. 25, Nov. 4,

Nov. 8, and Nov. 14, 2011, annexed to Willemin Decl. as Exs. 25–26, 28–31.)  The only other

staff reductions shown were Olds' resignation and Purdie's buyout.  (Budgets annexed to

Willemin Decl. as Exs. 25–26, 28–31.)

On November 14, 2011, Staton sent a "Notice of Intent to Lay Off" to all BSCLS staff

("Layoff Notice") noting that, in accordance with the collective-bargaining agreement with the

BSCLS staff union, the management was providing formal notice of its intent to make layoffs.

(Defs. 56.1 ¶ 101; Pls. 56.1 ¶ 101.)  The Notice included an e-mail from board member Job

Mashiriki, which stated that BSCLS "intends to implement layoffs effective January 4, 2012,"

but that it would "consider any alternative proposal provided by the union."  (Pls. 56.1 ¶ 70(xiv);

E-mail dated Nov. 14, 2011 from Betty Staton to "BSLS – Staff", annexed to Willemin Decl. as

Ex. 32.)  On November 15, 2011, the federal Legal Service Corporation announced that it would

reduce funding to organizations like LSNYC by more than the amount previously projected.[6]

(Defs. 56.1 ¶ 102; Pls. 56.1 ¶ 102.)  BSCLS needed to retain attorneys who had expertise in the

---

[6] As of January 25, 2012, thirteen percent of all attorneys and support staff across Legal
Service Corporation-funded programs were laid off; there were 1226 full-time staff reductions
across Legal Service Corporation programs nationwide.  (Defs. 56.1 ¶ 112; Pls. 56.1 ¶ 112.)

subject-matter of areas for which it had grants.  (Defs. 56.1 ¶ 123; Pls. 56.1 ¶ 123.)

The BSCLS Board met on November 16, 2011, and the minutes reflect that layoffs were still being considered, but Staton was "working on reducing the amount."  (Defs. 56.1 ¶ 103; Pls. 56.1 ¶ 103; Minutes of BSCLS Bd. of Dirs. Meeting dated Nov. 16, 2011, annexed to Willemin Decl. as Ex. 33, at D001673.)  On November 18, 2011, the "active" budget workbook for BSCLS reflected that Irons and Chandler would be laid off, and on that same date, Rasmussen e-mailed the Project Directors and informed them that two managers at BSCLS (and one at another location) were to be laid off.[7]  (Defs. 56.1 ¶¶ 104–105; Pls. 56.1 ¶¶ 104–105.)  On November 30, 2011, the "active" budget workbook reflected Plaintiffs' layoffs, Son's layoff, Purdie's buyout, and reduced workweeks or furloughs for several other BSCLS employees.  (Defs. 56.1 ¶ 107; Pls. 56.1 ¶ 107.)

Plaintiffs were notified on December 2, 2011 that they would be laid off effective January 4, 2012.  (Defs. 56.1 ¶ 108; Pls. 56.1 ¶ 108.)  On December 9, 2011, Lana Gilbert e-mailed Rasmussen a document titled "List of Layoffs 12-8-11-2," which showed that Plaintiffs and Son were selected for layoffs at BSCLS.  (E-mail dated Dec. 9, 2011, annexed to Willemin Decl. as Ex. 35, at D005197–98.)

### d.  Sexual harassment complaint and investigation

In the period between the issuance of the thirty-day layoff notice to all employees, on November 14, 2011, and when he was notified of his layoff on December 2, 2011, Irons complained to LSNYC's Human Resources Department ("HR") that Staton sexually harassed

---

[7] As discussed further below, Plaintiffs argue that because the budget workbooks could be changed until they were adopted by the LSNYC Board on December 10, 2011, the "active" workbook was not final, nor were any decisions regarding their termination.  (Pls. 56.1 ¶¶ 66–70, 104, 106.)

him, as detailed below. Irons testified that, from September through November of 2011, Staton subjected him to a pattern of sexual harassment, including "offensive gender based comments, unwanted sexual advances, [and] sexualized statements . . . ." (Defs. 56.1 ¶ 142; Pls. 56.1 ¶ 142.)

Irons could recall only two specific dates on which the conduct occurred, but testified that it regularly occurred approximately three times per week. (Irons Dep. 157:22–159:18, 161:8–21, 166:9–169:12.) Irons contends that, on November 15, 2011, Staton looked at Irons directly and said, to two other BSCLS employees, "I have a man who is 14 years younger than me, and he knows how to please me, will take care of me and please me." (Defs. 56.1 ¶ 144; Pls. 56.1 ¶ 144; Irons Dep. 160:6–161:4, 162:22–163:23.) On November 22, 2011 — after Irons complained to Chandler about the November 15, 2011 incident, which complaint is discussed in further detail below — Irons overheard Staton speaking with another individual in a loud and "boisterous" manner, discussing a man at a bar who wanted to "pick her up." (Defs. 56.1 ¶ 145; Pls. 56.1 ¶ 145.) Staton did not make these remarks directly to Irons, who was in his office at the time. (Defs. 56.1 ¶ 145; Pls. 56.1 ¶ 145.)

### i.   Complaints

Irons complained about Staton's "continual" remarks to Chandler, including the November 15, 2011 incident, and later made a formal complaint to HR. Irons and Chandler gave different accounts of his complaints.

Irons testified that he first complained to Chandler about Staton's behavior beginning in September of 2011 (although Irons does not recall any specific incident other than the November 15 and November 22, 2011 incidents), but not to anyone else at LSNYC or BSCLS. (Defs. 56.1 ¶ 154; Pls. 56.1 ¶ 154.) On November 16, 2011, he asked Chandler about making a formal

sexual harassment complaint because Chandler, as the Director of Finance and Administration at BSCLS, would have insight into the proper channels for making such a complaint.[8]  (Defs. 56.1 ¶ 156; Pls. 56.1 ¶ 156.)  Chandler contacted Verna Alexander, who worked at Queen Legal Services and who Chandler believed sat on LSNYC's "sexual harassment panel."  (Defs. 56.1 ¶ 156; Pls. 56.1 ¶ 156.)  Alexander told Chandler that the sexual harassment panel was not meeting[9] and that Irons should speak to Lana Gilbert, in HR.  (Defs. 56.1 ¶ 158; Pls. 56.1 ¶ 158.) On November 23, 2011, the day before Thanksgiving,[10] Irons contacted HR about his complaints for the first time.  (Defs. 56.1 ¶ 159; Pls. 56.1 ¶ 159.)  He spoke with Elisette Reynoso, and told her that he wanted to file a complaint against Staton for sexual harassment; Reynoso told Irons that he could talk to Rasmussen, but Irons declined.  (Defs. 56.1 ¶ 159; Pls. 56.1 ¶ 159.) Reynoso called Gilbert, who was on vacation, and Reynoso told Irons that Gilbert would return the following week and would contact him to speak about the matter further.  (Defs. 56.1 ¶ 159; Pls. 56.1 ¶ 159.)

Chandler testified that Irons first complained to her "around" November 15, 2011, about

---

[8]  Irons' testimony that he reached out to Chandler on November 16, 2011 to ask about the "proper channels" for lodging a complaint against Staton suggests that his earlier complaints to Chandler arose out of their personal friendship, and not Chandler's position as Director of Finance and Administration.  (*See* Irons Dep. 169:15–171:20 (indicating that Irons was complaining about Staton all the time to his wife and to Chandler, that he was "bewildered" by Staton's behavior and "didn't take anything beyond that point," and Chandler complained that "she heard similar things that I heard . . . it was highly inappropriate and unseemly . . ."); *id.* 233:4–22 (discussing how he went to Chandler to make a complaint on November 16, 2011, "because of her title primarily").).

[9]  There is some dispute about whether the sexual harassment panel had been "disbanded" or "dissolved" at that point.  (*See* Defs. 56.1 ¶ 158; Pls. 56.1 ¶ 158.)

[10]  The Court takes notice that Thanksgiving was on Thursday, November 24, 2011.  *See Yoselovsky v. Associated Press*, 917 F. Supp. 2d 262, 280 (S.D.N.Y. 2013) (taking judicial notice that Passover began at sundown on Wednesday, April 8, 2009 (citing Fed. R. Evid. 201(b))).

the November 15, 2011 incident. (Defs. 56.1 ¶ 154; Pls. 56.1 ¶ 154; Chandler Dep. 197:25–198:7.) Chandler testified that, on the same day, she reached out to Alexander, communicated the information she received from Alexander to Irons, and then had another conversation with Irons, wherein Irons told Chandler that he had called Gilbert and Reynoso after speaking with her. (Defs. 56.1 ¶ 160; Pls. 56.1 ¶ 160; Chandler Dep. 210:2–211:19.) Chandler testified that she believed Irons spoke with Reynoso over the phone on November 15, 2011, because Irons told her that he did, and because "[his] office is right next to me. I can hear exactly who he's talking to." (Chandler Dep. 211:20–24.) However, the parties appear to accept that Irons contacted HR for the first time on November 23, 2011, consistent with Irons' testimony. (Defs. 56.1 ¶ 159; Pls. 56.1 ¶ 159.)

Chandler did not discuss Iron's sexual harassment allegations with anyone at BSCLS other than Alexander and Irons, Alexander did not discuss her call from Chandler with anyone else.[11] (Defs. 56.1 ¶ 158; Pls. 56.1 ¶ 158.) Reynoso called Rasmussen on November 23, 2011, to tell him that there was a complaint involving Staton. (Rasmussen Dep. 123:2–124:19.) Staton testified that Perry and Rasmussen called her about Irons' sexual harassment complaint in "late November 2011," which she asserts was the first time she became aware of his allegations. (Staton Dep. 265:24–269:4; *see also* Perry Dep. 106:14–107:2 (noting that she and Rasmussen called Staton to discuss the complaint).) Staton could not recall when she learned that Chandler had any involvement in Irons' sexual harassment complaint. (Staton Dep. 317:15–318:3.)

---

[11] Alexander testified that she might have sent Lana Gilbert an e-mail stating that there was a complaint, but that she could not recall if she did. (Tr. of Aug. 15, 2014 Dep. of Verna Alexander ("Alexander Dep."), annexed to Willemin Decl. as Ex. 5, 39:19–41:21.) No such e-mail has been presented to the Court. Gilbert testified that she first learned that Irons made a complaint when Reynoso called her at home on November 23, 2011, "the day before Thanksgiving," and did not testify that she had received an e-mail from Alexander regarding the complaint. (Gilbert Dep. 47:16–49:13.)

### ii.    Internal investigation

Gilbert called Irons on November 28, 2011, the Monday after Thanksgiving, upon her return to the office.  (Defs. 56.1 ¶ 162; Pls. 56.1 ¶ 162.)  Thereafter, Gilbert informed Perry that Irons had made a complaint about Staton.  (Defs. 56.1 ¶ 163; Pls. 56.1 ¶ 163.)  Perry and Rasmussen met to discuss Irons' allegations, and contacted LSNYC Board members to engage attorney Vilia Hayes, of Hughes Hubbard & Reed LLP, to investigate the sexual harassment claim.  (Defs. 56.1 ¶ 163; Pls. 56.1 ¶ 163.)  Hayes was a member of the LSNYC Board. (Rasmussen Dep. 133:2–2; Tr. of Aug. 22, 2014 Dep. of Vilia B. Hayes ("Hayes Dep."), annexed to Willemin Decl. as Ex. 9, 15:15–16:3.)  Hayes interviewed Irons on December 1, 2011, Staton on December 2, 2011 and December 5, 2011, and Chandler on December 29, 2011. (Defs. 56.1 ¶¶ 167–69; Pls. 56.1 ¶¶ 167–69.)  Hayes also interviewed other witnesses identified by Irons.[12]  (Defs. 56.1 ¶ 170; Pls. 56.1 ¶ 170.)  She eventually submitted a report summarizing her investigation.

### e.    Plaintiffs' termination

On December 2, 2011, Staton sent Irons and Chandler each a "30 Day Layoff Notice," informing them that they would be laid off effective January 4, 2012.  (Defs. 56.1 ¶ 108; Pls.

---

[12]    Plaintiffs argue that Hayes did not interview Jessica Rijo, a witness identified by Irons, and instead fraudulently manufactured notes from a purported interview with Rijo.  (*See* Pls. 56.1 ¶¶ 170–71.)  Plaintiffs contend that "Rijo testified that she never spoke to any investigator in connection with Irons' complaint of sexual harassment."  (*Id.* ¶ 171(iii) (citing Rijo Dep. 24:13–26:21).)  This allegation misstates Rijo's testimony.  After Rijo stated that she did not meet with an investigator in the case, she was shown a document in an attempt to refresh her recollection.  After reviewing it, she testified that it was possible she met with an investigator on December 16, 2011, but she could not remember.  (Rijo Dep. 24:13–29:3.)  This does not "suggest[] that Hayes simply fabricated the summary of the Rijo interview," as Plaintiffs assert. (Pls. 56.1 ¶ 171(iii).)

56.1 ¶ 108.)  Son, a female staff attorney at BSCLS and a member of the union,[13] was also laid

off effective January 4, 2012, and BSCLS furloughed employees to reduce its budget deficit

further.  (Defs. 56.1 ¶¶ 107, 109–110; Pls. 56.1 ¶¶ 107, 109–110.)  On December 10, 2011, the

LSNYC Board adopted the final budget, which reflected these reductions.  (Defs. 56.1 ¶ 111; Pls.

56.1 ¶ 111.)  In total, LSNYC laid off nineteen employees at the end of 2011, including twelve

female employees at offices other than BSCLS.  (Defs. 56.1 ¶ 112; Pls. 56.1 ¶ 112.)

The parties vehemently dispute when the "final" decision to terminate Irons and Chandler

was made.  According to Defendants, Plaintiffs were candidates for layoff beginning in the

summer of 2011, when it became clear that BSCLS would have to cut back expenses by five

FTEs.  (Defs. 56.1 ¶¶ 83–84; e.g., Rasmussen Dep. 62:9–64:5; Vogel Decl. ¶ 6.)  Michael D.

Young, who served as interim Executive Director of LSNYC from June of 2010 to June of 2011

and thereafter served as Vice Chair of the LSNYC Board until June of 2014, stated that the

LSNYC Board had directed BSCLS that any relief from its budget constraints was contingent on

BSCLS "cut[ting] its budget at least by laying off Mr. Irons and Ms. Chandler."  (Young Decl. in

Support of Defs. Mot. for Summ. J. ("Young Decl.") ¶¶ 2–3, 7, Docket Entry No. 40-10.)  Staton

convinced the board to wait to lay off Irons and Chandler until December, because it would be

easier to terminate them when layoffs were mandated.  (Staton Dep. 125:11–128:18.)  Staton

testified that Plaintiffs' layoffs were finalized in the late summer of 2011, and that she "made the

names [of those being laid off] known for the record at LSNY[C] in August of 2011."[14]  (Staton

_____

[13]  The collective bargaining agreement with the union required layoffs in seniority order
except for "programmatic reasons."  (Defs. 56.1 ¶ 122; Pls. 56.1 ¶ 122.)

[14]  Plaintiffs note that their layoffs are not mentioned in the board minutes from ten
different board meetings between May 10, 2011 and December 21, 2011.  (Pls. 56.1 ¶ 70(xix);
Minutes of LSNYC and BSCLS Board of Directors meetings, annexed to Willemin Decl. as Exs.

Dep. 137:21–138:18.)

Plaintiffs highlight several statements which indicate that the budgets were in draft form and that the number of layoffs could have been reduced. For example, on August 30, 2011, Gilbert prepared a document projecting the cost savings if Irons and Chandler were laid off, and testified that it was her understanding that Plaintiffs were being "considered" for layoff, but she was unaware if a final decision to terminate Irons and Chandler had been made at that time. (Tr. of Aug. 15, 2014 Dep. of Lana Gilbert ("Gilbert Dep."), annexed to Willemin Decl. as Ex. 6, 25:15–27:20; E-mail dated Aug. 30, 2011 from Gilbert to Betty Caines copying Jeanne Perry, annexed to Willemin Decl. as Ex. 21, D005270.) The following day, Rasmussen sent an e-mail to all LSNYC employees stating that LSNYC intended to "raise funds to preserve as many jobs as possible." (E-mail dated Aug. 31, 2011 re: "funding update," annexed to Willemin Decl. as Ex. 22, D004983.) Saton's October 19, 2011 report to the BSCLS Board states that Staton was "still hoping that the number of lay-offs will be less than originally estimated." (Report of Acting Project Director dated Oct. 19, 2011, annexed to Willemin Decl. as Ex. 27, D002309.) Plaintiffs assert that a list of layoffs was not created until December 8, 2011, after they were notified of their termination. (Pls. 56.1 ¶ 70(xvii); E-mail dated Dec. 9, 2011.)

**f. EEOC filings**

Irons and Chandler filed charges of discrimination with the EEOC on April 5, 2012 and

_____

37–46.) However, the November 15, 2011 minutes of the LSNYC Board meeting did reflect plans for "approximately 15 staff layoffs" across four offices, including BSCLS, and included a note that "approval to redesign the Central office will have a favorable budget impact." (Minutes of Nov. 15, 2011 LSNYC Board meeting, annexed to Willemin Decl. as Ex. 44, D006265.) Defendants contend that this decision was not included in board minutes or in any budget documentation that was circulated to other staff in order to maintain confidentiality and avoid revealing the fact of the layoffs too early, thus further harming morale and productivity among the employees slated for layoff. (Defs. 56.1 ¶ 89; Rasmussen Dep. 114:18–115:5; Staton Dep 246:19–247:23; Vogel Decl. ¶ 5.)

August 15, 2012, respectively.  (Compl. ¶ 10; Defs. 56.1 ¶¶ 172, 177; Pls. 56.1 ¶¶ 172, 177.)

The EEOC issued two separate right-to-sue letters on May 15, 2013, one to Irons and one to

Chandler.  (Defs. 56.1 ¶¶ 174, 178; Pls. 56.1 ¶¶ 174, 178.)  On August 7, 2013, Plaintiffs timely

filed this action.

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Tolbert v. Smith*, 790

F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir.

2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013).  The role of the court is not

"to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162

(2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine

issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for

the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not

sufficient to defeat summary judgment.  *Id*.  The court's function is to decide "whether, after

resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational

juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.

2000).  The Second Circuit has cautioned that "[w]here an employer acted with discriminatory

intent, direct evidence of that intent will only rarely be available, so affidavits and depositions

must be carefully scrutinized for circumstantial proof which, if believed, would show

discrimination."  *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

    **b.  Irons' Title VII and NYSHRL discriminatory discharge claim**

Irons contends that his discharge was discriminatory on the basis of his sex, in violation

of Title VII and NYSHRL.[15]  Title VII and NYSHRL discrimination claims are assessed using

the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in which

the Supreme Court set forth a burden-shifting scheme that governs a plaintiff's ultimate burden

of proof at trial.  *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (discussing

burden-shifting, citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248, 253–55 (1981)); *see also Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60

(2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome

of an employment discrimination claim made pursuant to the NYSHRL is the same as it is

under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363

n.1 (2d Cir. 1999))).  Under that framework, a plaintiff must first establish a *prima facie* case of

discrimination.  *Hicks*, 509 U.S. at 506; *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir.

2010).  The plaintiff's burden at this stage is "minimal" or "*de minimis*."  *Hicks v. Baines*, 593

F.3d 159, 164 (2d Cir. 2010); *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting

*Hicks*, 509 U.S. at 506).  If plaintiff meets her burden at the *prima facie* stage, a temporary

presumption of discrimination arises, and the burden shifts to the employer-defendant to

---

[15]  Irons brings a single "cause of action" for discrimination and harassment in violation of Title VII, (*see* Compl. ¶¶ 62–67), and one for discrimination and harassment in violation of the NYSHRL, (*see id.* ¶¶ 72–79).  However, Irons specifically alleges that he was subject to discriminatory discharge in addition to workplace-related sexual harassment, (*id.* ¶¶ 2, 42, 44). Although discriminatory discharge and sexual harassment are two theories under which a plaintiff can show gender discrimination, and Irons groups these two theories into one "cause of action," for clarity, the Court considers Irons' theories of discrimination separately.

articulate a legitimate, nondiscriminatory reason for its actions. *Vega v. Hempstead Union Free Sch. Dist.*, --- F.3d ---, ---, 2015 WL 5127519, at *9 (2d Cir. Sept. 2, 2015); *see Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. "The defendant's burden at this step in the analysis is also 'light.'" *Risco v. McHugh*, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998)). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *Hicks*, 509 U.S. at 509). If the employer satisfies its burden, the plaintiff must then "demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). To defeat summary judgment on a discrimination claim at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

To establish a *prima facie* case of sex discrimination under Title VII, a plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 29 (2d Cir. 2015); *Ruiz*, 609 F.3d at 491–92. A plaintiff can meet the fourth element of the *prima facie* case by pointing to similarly-situated employees outside the protected class who did not suffer the same fate. *See McDonnell v. Schindler Elevator Corp.*, --- F. App'x ---,

---, 2015 WL 4038567, at *3 (2d Cir. July 2, 2015) (quoting *Abdu-Brisson v. Delta Air Lines,*

*Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)); *Ruiz*, 609 F.3d at 493–94.

Defendants[16] assert that they are entitled to summary judgment on Irons' discriminatory

discharge claim because Irons failed to produce evidence that Defendants were acting with

discriminatory intent, and because Defendants proffered several legitimate, non-discriminatory

reasons for Irons' discharge. (Defs. Mem. in Supp. of Mot. for Summ. J. ("Defs. Mem.") 25,

Docket Entry No. 40-13.) Irons argues that there is an issue of fact as to Defendants' motivation

because he was terminated while Giles, a female BSCLS attorney who worked on the same type

of cases as Irons, was retained. (Pl. Irons' Mem. in Opp'n to Defs. Mot. for Summ. J. ("Irons

Mem.") 24–25, Docket Entry No. 43.) The parties dispute whether Irons and Giles were

similarly situated, and whether that issue can be resolved on the facts presented in this motion.

(*Compare id. with* Defs. Mem. 18–19.) As the first three elements of the *prima facie* case are not

currently in dispute, the Court will assume that Irons meets all three elements and addresses only

whether he has raised an inference of discriminatory intent.

### i. Inference of discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in

differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196,

204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.

1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred

under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish*

---

[16] Plaintiffs' Title VII claims are only against BSCLS and LYSNYC. (Compl. ¶¶ 62–74
(bringing two causes of action alleging (1) discrimination and harassment, and (2) retaliation in
violation of Title VII).) Plaintiffs' NYSHRL claims are against all Defendants, and against
Staton as an aider and abettor. (*Id.* ¶¶ 75–89.) The Court addresses Plaintiffs' NYSHRL claim
against Staton for aiding and abetting separately.

*Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citation

omitted). An inference of discrimination can be drawn from circumstances such as: "the

employer's continuing, after discharging the plaintiff, to seek applicants from persons of the

plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's

performance in [ ] degrading terms; or its invidious comments about others in the employee's

protected group; or the more favorable treatment of employees not in the protected group; or the

sequence of events leading to the [adverse employment action]." *Abdu-Brisson*, 239 F.3d at 468

(quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)); *see also Abdul-*

*Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (finding that an inference of

discrimination can be raised by "showing that an employer treated plaintiff less favorably than a

similarly situated employee outside his protected group . . . ." (quoting *Ruiz*, 609 F.3d at 493)).

Contrary to Defendants' implicit argument, at the *prima facie* stage, Plaintiffs are not required to

show that Defendants "lacked a legitimate reason for terminating [Plaintiffs] in order to raise an

inference of discrimination;" that inquiry is more appropriate for the pretext stage of the analysis.

*Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *9 (E.D.N.Y.

Sept. 24, 2014) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 41–42 (2d Cir. 2000)).

### 1. Similarly-situated employee

"A showing of disparate treatment — that is, a showing that an employer treated plaintiff

less favorably than a similarly situated employee outside his protected group — is a recognized

method of raising an inference of discrimination for the purposes of making out a prima facie

case." *Ruiz*, 609 F.3d at 493 (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir.

2003)). To be "similarly situated," the plaintiff must establish that "[]he was similarly situated in

all material respects to the individuals with whom []he seeks to compare h[im]self." *Brown v.*

*Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham*, 230 F.3d at 40).  What facts establish similarity in "all material respects" varies from case to case, but the inquiry generally rests on whether the plaintiff and the putative comparator "were subject to the same workplace standards."  *Id.*; *see also Ruiz*, 609 F.3d at 493–94 ("An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" (quoting *Graham*, 230 F.3d at 40)).  A plaintiff need not show that he and the putative comparator are identical, but rather that there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases . . . ."  *Ruiz*, 609 F.3d at 494 (quoting *Graham*, 230 F.3d at 40); *see also Brown*, 756 F.3d at 230.

It is undisputed that Giles and Irons were both attorneys, and that supplemental social security income cases made up part of both Giles' and Irons' practice at BSCLS.  (Defs. 56.1 ¶¶ 23–26, 43; Pls. 56.1 ¶¶ 23–26, 43.)  Giles' annual salary, approximately $101,000, was also close to Irons' salary, $106,000.  (Pls. 56.1 ¶¶ 116(vii), 127; Defs. 56.1 ¶ 127 (noting that Irons was the highest paid employee other than the Project Director); *see, e.g.*, Budget dated Sept. 15, 2011, annexed to Willemin Decl. as Ex. 25, JI0000376.)  Irons contends that Giles was a comparable candidate for termination because she had a demonstrably worse performance record than he did.  (Pls. 56.1 ¶ 116.)

However, the differences between Irons and Giles are too great to conclude that they were similarly situated for the purposes of layoffs.  Irons was Giles' direct supervisor, and Irons was a manager while Giles was not.  (Defs. 56.1 ¶¶ 8, 19, 25; Pls. 56.1 ¶¶ 8, 19, 25.)  Irons had additional responsibilities as a manger, and thus his overall performance and value was subject to evaluation on different grounds than Giles', which further undermines his assertion that they were similarly situated.  *See Risco*, 868 F. Supp. 2d at 102 (finding plaintiff had failed to identify

similarly-situated comparator with similar job functions who was treated more favorably); *see also Ruiz*, 609 F.3d at 493–94 (holding comparators must be "subject to the same performance evaluation and discipline standards"). In addition, Irons was not a member of the staff attorneys' bargaining unit, the LSSA, and Giles was, (Defs. 56.1 ¶¶ 10, 40; Pls. 56.1 ¶¶ 10, 40), further demonstrating the material differences between Irons and Giles. *See Debidat v. Marriott Int'l, Inc.*, 580 F. Supp. 2d 300, 308 (S.D.N.Y. 2008) (concluding plaintiff could not show a *prima facie* case of discriminatory demotion by comparing himself to a non-supervisor who was subject to collective bargaining agreement, because comparison to plaintiff, a supervisory at-will employee, was "dubious" and "limited"); *see also Warren v. Johnson*, No. 11-CV-810, 2015 WL 1243319, at *5 (W.D.N.Y. Mar. 18, 2015) (granting summary judgment on disparate treatment claim arising from delay in plaintiff's transfer, finding plaintiff was not similarly situated to non-supervisory officer who was subject to a collective bargaining agreement which governed transfers); *Krishnapillai v. Donahoe*, No. 09-CV-1022, 2013 WL 5423724, at *14 (E.D.N.Y. Sept. 26, 2013) (finding "non-management, bargaining unit employee" not similarly situated to plaintiff for purposes of Title VII and ADEA claim that plaintiff was required to work without same holiday pay as other employees).

Irons contends that the fact that he was not a member of the LSSA union is "irrelevant" because Son, a female staff attorney who was subject to the collective bargaining agreement, was also laid off effective January 4, 2012. (Irons Mem. 25; *see also* Defs. 56.1 ¶ 109; Pls. 56.1 ¶ 109.) This argument is unpersuasive. The LSSA had a collective bargaining agreement with LSNYC which proscribed certain procedures for layoffs and required layoffs in order of seniority; Giles, but not Irons, was subject to that agreement. (*See* Defs. 56.1 ¶¶ 101, 122; Pls. 56.1 ¶¶ 101, 122.) Irons testified that Giles was also a long-serving employee at BSCLS, and

that, under the collective bargaining agreement, her high salary could indicate higher seniority. (Irons Dep. 216:8–13, 255:9–14; *see also* Saton Dep. 344:20–345:11 (noting that Giles was the most senior BSCLS attorney and, under union rules, could not be fired without an "extraordinary reason").)  It is undisputed that the collective bargaining agreement imposed limitations on laying off employees like Giles that were not applicable to Irons, and that the LSSA was involved in negotiation with BSCLS and LSNYC over the impact of the layoffs on bargaining unit employees, pressuring LSNYC to keep the number of bargaining-unit layoffs to a minimum. (Defs. 56.1 ¶ 122; Pls. 56.1 ¶ 122.)  Defendants were not subject to the same constraints in evaluating whether to lay off Irons.  The fact that a member of the LSSA was also laid off does not alter the effect of the collective bargaining agreement's procedures, and the differential impact of those standards on Giles, the purportedly "similarly situated" employee.  *See Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 313 (E.D.N.Y. 2012) (finding plaintiff and members of union were not similarly situated, as they were not subject to same performance evaluation and disciplinary standards, and because the union "impose[d] contractual limitations on [the employer's] ability to impose discipline on them").  Giles, a non-management employee and part of the LSSA, was not subject to the same workplace standards and layoff procedures that Irons was, and is not similarly situated to Irons such that Defendants' failure to terminate Giles raises an inference of discrimination.

### 2.  Additional evidence

In addition, as Defendants note, there is no evidence that Irons was replaced by a female employee, or that the majority of his responsibilities were reassigned to a female employee.  *See Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989) (discussing circumstances giving rise to an inference of discrimination in a reduction-in-

workforce or "structural reorganization" case); *Sgarlata v. Viacom, Inc.*, No. 02-CV-7234, 2005 WL 659198, at *7 (S.D.N.Y. Mar. 22, 2005) (granting summary judgment, finding that plaintiff failed to raise an inference of discrimination when he was terminated as part of a reduction in force, no one was hired to replace him, and duties were distributed to remaining colleagues (citing *Roge v. NYP Holdings*, 257 F.3d 164, 170 n.2 (2d Cir. 2001))). Furthermore, of the three employees laid off from BSCLS, two were women, and the other was Irons. (Defs. 56.1 ¶¶ 107–110; Pls. 56.1 ¶¶ 107–110.) LYSNC's nineteen total layoffs included twelve female employees at offices other than BSCLS. (Defs. 56.1 ¶ 112; Pls. 56.1 ¶ 112.) These facts further undercut the proposition that discrimination played a role in Irons' termination. *See McDonnell*, --- F. App'x at ---, 2015 WL 4038567, at *3 (affirming grant of summary judgment on disparate treatment claim based on mechanic's layoff when other two mechanics who were laid off were outside the protected class); *see also Robles v. Cox & Co., Inc.*, 987 F. Supp. 2d 199, 208 (E.D.N.Y 2013) (granting summary judgment on age discrimination claim, noting that reduction in work force resulted in retention of people within the protected class and termination of people outside it (citing *Chin v. ABN-AMRO N. Am., Inc.*, 463 F. Supp. 2d 294, 303 (E.D.N.Y. 2006))).

Irons proffers no other evidence in support of his argument that his employment was terminated under circumstances giving rise to an inference of sex discrimination. (Irons Mem. 24–25.) As Irons has failed to establish a *prima facie* case of discriminatory termination in violation of Title VII or the NYSHRL, the Court grants Defendants' motion for summary judgment as to this claim.[17]

---

[17] Even if *Irons* had established a *prima facie* case of discrimination, his claims would fail for substantially the same reasons discussed *infra* Part II.d.ii and iii. Defendants have proffered a legitimate, nondiscriminatory reason for Irons' termination and Irons has not presented evidence to show that discriminatory animus played a role in the decision to lay him

### c. Irons' Title VII and NYSHRL sexual harassment claim

Irons claims that Staton's comments amounted to sexual harassment, a form of gender-based discrimination prohibited by Title VII and the NYSHRL. Defendants contend that the conduct alleged, including only two specific incidents that Irons could identify, amounted only to isolated, trivial occurrences and was not so objectively offensive to constitute actionable sexual harassment. (Defs. Mem. 14.) Defendants further argue that even if the conduct rose to the level of actionable harassment, there is no evidence that it was directed at Irons because of his gender. (*Id.* at 17.) Irons contends that Staton's conduct was consistent, regular and sexually offensive, that it "single[d] out men as sexual objects," and that a jury could determine that Staton's conduct altered Irons' conditions of employment for the worse. (Irons Mem. 23–24.)

Sexual harassment claims are typically pursued under two legal theories: hostile work environment, where an individual is subject to severe and pervasive discriminatory conduct altering his conditions of employment, and "*quid pro quo*" sexual harassment, where an individual's tangible job benefits are directly premised on submission to unwelcome sexual conduct. *See Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 181–82 (E.D.N.Y. 2012) (citing *Gregory v. Daly*, 243 F.3d 687, 698 (2d Cir. 2001)) (noting there is no reason to distinguish between the two types of harassment); *Richards v. N.Y.C. Dep't of Homeless Servs.*, No. 05-CV-5986, 2009 WL 700695, at *5 (E.D.N.Y. Mar. 15, 2009); *Gonzalez v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 349–50 (S.D.N.Y. 2003). Given Irons' allegations and argument that the sexual harassment was consistent and regular and altered his conditions of employment, the Court assumes that Irons is proceeding on his sexual harassment claim under a hostile work

---

off. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013).

environment theory.[18]

In order to establish a Title VII or NYSHRL hostile work environment claim, a plaintiff must produce evidence to show that the complained-of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or another protected

---

[18] *Quid pro quo* arrangements and hostile work environment are theories upon which an employee can show discriminatory treatment on the basis of sex. To the extent that the two theories of discrimination arise from a plaintiff's allegations, both theories can be considered in analyzing the same claim. *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 182 (E.D.N.Y. 2012); *see also Gregory v. Daly*, 243 F.3d 687, 698 (2d Cir. 2001) (noting that "the Supreme Court's current emphasis on the fact that traditional categories of 'hostile work environment' and 'quid pro quo' harassment do not reflect statutory proscriptions that separate 'harassment' from other forms of discrimination"). "The distinction between the two forms of sexual harassment serves to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain [that] the latter must be severe or pervasive." *Richards v. N.Y.C. Dep't of Homeless Servs.*, No. 05-CV-5986, 2009 WL 700695, at *5 (E.D.N.Y. Mar. 15, 2009) (alteration in original) (quoting *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004)). The distinction between the two theories is "useful to distinguish between 'cases involving a threat which is carried out and offensive conduct in general.'" *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Mormol*, 364 F.3d at 57).

The gravamen of a *quid pro quo* claim is that a tangible job benefit is linked to an employee's acceptance or rejection of a supervisor's sexual advances. *See Schiano*, 445 F.3d at 603; *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001) (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994)). Irons testified that he believed Staton was making a sexual advance at him, and that he felt like it was an advance because she looked at him while she commented that she had a man who was younger than her and could please her, which Irons took to mean that he would not be treated fairly unless he pleased her like the younger man did. (Irons Dep. 161:23–163:23, 172:13–23.) To the extent Irons intended to argue that his termination resulted from a failure to submit to Staton's sexual advances, this theory of recovery was not raised in the Complaint nor addressed in Plaintiffs' briefs, and thus the Court will not address it here. *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012) ("It is 'well settled that a Court should not on summary judgment consider factual allegations and legal theories not raised in the complaint.'" (citations omitted)). However, Irons' testimony regarding his interpretation of Staton's remarks is relevant to his hostile work environment claim. *See Schiano*, 445 F.3d at 604 (noting that supervisor's comment, that plaintiff was "sleeping with the wrong employee" if she wanted a raise, was relevant to hostile work environment claim, even if they did not rise to the level of *quid pro quo* harassment).

characteristic."[19] *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012)

(internal quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007));

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (noting that conduct is evaluated

form both an objective and subjective perspective); *see also Rivera v. Rochester Genesee Reg'l*

*Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) ("The same standards [as are applied to Title

VII] apply to the plaintiffs' hostile environment claims arising under the NYSHRL . . . .");

*Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment

claims under both [federal law] and the NYSHRL are governed by the same standard." (citing

*Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))).

Discriminatory and harassing conduct is "severe or pervasive" when it "alter[s] the

conditions of [a plaintiff's] employment and create[s] an abusive working environment.'" *Lewis*

*v. City of Norwalk*, 562 F. App'x 25, 28 (2d Cir. 2014) (quoting *Clark Cty. Sch. Dist. v. Breeden*,

532 U.S. 268, 270 (2001)) (citing *Kaytor*, 609 F.3d at 547); *see also Rivera*, 743 F.3d at 20

(stating that a plaintiff must produce evidence that "the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment" (quoting

*Gorzynski*, 596 F.3d at 102)).   A work environment is "objectively hostile or abusive" if "a

reasonable person would find it hostile or abusive." *Kaytor*, 609 F.3d at 547 (quoting *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)); *see also Schiano*, 445 F.3d at 604 ("A jury must

be able to conclude that the work environment both objectively was, and subjectively was

perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the

---

[19] The employee must also show that the employer is responsible for the harassing conduct, an issue not raised by either party on this motion. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010).

worse." (footnote omitted) (citing *Harris*, 510 U.S. at 21 and *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004))).

Whether the standard is met depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Lewis*, 562 F. App'x at 28 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)); *see also Kaytor*, 609 F.3d at 547 (quoting *Harris*, 510 U.S. at 23); *Schiano*, 445 F.3d at 605 (same). The Second Circuit distinguishes between "[complaints of] sexual assaults; [other] physical contact[, whether amorous or hostile, for which there is no consent express or implied]; uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which are not protected under the law. *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012) (alteration in original) (citations omitted).

Irons contends that Staton's comments to others about her social life and personal relationships contained implicit sexual pressures and uninvited sexual solicitations directed toward him, which made his workplace hostile in violation of Title VII. (Irons Mem. 22–24.) Irons testified that Staton would "regularly" speak about aspects of her personal life, including that she would "go to bars, meet men at bars who thought she was hot, sexually attractive, and wanted to please her" and that "[o]ftentimes" Staton would look directly at him when she said these things. (Defs. 56.1 ¶ 143 (quoting Irons Dep. 158:19–159:2); Pls. 56.1 ¶ 143.) Although Irons claims Staton's offensive comments began in September of 2011 and continued through November of that year, Irons only provided evidence as to two specific incidents. Nevertheless, construing the evidence in the light most favorable to Irons and drawing all inferences in his

favor, the jury could credit Irons' general allegations that he overheard similar comments from Staton about her personal life to others on a weekly basis, between September and November of 2011. *See Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 349 (S.D.N.Y. 2001) (noting that a jury could credit general allegations about repeated conduct). According to Irons, this caused him to feel embarrassed, humiliated and abused, and made him believe that Staton viewed him as a sexual object and was making a sexual advance or demonstrating her sexual prowess to him. (Pls. 56.1 ¶ 144; Irons Dep. 161:23–12, 163:8–23, 172:13–23.)

However, these incidents, while they may have made Irons subjectively uncomfortable, embarrassed or even "humiliated," do not objectively create a working environment that a reasonable person would find hostile or abusive under the totality of the circumstances. It is undisputed that Staton never directly asked Irons whether he was interested in sexual activity with her, and never made the comments directly to Irons, (Defs. 56.1 ¶¶ 147–48; Pls. 56.1 ¶¶ 147–48), although Irons contends that on some occasions Staton looked directly at him while talking to — or, in Irons' words, "bantering" with, (Irons Dep. 160:6–12) — other BSCLS employees like Lane and Rijo, making him a part of the conversation, (Pls. 56.1 ¶ 148; Irons Dep. 193:6–24). *See Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 18 (2d Cir. 2009) (finding female plaintiff's allegations that male co-worker gave out fax number as "25penis," that plaintiff heard male colleagues discussing topics that were inappropriate and sexual in nature, and that manager invited former employee who had been accused of discrimination to office holiday party were not severe or pervasive enough to give rise to a hostile work environment claim); *see also Redd*, 678 F.3d at 177 ("[T]he occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" is not protected under Title VII.). Irons never witnessed any overt or obscene sexual conduct or gestures, nor was he subjected to explicit

sexual solicitations or physical contact, and the only arguable contact he endured was eye contact from Staton while she made comments to other people about her personal and social life. *See Lewis*, 562 F. App'x at 28–29 (holding that evidence a supervisor licked his lips and "leered" at plaintiff, invited plaintiff to join his gym and have drinks with him, told plaintiff he was "lonely in his current relationship, and asked for help dealing with his loneliness," which conduct occurred a couple of times per week, was not sufficient to establish an objectively hostile working environment); *Mendez-Nouel v. Gucci Am., Inc.*, 542 F. App'x 12, 13 (2d Cir. 2013) (affirming grant of summary judgment on hostile work environment claim when allegations showed "two instances of touching, the more significant being an incident in which [plaintiff's] supervisor touched his lower back for four to five seconds," and "workplace banter about a supervisor's sexual orientation and nightlife," including one single occasion where a supervisor told plaintiff he was gay but did not know it (citing *Redd*, 678 F.3d at 177)); *Garone v. United Parcel Serv., Inc.*, 436 F. Supp. 2d 448, 464 (E.D.N.Y. 2006) ("[E]ven where incidents are continuous and concerted, a pattern 'only of verbal remarks,' and marked by 'the absence of sexually suggestive or offensive physical contact . . . might not rise to a Title VII violation.'" (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001))), *aff'd sub nom. Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108 (2d Cir. 2007).

There is no indication that Staton's remarks, over a three-month period, involving men who found her physically attractive, were regularly demeaning or disparaging to men or cast men "as objects of sex-based ridicule and subjects for sexual exploitation," thereby objectively or subjectively altering Irons' ability to perform his job effectively. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 222 (2d Cir. 2004) ("Such workplace disparagement of women, repeated day after day over the course of several years without supervisory intervention, stands as a serious impediment

to any woman's efforts to deal professionally with her male colleagues."). Irons may have been "bewildered" by Staton's behavior and was unsure if she could "treat [him] fairly as a subordinate," but there is no evidence that Irons' job performance was affected — based on the evidence, Staton's comments at most led to half an hour of interference with his work, where he was "thinking what [he] should do" about her conduct, (Irons Dep. 169:22–170:7, 172:13–23). *See Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 46–47 (1st Cir. 2003) (affirming grant of summary judgment when evidence showed that complained-of conduct was episodic, never severe, never "physically threatening (though occasionally discomforting or mildly humiliating)," and was never an impediment to plaintiff's work performance).

While Irons testified that he believed Staton's comments that men found her "hot" and that she had a younger man who "wanted to please her" to be testimony of her "sexual prowess" and sexual solicitations, his interpretation of these comments — which only referenced her personal relationships and were made to other female employees at BSCLS in conversation — is not objectively reasonable, based on the evidence currently before the Court. *Cf. Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (finding that, although it was a close case, weekly repetition, for two to three months, of male supervisor's comment to female employee that employee's husband was "not taking care of [her] in bed," could be "a solicitation for sexual relations coupled with a claim of sexual prowess" and, in combination with employee's affidavit that she found the conduct "threatening," vulgar and humiliating, was enough to warrant trial); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 584 (S.D.N.Y. 2011) (finding testimony that direct supervisor repeatedly invited female plaintiff to his house, "made comments about her body, expressed romantic feelings towards her in person and over the phone, and repeatedly expressed a desire to 'hug' her" for several years, and "engaged in a sexually explicit gesture" in

front of her was sufficient to state hostile work environment claim to survive motion to dismiss).

The Court grants Defendants' motion for summary judgment as to Irons' Title VII and NYSHRL

hostile work environment claims.

### d.   Plaintiffs' Title VII and NYSHRL retaliation claims

Plaintiffs claim that their layoffs were retaliation for making and supporting Irons' sexual

harassment complaint, in violation of Title VII and the NYSHRL.  Claims of retaliation for

engaging in protected conduct under Title VII and the NYSHRL are similarly examined under

the *McDonnell Douglas* burden shifting test.  *See Summa*, 708 F.3d at 125.  Under the test,

"[f]irst, the plaintiff must establish a *prima facie* case of retaliation.  If the plaintiff succeeds,

then a presumption of retaliation arises and the employer must articulate a legitimate, non-

retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Fincher v. Depository*

*Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also Jute v.*

*Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (same).  If the employer succeeds

at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, *but*

*for* the protected activity, she would not have been terminated.[20]  *See Nassar*, 570 U.S. at ---, 133

---

[20]   It remains unclear whether "but-for" causation applies to NYSHRL retaliation claims
after the Supreme Court's decision in *University of Texas Southwest Medical Center v. Nassar*,
570 U.S. ---, 133 S. Ct. 2517 (2013), requiring but-for causation in Title VII retaliation cases.
*See Kleehammer v. Monroe Cty.*, 583 F. App'x 18, 21 (2d Cir. 2014) ("We have not decided
whether the but-for-causation standard also now applies to retaliation claims under NYSHRL.");
*Giudice v. Red Robin Int'l, Inc.*, 555 F. App'x 67, 70 n.1 (2d Cir. 2014) (refusing to address the
question as non-dispositive); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 n.7 (2d Cir.
2013) ("Because the plaintiff's claims survive under the *Nassar* 'but-for' standard, we do not
decide whether the NYSHRL claim is affected by *Nassar,* which by its terms dealt only with
retaliation in violation of Title VII."); *see also St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d
287, 321 n.14 (E.D.N.Y. 2014) (detailing the similarities between the statutory texts of Title VII
and NYSHRL and noting the ambiguity as to whether "but for" causation applies to NYSHRL
retaliation claims).  Because the NYSHRL has traditionally followed the federal discrimination
laws' analytical framework, this Court will continue applying "but for" causation to NYSHRL

S. Ct. at 2534 (emphasis added) (holding that a plaintiff asserting a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 315–16 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015) (same); *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013) (same).

### i. *Prima facie* case

In order to establish a *prima facie* case of retaliation, a plaintiff must provide evidence that "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa*, 708 F.3d at 125; *Schiano*, 445 F.3d at 608. The burden at the *prima facie* stage for Plaintiffs is minimal and *de minimis*, and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (quoting *Hicks*, 593 F.3d at 164).

Defendants contend that Plaintiffs cannot establish a *prima facie* case of retaliation because (1) neither Plaintiff engaged in protected activity, and (2) Plaintiffs cannot establish a causal connection between their layoffs and Irons' sexual harassment complaint. (Defs. Mem. 17–24.) It is not disputed that Plaintiffs' layoffs constituted adverse action; the third element of

---

retaliation claims. *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 219–22, 220 n.25 (E.D.N.Y. 2014) (applying but-for standard to retaliation claims under Title VII and NYSHRL, collecting cases).

Plaintiffs' *prima facie* case is thus established. The Court considers the other elements below.

### 1. Protected activity

Section 704(a) of Title VII prohibits retaliation against two kinds of protected activity: "participation" in investigations into discrimination and "opposition" to conduct prohibited by the statute. *Littlejohn*, 795 F.3d at 316 (citing 42 U.S.C. § 2000e-3(a) and *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012)); *see also* N.Y. Exec. Law § 296(1)(e), (7) (making it an unlawful employment practice to retaliate against a person because she has "opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article"). The "participation" clause of the statute is limited to participation in formal EEOC proceedings, and includes the filing of formal charges of discrimination with an administrative agency. *Littlejohn*, 795 F.3d at 316 (citing *Townsend*, 679 F.3d at 49); *Correa v. Mana Prods., Inc.*, 550 F. Supp. 2d 319, 329 (E.D.N.Y. 2008) (noting that "participation" is restricted to administrative proceedings, and participation in internal investigations is analyzed under the opposition clause (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001))). The "opposition" clause protects other activity, such as "informal protests of discrimination, including making complaints to management . . . and expressing support of co-workers who have filed formal charges." *Summa*, 708 F.3d at 126–127 (quoting *Matima v. Celli*, 228 F.3d 68, 78–79 (2d Cir. 2000)); *see also Amin v. Akzo Nobel Chemicals, Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) ("Informal complaints to management as to discrimination on a basis prohibited by Title VII are protected activity." (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000))); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 322 (E.D.N.Y. Mar. 28, 2014) ("The complaint can be informal — an employee does not need to lodge a formal complaint of discrimination [to be protected]." (collecting cases)).

## A. Irons

Defendants argue that Irons cannot establish that he engaged in protected activity because Irons, an attorney, could not have reasonably and in good faith believed that Staton sexually harassed him, based on the "sporadic" comments she allegedly made. (Defs. Mem. 22–23.) Irons contends that Defendants' characterization of Staton's comments as "sporadic" is contradicted by the record, and that conduct far less severe than the conduct Irons alleged is sufficient to establish a good-faith belief of harassment. (Irons Mem. 12–13.)

A complaint of discrimination constitutes protected activity "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Kelly*, 716 F.3d at 14 (quoting *Gregory*, 243 F.3d at 701); *see also Rivera v. N.Y.C. Dep't of Corr.*, 951 F. Supp. 2d 391, 400 (E.D.N.Y. 2013) (noting that a retaliation claim does not necessarily lack merit just because underlying discrimination complaint lacked merit, and "[w]hat matters is whether plaintiff had a good faith, reasonable belief that the conduct violated Title VII"). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Kelly*, 716 F.3d at 14–15 (quoting *Galdieri-Ambrosini v. Nat'l Realty Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Irons, an attorney, may be expected to understand that Staton's comments on November 15, 2011 and November 22, 2011 — viewed in isolation — did not constitute conduct prohibited by the law. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1179 (2d Cir. 1996) (noting that plaintiff might not have passed the "good faith reasonableness" test if the only evidence offered was isolated comment). However, Irons testified that the conduct occurred over a period of two to three months, on a regular basis — which, in certain circumstances, may constitute "pervasive" conduct. *See Orange v. Leake & Watts Inc.*, No. 13-CV-6110, 2015 WL 2340649,

at *3 (S.D.N.Y. May 15, 2015) ("Protected activity for purposes of Title VII and NYSHRL retaliation claims encompasses an employee's complaint to supervisors about alleged unlawful activity, even if the activity turned out not to be unlawful, provided that the employee had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." (internal quotation marks omitted) (quoting *Rodas v. Farmington*, 567 F. App'x 24, 26 (2d Cir. 2014))), *appeal dismissed* (Aug. 26, 2015). While the evidence presented ultimately belied his claim of a hostile work environment, the Court will assume for the purposes of this motion that Irons held a good-faith — although mistaken — belief that Staton's conduct amounted to a hostile work environment.

### B. Chandler

Defendants contend that Chandler did not engage in protected activity because (1) she did not oppose harassment, because referring Irons to Alexander was simply part of her regular job duties, and (2) she did not participate in a formal proceeding relating to Irons' claims of harassment. (Defs. Mem. at 23–24.) In response, Chandler asserts that she "opposed" potentially discriminatory practices and thus engaged in protected activity by contacting Alexander and informing her that Irons had a sexual harassment complaint, communicating to Irons that she would support his sexual harassment complaint,[21] and ultimately serving as a witness in the investigation. (Pl. Chandler's Mem. in Opp'n to Defs. Mot. for Summ. J. ("Chandler Mem.") 11, Docket Entry No. 44.) Chandler asserts that she had overheard Staton make inappropriate remarks of a sexual nature to Irons, and reasonably believed that Irons was

---

[21] According to Chandler, Gilbert, Staton, Rasmussen and Hayes were all ultimately aware that Chandler volunteered to serve as a witness in the investigation, although she did not know when they were made aware. (Chandler Dep. 213:19–216:3.) Gilbert testified that her notes reflected that, in conversations with Irons after Thanksgiving, Irons mentioned Chandler as a witness. (Gilbert Dep. 55:15–56:14.)

"requesting her assistance in advancing a sexual harassment complaint against Staton because Irons [an attorney] . . . believed that the law had been violated." (*Id.* at 11–12.)

Communicating another person's complaint of discrimination to one's employer will not always constitute "opposition" to discrimination. While an employee may complain of discriminatory conduct against another employee and be "opposing" discrimination within the meaning of the statute, "[t]o the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under § 704(a)'s opposition clause." *Littlejohn*, 795 F.3d at 318. In order for activity to constitute "opposition" to conduct prohibited by the statute, the employee — as discussed above — must have a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *Gregory*, 243 F.3d at 700–01, and must *communicate that belief* to the employer in some manner — by supporting another employee in asserting his rights, complaining to the employer, or being "'critical' about the 'discriminatory employment practices' of her employer . . . ," *Littlejohn*, 795 F.3d at 318 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.3d 203, 209 (2d Cir. 1990)). *See also Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 (2004) (Protected activity under NYSHRL includes "opposing or complaining about unlawful discrimination."). In other words, to show that she engaged in protected activity, a plaintiff must do more than simply report or pass along information about another employee's complaint; she must communicate *her own* opposition to, or criticism of, the challenged behavior. *See Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (noting that communicating to the employer the person's own "belief that the employer has engaged in a form of employment discrimination" will "virtually always constitute[]" opposition to discrimination); *Littlejohn*, 795 F.3d at 318 (same, noting it holds true for all

employees regardless of other job duties).

For the purposes of this motion, the Court assumes that Chandler had a good-faith belief that the law had been violated. However, Chandler's testimony and the undisputed facts raise serious doubts as to whether Chandler opposed what she believed was sexual harassment. *See Littlejohn*, 795 F.3d at 318. On November 15 or 16, 2011, at Irons' request, Chandler called Verna Alexander, a member of the sexual harassment panel, because she felt that it was her duty, as Director of Finance and Administration, to assist Irons in making his sexual harassment complaint. (Defs. 56.1 ¶ 158; Pls. 56.1 ¶ 158.) Chandler testified that she called Alexander because Alexander was a member of the sexual harassment panel, and told Alexander that Irons wanted to file a complaint. (Defs. 56.1 ¶ 158; Pls. 56.1 ¶ 158.) Chandler did not speak to anyone else about Irons' complaints, and simply passed the information that Alexander gave her back to Irons. (Defs. 56.1 ¶ 158; Pls. 56.1 ¶ 158.) Chandler testified that she "[j]ust made sure that [Irons] saw the correct people in order to file his harassment case" and that she never made her own complaints about Staton's remarks. (Chandler Dep. 207:2–20.) Alexander testified that Chandler "told [her] about an incident with [Irons] coming out of the bathroom and hearing Ms. Staton speaking to someone in the office about a young man," and told her that "Mr. Irons was upset." (Alexander Dep. 38:16–39:8.) In short, Chandler simply passed along Irons' complaint — and she did so because it was part of her job responsibilities — which does not constitute "opposition" to discrimination under the statute. *See Benussi v. UBS Fin. Servs. Inc.*, No.12-CV-1261, 2014 WL 558984, at *9 (S.D.N.Y. Feb 13, 2014) (noting that a plaintiff need not "instigate or initiate" a discrimination complaint to be covered by the anti-retaliation provision of the law, and that making "an ostensibly disapproving account of sexually obnoxious behavior . . . by a fellow employee" will constitute opposition (quoting *Crawford*, 555 U.S. at 277)).

However, Chandler's involvement in Irons' sexual harassment complaint has another component, which may rise to the level of opposition. Chandler also told Irons that she would serve as a witness for him, and ultimately spoke with investigator Hayes during the internal investigation. (Defs. 56.1 ¶¶ 169, 179; Pls. 56.1 ¶¶ 169, 179.) While being "named as a voluntary and favorable witness" in an EEOC proceeding constitutes "participation" as contemplated by Title VII, *Jute*, 420 F.3d at 175 (holding that the participation clause encompasses participating in any manner in a Title VII proceeding, including being named as a voluntary witness), as discussed above, the Second Circuit has made it clear that participating in *internal* investigations is not covered by the participation clause of the statute. *See Littlejohn*, 795 F.3d at 316 (citing 42 U.S.C. § 2000e-3(a) and *Townsend*, 679 F.3d at 48). Thus, Chandler's participation in the investigation must have also included some element of opposition to what she believed to be sexual harassment, as discussed above. Irons ultimately told Gilbert that Chandler was a witness to his complaints, (Gilbert Dep. 56:6–14), but it is unclear whether he indicated that Chandler was a favorable witness or that she otherwise would oppose the conduct, and whether his indicating her support would qualify as *Chandler's* protected activity. But, assuming Chandler actively supported Irons or spoke out against sexual harassment in her interview with investigator Hayes, such conduct would likely constitute protected activity. *See Littlejohn*, 795 F.3d at 318 (If an employee "actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause." (alterations in original) (quoting *Sumner*, 899 F.2d at 209)). The Court assumes that Chandler can show that volunteering to serve as a favorable witness in support of Irons' sexual harassment complaint was protected activity.

## 2. Defendants' knowledge

Defendants' knowledge of Irons' sexual harassment complaint is not explicitly in dispute. Generally, a plaintiff can satisfy the "knowledge" requirement of a *prima facie* case by showing general corporate knowledge of the protected act at the time of the alleged retaliation. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the [corporate defendant's] agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."); *Henry,* 616 F.3d at 147–488 ("[T]o satisfy the knowledge requirement, [nothing] more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity." (alteration in original) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000))). While the parties disagree how and when decision-makers like Staton and Rasmussen became aware of Irons' complaint or Chandler's support thereof, that dispute is more appropriately addressed in consideration of the fourth element of the *prima facie* case — causation — not the knowledge element. *See Gordon*, 232 F.3d at 117 ("The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." (citing *Altson*, 14 F. Supp. 2d at 312–13).

## 3. Causal connection

Absent direct evidence of retaliation or circumstantial evidence of disparate treatment based on retaliatory animus, "[a] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110–11 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *Kim v.*

*Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) ("[T]emporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a *prima facie* retaliation claim . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement that [plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."). "The Supreme Court has emphasized that '[e]mployers need not suspend previously planned [employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality.'" *Lewis*, 562 F. App'x at 30 (alteration in original) (quoting *Clark Cty. Sch. Dist.*, 532 U.S. at 272). However, "an employer cannot insulate itself from liability at the summary judgment stage simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the protected conduct." *Nagle v. Marron*, 663 F.3d 100, 109 (2d Cir. 2001).

Defendants contend that the evidence establishes that Defendants had decided to terminate Plaintiffs' employment months before Irons lodged his sexual harassment complaint, and that "Plaintiffs have no evidence to dispute the timing of Defendants' decision to lay them off." (Defs. Mem. 18–19.) Defendants argue "Staton began marginalizing" Plaintiffs when she stepped in as Acting Project Director in July of 2011, established virtually no working relationship with either Plaintiff, and was simply waiting until the budget required layoffs to terminate Plaintiffs' employment. (*Id.* at 19–20.) Irons and Chandler both argue that the decision to terminate them was not made prior to Irons' sexual harassment complaint, and that the temporal proximity between Irons' complaint, made on November 16, 2011 (or "around" November 15, 2011, according to Chandler's testimony), and their layoffs on December 2, 2011

supports a causal connection.  (Irons Mem. 14–16; Chandler Mem. 12–14.)  The Court addresses the timing below.

### A.    Date of protected activity

Irons contends that he engaged in protected activity on or about November 16, 2011, when he contacted Chandler about Staton's behavior and asked about the proper channels for making a complaint.  (Pls. 56.1 ¶ 155.)  Irons received the information as to how to proceed the same day he asked Chandler but, according to Irons, he did not contact HR until November 23, 2011.  (Defs. 56.1 ¶ 159; Pls. 56.1 ¶ 159.)  Similarly, Chandler told Irons that she would serve as a voluntary witness for his complaint on or about November 16, 2011.  While Irons did tell Gilbert that Chandler would serve as a witness, Gilbert testified that she learned of this after November 24, 2011.  (Gilbert Dep. 55:15–56:14.)  Furthermore, Chandler did not have her interview with Hayes until December 29, 2011.  (Defs. 56.1 ¶ 169; Pls. 56.1 ¶ 169.)

### B.    Date of decision to terminate

Drawing all reasonable inferences in Plaintiffs' favor, the undisputed evidence establishes that the decision to terminate Plaintiffs had been made on November 18, 2011, the date it was announced to the Project Directors and the date the "active" budget workbook was changed.  On November 18, 2011, the "active" budget workbook for BSCLS reflected that Plaintiffs would be laid off, and on that same date Rasmussen e-mailed the Project Directors and informed them that two managers at BSCLS (and one at another location) were to be laid off.  (Defs. 56.1 ¶¶ 104–105; Pls. 56.1 ¶¶ 104–105; E-mail dated Nov. 18, 2011 from Rasmussen re: "Follow-Up from Meeting with Union Executive Committee," annexed to Rice Decl. as Ex. OO, D002758.)  No documents post-dating November 18, 2011 reflected Plaintiffs' continued employment, and Plaintiffs have pointed to no other evidence that the decision to terminate them

was "in flux" past this date.[22]  In fact, Plaintiffs concede that Irons and Chandler were "slated" for termination on November 18, 2011.  (Irons Mem. 9; Chandler Mem. 8; Pls. 56.1 ¶ 116(i).)

### C.    There is no evidence that Staton knew of Irons' complaint prior to November 23, 2011

The evidence presented shows that, drawing all permissible inferences in Plaintiffs' favor, Staton became aware of Irons' sexual harassment complaint on or after November 23, 2015.  The parties agree that Irons contacted HR for the first time on November 23, 2011.  (Defs. 56.1 ¶ 159; Pls. 56.1 ¶ 159.)  Rasmussen testified that he first became aware of Irons' sexual harassment allegations on November 23, 2011, when Reynoso told him that Irons had come by the office with a complaint about Staton.  (*See* Defs. 56.1 ¶ 161; Rasmussen Dep. 123:2–124:19.) Staton testified Perry and Rasmussen called her in "late November 2011" to tell her about Irons' sexual harassment complaint, which was the first time she became aware of his allegations. (Staton Dep. 265:24–269:4; *see also* Perry Dep.106:14–107:2 (noting that she and Rasmussen

---

[22]  Plaintiffs admit that they have no personal knowledge about when BSCLS made the decision to lay them off, (Defs. 56.1 ¶ 141; Pls. 56.1 ¶ 141), but argue that the documents show that the budget was subject to change — and frequently changing — until it was approved by the LSNYC Board on December 10, 2011 and that Defendants' post-hoc justification for their termination and their witnesses' self-serving testimony to the contrary should be disregarded, (*see, e.g.*, Pls. 56.1 ¶¶ 66–70, 116).  Plaintiffs point to several budget workbooks that were prepared between September and early November of 2011, some of which did include the Plaintiffs' layoff and some of which did not.  (Pls. 56.1 ¶¶ 66, 70.)

Contrary to Plaintiffs' contentions, the fact that the budget was not approved and adopted by the Board does not contradict Defendants' assertion that they had decided to lay off Irons and Chandler, by November 18, 2011 at the latest.  The budget was not adopted by the Board until December 10, 2011, nevertheless, Plaintiffs received their layoff notices on December 2, 2011, (Defs. 56.1 ¶¶ 108, 111; Pls. 56.1 ¶¶ 108, 111), which — in addition to the documentary evidence discussed above — indicates that the *decision* to lay off Plaintiffs could be made by Staton before the Board adopted the budget.  Furthermore, the parties agree that Staton had the power to make decisions about who would be terminated.  (Defs. 56.1 ¶ 17; Pls. 56.1 ¶ 17.)  For the purposes of analyzing whether the circumstances of Plaintiffs' termination show some evidence of causality, the relevant question is not whether the decision to terminate Plaintiffs *could be changed*, but whether it was *made* prior to the time the decision-makers became aware of Irons' sexual harassment complaint.

called Staton to discuss the complaint).)  Plaintiffs argue that Rasmussen's and Staton's testimony should be disregarded as "self-serving and rebutted by" Alexander's testimony (a member of LSNYC's sexual harassment panel) that she was told about Irons' sexual harassment allegations on November 16, 2011 and the fact that the BSCLS Board, including Staton, met on November 16, 2011.  (Pls. 56.1 ¶ 161; Alexander Dep. 35:15–37:3.)

Plaintiffs' rely only on speculation that anyone other than Irons, Chandler and Alexander knew about Irons' sexual harassment complaint on November 16, 2011.  Chandler testified that she did not discuss Irons' sexual harassment allegations with anyone else, (Chandler Dep. 209:22–25), and Irons testified that he did not speak about it with anyone other than Chandler and his wife prior to reporting it to Reynoso on November 23, 2011, (Irons Dep. 240:20–24, 242:3–243:12, 244:21–245:7).  Alexander testified that she did not convene a meeting of the sexual harassment panel after receiving the call from Chandler, and that she believed HR would "know more than [she] did about how to go about contacting someone."  (Alexander Dep. 37:23–38:5.)  Alexander also testified that she did not discuss her call with Chandler or Irons' complaint with anyone else, except for a brief telephone call with Gilbert one or two weeks later wherein Gilbert informed her that the "main office" was handling Irons' complaint.  (*Id.* at 39:19–40:16.)  When asked if she sent any e-mails about the conversation with Chandler, Alexander testified that she "might have sent an e-mail to [Gilbert] saying that Karen Chandler she [*sic*] asked about sexual harassment," but she could not recall if she did, and did not specify on what day she might have sent the e-mail.  (*Id.* at 41:9–21.)  However, Gilbert testified that she first became aware of Irons' sexual harassment complaint when Reynoso called her "the day before Thanksgiving" at home to tell her that Irons was insistent on speaking to her.  (Gilbert Dep. 47:16–49:13.)  There is no evidence that Gilbert saw an e-mail from Alexander or that such

an e-mail was ever sent. Plaintiffs, who have produced hundreds of documents in opposition to this motion, have not produced any such e-mail.

Even assuming such an e-mail was sent to Gilbert and Gilbert received it, there is no evidence form which any reasonable jury could conclude that Gilbert told Staton — or anyone else — about Irons' sexual harassment complaint between November 15 and 17, 2011. Indeed, the evidence explicitly contradicts such an assumption since Gilbert testified that she learned of Irons' sexual harassment complaint the day before Thanksgiving, November 23, 2011, and thus could not have communicated it to anyone until then.[23] Plaintiffs are, in effect, inviting the Court to assume that Gilbert received an e-mail from Alexander between November 15 and November 17, 2011, reject Gilbert's testimony that she did not know about Irons' complaint until Reynoso told her about it on November 23, 2011, and then speculate that Gilbert told Staton about the complaint between November 15 and 17, 2011. "To defeat summary judgment[,] non-moving parties must do more than simply show that there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation." *Bermudez v. City of New York*, 790 F.3d 368, 373–74 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

Accordingly, Plaintiffs have failed to point to evidence creating a genuine dispute that Staton knew Irons was making a complaint against her until November 23, 2011. *See Hicks*, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would

---

[23] Additionally, Alexander only testified that she might have sent an e-mail to Gilbert stating that Chandler "asked about sexual harassment." (Alexander Dep 41:12–21.)

otherwise exist." (alterations in original) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))); *Richardson v. Bronx Lebanon Hosp.*, No. 11-CV–9095, 2014 WL 4386731, at *1 n.1 (S.D.N.Y. Sept. 5, 2014) ("[N]oting the absence of corroborating documentation for [deposition] testimony does not, as [p]laintiff appears to believe, suffice to controvert those asserted facts [in a Rule 56.1 statement]."); *Risco*, 868 F. Supp. 2d at 86 n.2 (declining to consider arguments that facts are "disputed" when plaintiff failed, *inter alia*, to point to admissible evidence supporting her contentions (citing *Holtz*, 258 F.3d at 74)). Plaintiffs themselves state that "it is reasonable to infer that Staton knew of Irons' complaint by November 23, 2011," after Irons complained of sexual harassment to Reynoso, who then reported the complaint to Rasmussen. (Pls. 56.1 ¶ 166(iii).)

Because there is no evidence that the relevant decision-makers knew of Plaintiffs' protected activity at the time Plaintiffs were "slated" for layoff, and, indeed, the evidence presented leads only to the conclusion that they did not know of Plaintiffs' protected activity at that time, Plaintiffs cannot rely on the temporal proximity between the sexual harassment complaint and their termination. *See Lewis*, 562 F. App'x at 30 (noting an employer need not suspend employment actions upon learning that the employee engaged in protected activity). Furthermore, there is no evidence, and neither of the parties argue, that the decision-makers were acting upon the direction of someone with the requisite knowledge. *See Henry*, 616 F.3d at 148.

### D. Defendants were undisputedly contemplating Plaintiffs' layoffs prior to the complaint

Ultimately, when Defendants became aware of the sexual harassment complaint may be "immaterial" to the causation analysis, in light of the well-documented and undisputed fact that Defendants were planning Plaintiffs' termination long before Irons made his sexual harassment complaint. *See Clark Cty. Sch. Dist.*, 532 U.S. at 272; *see also Abril-Rivera v. Johnson*, 795

F.3d 245, 259 (2d Cir. 2015) (noting that plaintiffs' second set of protected complaints were not causally related to closure of processing center, and thus could not form the basis for Title VII retaliation complaint, when decision to close center was "set in motion by recommendations" months before complaints). Where the undisputed evidence shows that the employer was considering the adverse employment action before the protected activity occurred, the fact that the employer continued "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist.*, 532 U.S. at 272. *But see Richardson*, 2014 WL 4386731, at *15 (finding that issue of fact as to whether supervisor knew of plaintiff's lawsuit at the time she decided to terminate plaintiff, in combination with undisputed fact that she was aware of the lawsuit at the time she fired plaintiff, sufficient to withstand summary judgment on Title VII retaliation claim.).

Here, before Irons filed his sexual harassment complaint, Defendants' had a financial need to reduce staff and were considering laying off Irons and Chandler in evaluating what other (or different) budgetary cuts needed to be made. Staton, Rasmussen and Young all testified that Plaintiffs' termination was incorporated into their working assumptions for budget reductions in the summer of 2011.[24] (*E.g.*, Rasmussen Dep. 63:23–64:4, 104:5–16; Staton Dep. 137:24–

---

[24] The only facts Plaintiffs offer to dispute Defendants' assertion that Rasmussen, Staton and Perry — LSNYC's then-Chief of Operations — decided, together, in the summer of 2011 that the layoffs of Irons and Chandler would be part of the plan to meet the budget deficit at BSCLS is the assertion that the proffered testimony is "self-serving," that the budget documents showed that the budget was "in flux" and the decisions were not "final." (*See, e.g.*, Pls. 56.1 ¶¶ 83–84.) The self-serving nature of a witness's testimony goes to the weight of the testimony and not its admissibility. *See In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). It is not the province of the Court on summary judgment to reject testimony as incredible. *See Danzer*, 151 F.3d at 57. Rather, the Court must draw reasonable inferences from the evidence before it, identifying facts that are genuinely in dispute. To the extent Plaintiffs argue that the testimony Defendants offer should be disregarded,

138:14, 139:9–140:3, 242:17–21; Young Decl. ¶¶ 4–6; *see also* Perry Dep. 78:2–80:25 (noting that the financial situation at BSCLS was "pretty grim" by the end of 2010, and that conversations began, and evolved so that "we were looking at options for helping them close a significant budget deficit," including likely layoffs of Chandler and Irons).)  This is amply supported by contemporaneous documents, including e-mails, budget documents, and board minutes.  *Cf. Nagle*, 663 F.3d at 110 (finding that date of adverse action was date it was communicated to plaintiff because supervisor "did not testify that a decision had already been made, or even that a consensus had been reached, not to retain" plaintiff at the time he learned of the protected activity; "[a]ll [the supervisor] said was that he was leaning that way" and thus a reasonable jury could conclude that the protected activity "convinced him to follow his inclinations").  For example, Perry e-mailed Young and Staton in May of 2011 with the cost calculation for laying off Chandler, and her layoff was one of the "initial" layoffs proposed in July of 2011.  (Defs. 56.1 ¶¶ 78, 80; Pls. 56.1 ¶¶ 78, 80.)  On August 30, 2011, Plaintiffs' severance packages were calculated, and in September, some draft budgets reflected one voluntary buyout — Purdie's — and two layoffs — Plaintiffs'.  (Exs. 16–21 to Willemin Decl.)  On November 14, 2011, the Layoff Notice was sent to all staff — indicating that BSCLS had made a decision to lay off staff.  At that time, the only involuntary staff reductions reflected in the budget documents were Plaintiffs' layoffs.  (Defs. 56.1 ¶ 101; Pls. 56.1 ¶ 101.)

This uncontested documentary evidence, when combined with the deposition testimony and declarations which assert that the LSNYC and BSCLS made the decision to terminate Plaintiffs before Irons made his sexual harassment complaint, vitiate Plaintiffs' reliance on

---

there must be admissible evidence from which an opposing inference could be drawn — Plaintiffs cannot rely on speculation alone.  *See Hicks*, 593 F.3d at 166.

temporal proximity to establish causation. *See Lewis*, 562 F. App'x at 29–30 (finding plaintiff could not raise inference of retaliation when he was terminated, because protected activity occurred after plaintiff was served with a negative "draft" performance review and was informed he was at risk of being terminated, and there was "no plausible allegation" that poor performance review was itself related to alleged harassment); *Risco*, 868 F. Supp. 2d at 114 (finding temporal proximity did not support causal connection because supervisors had taken steps to terminate plaintiff, including getting approval for her termination, at least two weeks before plaintiff complained of discrimination); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 385 (S.D.N.Y. 2013) (finding plaintiff could not establish inference of retaliatory intent through temporal proximity when evidence included a memorandum dated three weeks prior to complaint showed that defendant was contemplating firing plaintiff, testimony that supervisors had discussions about terminating plaintiff prior to his complaint, and plaintiff was notified of first in a series of suspensions culminating in his termination before he sent his complaint); *Webb v. Niagara Cty.*, No. 11-CV-192, 2012 WL 5499647, at *3 (W.D.N.Y. Nov. 12, 2012) (concluding that causality element of prima facie case was not established when only evidence of causation was temporal proximity, and documentary evidence showed that challenged transfer was "suggested" and "at the very least . . . being considered" before plaintiff filed complaint (citing *Clark Cty. Sch. Dist.*, 532 U.S. at 272)). "[A]n employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct." *Russo*, 972 F. Supp. 2d at 456 (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 42 (App. Div. 2012)); *see also Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 371, 389 (E.D.N.Y. 2012) (citing same) ("The fact that [defendant's] disciplinary actions were

already in the works before the R & R and this court's opinion belies [plaintiff's] argument that [defendant] retaliated against her as a result of these judicial issuances.").  Thus, Plaintiffs cannot establish their *prima facie* case of retaliation, and their claims fail.

As discussed below, even if Plaintiffs had established a *prima facie* case, their claims would fail because Plaintiffs cannot show a genuine issue of fact as to Defendants' motive for laying them off.

### ii.    Legitimate, non-discriminatory reason

Defendants proffer several reasons for Plaintiffs' terminations, including significant budget constraints that materialized as early as the spring of 2011, morale issues among the staff that culminated in Olds' termination and pressure from the BSCLS Board and LSNYC leadership.  (Defs. Mem. 21–22.)  Defendants argue that Plaintiffs were selected for layoff because they were not unionized, because their marginal productivity did not justify the high costs of maintaining them as managers, and because they were not well-liked among Board members, and contend that Plaintiffs cannot legitimately dispute those reasons for their termination.  (*Id.* at 22; Defs. Reply Mem. 5–13.)

It is well established that organization-wide reductions in workforce due to budget constraints are a legitimate, non-discriminatory reason for discharging an employee.  *Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 548 (E.D.N.Y. 2014) ("A *bona fide* reduction in workforce is a legitimate nondiscriminatory reason for terminating an employee." (quoting *Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 234 (E.D.N.Y. 2009))); *Robles*, 987 F. Supp. 2d at 209 (same); *see, e.g., Quarless v. Brooklyn Botanic Garden Corp.*, 611 F. App'x 28, 29–30 (2d Cir. 2015) (that employer was in "financial distress and adopted cost-saving measures including an organization-wide reduction-in-force" was legitimate reason for plaintiff's

termination (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1226 (2d Cir. 1994))); *Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603, 604 (2d Cir. 2012) (finding defendant's "deteriorating financial condition [which] had resulted in layoffs and the elimination of seventeen positions" was a legitimate reason for plaintiff's termination); *Turner v. NYU Hosps. Ctr.*, 470 F. App'x 20, 22 (2d Cir. 2012) (finding that position was eliminated due to hospital-wide reduction in workforce was a legitimate reason for discharge). However, an employer still cannot select an employee for layoff based on impermissible reasons. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir. 2009), *superseded on other grounds, as recognized in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–109 (2d Cir. 2013).

Defendants allege that Plaintiffs were selected for layoffs for many reasons, "including budget constraints, job performance, and mismatch between their skills set and what was needed for the program based on the expense of their positions." (Defs. 56.1 ¶¶ 116–17.) Defendants contend that they decided to terminate Irons and Chandler around Olds' resignation in the spring of 2011, because Plaintiffs were expensive employees who added little value to BSCLS, and were not well-liked amongst the staff or the BSCLS or LSNYC Boards. Defendants contend that the staff had expressed dissatisfaction with Irons and Chandler, that Staton believed they were not as productive or efficient as they could be, and that the board was pressuring her to fire them. (Defs. 56.1 ¶¶ 77–83, 117; *see, e.g.*, Staton Dep. 124:14–125:24; 145:3–146:19, 153:18–154:8, 168:5–13; Perry Dep. 78:2–80:25; Young Decl. ¶ 4–6; E-mail from Perry to Young and Staton dated May 31, 2011 attaching "ChandlerKarenLayOff," annexed to Rice Decl. as Ex. JJ ("Here are the costs associated with a lay-off/termination of Karen Chandler"); E-mail chain between Perry and Staton in July of 2011, annexed to Rice Decl. as Ex. LL, at D003126 ("I would like to look at various scenarios: e.g. layoffs, initially Karen maybe others . . . .").).) These are

legitimate, non-discriminatory reasons for selecting Plaintiffs for layoff. Accordingly, the burden shifts back to Plaintiffs to show that these reasons were pretext for retaliation.

### iii. Pretext

Even assuming that Plaintiffs could establish a *prima facie* case of retaliation, Plaintiffs have not provided evidence to create a genuine issue of fact that but for Irons' sexual harassment complaint, they would not have been laid off. To survive summary judgment on a claim of retaliation under Title VII or the NYSHRL, Plaintiffs would have to show that retaliatory intent was the "but-for" cause of any wrongful actions — that is, "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at ---, 133 S. Ct at 2533; *Zann Kwan*, 737 F.3d at 850 (noting that Title VII retaliation claims must show "but-for" causation) (citing *Nassar*, 570 U.S. at ---, 133 S. Ct at 2533). "[A] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employers proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Richardson*, 2014 WL 4386731, at *16 (quoting *Zann Kwan*, 737 F.3d at 846); *Benussi*, 2014 WL 558984, at *10 (same). However, it is well-established that temporal proximity alone is not sufficient to satisfy a plaintiff's burden to show pretext. *See Piasecki v. Shinseki*, 555 F. App'x 88, 90 (2d Cir. 2014) (quoting *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)); *Aiossa v. Bank of Am., N.A.*, No. 10-CV-1275, 2012 WL 4344183, at *5 (E.D.N.Y. Sept. 21, 2012), *aff'd*, 538 F. App'x 8 (2d Cir. 2013).

Plaintiffs contend that the proffered reasons for their terminations are demonstrably false, they claim: that the purported "morale issues" related only to Olds and that no decision to

terminate them had been made at the March 16, 2011 BSCLS Board meeting; that Plaintiffs had

received positive performance reviews and no negative feedback; that it was "implausible"

Staton would wait nine months between March 2011 and December 2011 to terminate Plaintiffs;

and that Defendants present inconsistent testimony as to when the decision to terminate Plaintiffs

was made. (Irons Mem. 18–21; Chandler Mem. 17–20.) Irons and Chandler contend that there

is no documentary evidence that the decision to terminate them was made prior to December 2,

2011, and no documentation corroborating Defendants' allegations of widespread dissatisfaction

with their performance, pressure from the board, or early decision to terminate them. (*See* Pls.

56.1 ¶¶ 70, 116.) Plaintiffs also argue that there is contrary evidence that they performed well on

the job and that the staff did not complain about them. (Pls. 56.1 ¶¶ 132–40.) Plaintiffs further

argue that Defendants' failure to follow LSNYC policy to investigate Irons' sexual harassment

complaint shows pretext, as does the fact that the investigation was "sham" and inadequate.

(Irons Mem. 21–22; Chandler Mem. 20–21.)

### 1. Challenges to reasons for selecting Plaintiffs for layoff

Plaintiffs challenge Defendants' criticisms as to their performance and personality issues

with others in the office as post-hoc and demonstrably false. (Chandler Mem. 17–19; Irons Mem

18-20.) Plaintiffs' provide evidence of favorable reviews from Olds — though it is undisputed

that Olds was not well-liked amongst the staff and Defendants experienced severe morale issues

under his leadership — and otherwise point to a lack of documentary evidence of any alleged

performance problems or complaints about their personality. (*See* Pls. 56.1 ¶ 59; Olds Dep.

88:25–89:25; Irons Dec. 2010 Eval.; E-mail from Young dated Jan. 24, 2011, annexed to

Willemin Decl. as Ex. 15 (congratulating Irons and Chandler for exceeding goals); *see also*

Staton Dep. 237:5–24 (stating that there are no documents to reflect Plaintiffs' poor

performance); Rasmussen Dep. 56:2–24 (stating that Irons and Chandler were not hurting clients).) This argument, however, does not call into doubt the Defendants' budgetary justification for Plaintiffs' termination, or illustrate that the budget was not so dire as to warrant Plaintiffs' layoff, and is insufficient to raise a genuine dispute of fact as to whether Defendants' stated reasons are pretext for retaliation. *See Turner*, 470 F. App'x at 23–24.

The Court is mindful that it does not sit as a super-personnel department, and is not inclined to second-guess Defendants' business judgments. *See Schwarzkopf v. Sikorsky Aircraft Corp.*, 607 F. App'x 82, 82 (2d Cir. 2015). The fact that a plaintiff's purported performance issues were not well-documented may raise an inference of pretext in some situations, such as when the only explanation for a plaintiff's adverse action is poor performance. *Cf. Desir v. City of New York*, 453 F. App'x 30, 35 (2d Cir. 2011) (finding that because poor performance record was well-documented prior to termination, plaintiff could not show reasons were pretext); *Malacarne v. City Univ. of New York*, 289 F. App'x 446, 448 (2d Cir. 2008) ("In light of the multiple, contemporaneously documented, and non-discriminatory reasons for her negative evaluation, plaintiff's mere allegation that her complaint about sex discrimination [motivated her negative performance evaluation] is unavailing." (citing *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001).). However, that is not the case here. Defendants have not argued that they terminated Plaintiffs because of poor performance alone; rather, once the budget situation made it evident that layoffs were likely and budget relief necessary, BSCLS considered Plaintiffs' job performance in determining what positions they could eliminate, Plaintiffs' personality mismatch with the Board in determining who was expendable, and Plaintiffs' high salary in determining how to minimize the number of total layoffs. *See Bailey v. Vill. of Pittsford*, 981 F. Supp. 2d 178, 182 (W.D.N.Y. 2013). "Only where an employer's business decision is so implausible as to

call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 454 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014); *see also Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]he fact that an employee 'disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.'" (quoting *Grant v. Roche Diagnostics Corp.*, No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011))).

The focus at the pretext stage is not whether Defendants were correct in their perception of Plaintiffs, but rather on what *motivated* Defendants in laying Plaintiffs off — and whether, but-for Irons' sexual harassment complaint, Plaintiffs would not have been selected for layoff. *See Joseph*, 5 F. Supp. 3d at 320. Even if the Court assumes that Plaintiffs were good employees, the burden is on Plaintiffs to show some evidence that their credentials were so superior to the credentials of others that no reasonable person, exercising impartial judgment, would have laid them off. *See Turner*, 470 F. App'x at 24 ("While Turner plainly disagrees with these relative assessments, to defeat summary judgment . . . Turner had to adduce evidence that his qualifications were 'so superior' to [the replacement] that 'no reasonable person, in the exercise of impartial judgment, could have chosen [him] over the plaintiff for the job in question.'" (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001))). Plaintiffs have failed to make such a showing here. The record reflects a consistent need for layoffs, and the budget documents show that Plaintiffs — and only Plaintiffs — were

consistently considered for layoffs since as early as May 30, 2011.

Plaintiffs argue that the Defendants' witnesses provided different reasons for their termination, citing budget concerns, performance level, and discontent with Olds' "allies," which Plaintiffs argue is evidence of pretext. "[I]n order to infer pretext for a retaliatory motive from multiple justifications, a defendant's nonrealiatory justifications must be not merely different, but inconsistent with one another." *Richardson*, 2014 WL 4386731, at *16 (collecting cases); *see also Zann Kwan*, 737 F.3d at 846. As these varied explanations for Plaintiffs' selection for termination are not contradictory, this also fails to raise a question of fact as to whether Defendants would not have terminated Plaintiffs but for their retaliatory motives. *See Bailey*, 981 F. Supp. 2d at 182.

Plaintiffs further contend that Defendants were inconsistent about when the decision was made to lay Plaintiffs off. *See Shin v. ITOCHU Int'l, Inc.*, No. 97-CV-6235, 1998 WL 474198, at *6 (S.D.N.Y. Aug. 13, 1998) (finding issue of fact as to whether termination was retaliatory and reasonable juror could conclude that the explanation was pretext when defendant's testimony conflicted with document drafted after plaintiff's termination about when a final decision was made as to plaintiff's termination). In *Shin*, the plaintiff was terminated shortly after she made a complaint on June 6. *Id.* at *5. To memorialize her termination, the human resource manager sent a memorandum to Shin on June 10, which stated that the decision to terminate her was made "last week." *Id.* at *4. Other testimony stated that plaintiff's termination was "in May" or around May 13. *Id.* at *5. The Court found that these post-hoc, inconsistent reports called into question the defendants' assertion of the timing of the plaintiff's termination decision. *Id.* at *6. Here, the evidence is not entirely clear as to what constituted the "final decision" to terminate

Plaintiffs, and when that "final" decision was made.[25] However, unlike the situation in *Shin*, there is substantial documentary evidence that undisputedly reflects that Chandler's layoff was contemplated as early as May 30, 2011, and Irons' layoff as early as August 30, 2011. These documents show an ongoing need to reduce staff at BSCLS, and consistent consideration of Plaintiffs — and no others except Purdie and Son, who both eventually left BSCLS — as candidates for workforce reduction.

### 2. Challenge to investigation of sexual harassment complaint

Plaintiffs argue that BSCLS failed to follow its written policy in investigating Irons' sexual harassment complaint and instead engaged a board insider to conduct a "sham" investigation, which, Plaintiffs argue, suffices to show that Defendants' stated reason for terminating Plaintiffs was pretext. (Chandler Mem. 20–21; Irons Mem. 21–22.)

Plaintiffs' contend that BSCLS and LSNYC failed to follow the stated sexual harassment policy when investigating Irons' complaint. The Plaintiffs annex an "Addendum A to the July 1, 2009 — June 30, 2012 Collective Bargaining Agreement between the Legal Services Staff Association . . . and Legal Services NYC." (Willemin Decl. ¶ 50; LS-NYC Sexual Harassment Policy ("Policy"), annexed to Willemin Decl. as Ex. 49.) The policy provides that a formal complaint of harassment requires a member of the sexual harassment panel to notify the chair of the panel, the Project Director and the Executive Director, and provides that the complaint be

---

[25] *See, e.g.*, Rasmussen Dep. 63:22–64:5 (stating that decision was "definitive" in August, but that Staton, Perry and he agreed that Plaintiffs would be terminated earlier in the summer); Staton Dep. 136:3–12 (stating that the board had directed her to terminate Plaintiffs even before she became Acting Project director); Perry Dep. 129:18–136:4 (examining document dated October 11, 2011, indicating that Perry, Rasmussen and Staton had assumed that Purdie would accept a buyout and that Irons and Chandler would be laid off, but that the document seemed to reflect only a working set of assumptions); Young Decl. ¶¶ 4–6 (stating he had discussions with Staton about laying off Plaintiffs in April or May of 2011, and that Staton discussed it with the board in June of that year).

investigated by a three-person panel consisting of members of a sexual harassment panel. (Policy D000485–86.)  Plaintiffs contend that the Policy was not used, that Alexander took no affirmative action to respond to Irons' complaint, and the sexual harassment panel was bypassed for Hayes, a LSNYC Board Member, and that the investigation and report were not completed within the timelines required by the Policy.  (Pls. 56.1 ¶ 116; Chandler Mem. 5; Irons Mem. 6.) *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (noting that a departure from established procedures can raise a question of improper motivation).

Alexander testified that she did not follow the policy and convene the sexual harassment panel because the panel had not met in over a year, and she believed that the director of HR could better direct Chandler.  (Pls. 56.1 ¶ 158; Alexander Dep. 36:9–38:5.)  Gilbert instructed Alexander that HR would handle the complaint, (Alexander Dep. 40:4–8), and Rasmussen testified that using the panel was not even considered because the allegations concerned a manager and "we wanted to quickly engage an expert in conducting an investigation" into the complaint, (Rasmussen Dep. 134:5–135:25).  Gilbert was told that the reason for engaging Hayes was that the complaint was against a Project Director.  (Defs. 56.1 ¶ 164; Pls. 56.1 ¶ 164.)

As discussed above, these facts do not present a situation where the failure to follow LSNYC's sexual harassment policy ultimately led to adverse findings against Plaintiffs which resulted in Plaintiffs' termination.  *Cf. Gallo*, 22 F.3d at 1227 (finding issue of fact as to pretext when employee discharged as part of reduction-in-force was not rehired pursuant to personnel policy to rehire employees discharged as part of staff reduction); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 514–15 (S.D.N.Y. 2010) (noting plaintiff claimed that procedures used to investigate complaint *against him*, which in part led to his termination, were a sham); *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 213 (N.D.N.Y. 2002) (finding issue of fact

precluded summary judgment when defendant's stated reason for termination was violation of alcohol policy, which required mandatory termination, but plaintiff was not terminated until after she made a sexual harassment complaint). Rather, Plaintiffs' termination was announced to the Project Directors on November 18, 2011, before Irons even reported his complaint to HR. Focusing on the relevant inquiry, whether there is an issue of fact as to whether Defendants would have terminated Plaintiffs *but for* Irons' sexual harassment complaint, the use or non-use of a process that started *after* Plaintiffs' termination was announced, to investigate *Staton* — not Plaintiffs — simply does not further the pretext inquiry. *See Saenger*, 706 F. Supp. 2d at 509 ("The Court must ask whether anything about [the plaintiffs'] termination 'undermines the credibility of [the defendants'] stated justification.'" (quoting *Byrnie*, 243 F.3d at 103)). The Court grants Defendants' motion for summary judgment on Plaintiffs' retaliation claim.

> e. **Staton's personal liability under the NYSHRL**

Plaintiffs allege that Staton is responsible under the NYSHRL for aiding and abetting the alleged discrimination, hostile work environment and retaliation. Because Plaintiffs have not established BSCLS's or LSNYC's liability with respect to the claims of discrimination, hostile work environment, or retaliation under the NYSHRL, Plaintiffs cannot establish Staton's individual liability for these claims on an aiding and abetting theory, because liability as an aider and abettor under section 296(6) can only attach when liability has been established as to the employer or another individual. *See Benson v. Otis Elevator Co.*, 557 F. App'x 74, 77 (2d Cir. 2014) (dismissing aiding and abetting claims because plaintiff failed to raise a genuine factual dispute with respect to claims for primary violations (citing *Strauss v. N.Y. State Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (App. Div. 2005))); *Redd*, 923 F. Supp. 2d at 392 ("Under New York law, 'liability must first be established as to the employer/principal before accessorial liability

can be found as to an alleged aider and abettor.'" (quoting *DeWitt v. Lieberman,* 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999))); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 688 (S.D.N.Y. 2012) ("'[L]iability under the [NYS]HRL . . . must first be established as to the employer/ principal before an individual may be considered an aider and abettor.'" (quoting *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999))); *see also Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 513 (App. Div. 2014) ("Since it is alleged that [defendant's] own actions give rise to the discrimination claim, he cannot also be held liable for aiding and abetting.").

###### f. **Plaintiffs' NYCHRL claims**

Because the Court grants Defendants' summary judgment and dismisses all of Plaintiffs' federal claims in addition to Plaintiffs' parallel state law claims, the Court declines to exercise jurisdiction over Plaintiffs' remaining claims, brought pursuant to the New York City Administrative Code. *See* 28 U.S.C. § 1367(c)(3) ("District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction.") "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp.*, 712 F.3d at 727 (citations and internal quotation marks omitted); *see also One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims."). The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims alleging violations of the NYCHRL. Plaintiffs' NYCHRL claims are therefore dismissed without prejudice.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiffs' Title VII and NYSHRL claims, and declines to exercise supplemental jurisdiction over Plaintiffs' NYCHRL claims.  The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 28, 2015
      Brooklyn, New York